## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - x
                           :

| | |
|---|---|
| In re: | Chapter 11 |
| DELTA PETROLEUM, <u>et al.</u>, | Case No. 11-14006 (KJC) |
| Debtors. | Jointly Administered |

- - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| DELTA PETROLEUM GENERAL RECOVERY TRUST, and PAR PETROLEUM CORPORATION, | |
| Plaintiffs, | Adv. Pro No. 12-50877 (KJC) |
| v. | |
| ALERON LARSON, JR., | |
| Defendant, Counterclaimant. | |

- - - - - - - - - - - - - - - - - - - - - - x

### ALERON LARSON JR.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 AND FED. R. BANKR. P. 7056 (Adv. D.I. 34)

BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP

Raymond H. Lemisch (No. 4204)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010

JONES & KELLER, P.C.

Barry L. Wilkie (Colo. Bar No. 10751)
Stuart N. Bennett (Colo. Bar No. 5682)
1999 Broadway, Suite 3150
Denver, CO 80202
(303) 573-1600

*Counsel to Aleron Larson, Jr.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ...................................................................... 1

NATURE AND STAGE OF PROCEEDINGS .................................................. 3

SUMMARY OF ARGUMENT ........................................................................ 3

STATEMENT OF FACTS .............................................................................. 4

ARGUMENT ................................................................................................. 10

    I.   The 1999 ORRI is a real property interest and is not avoidable........................... 10

        A.  The 1999 ORRI is a real property interest.................................................... 11

        B.  Plaintiffs are judicially estopped from claiming the 1999 ORRI is anything but a real property interest. ................................................. 14

        C.  The 1999 ORRI is not avoidable because the transfer was not a transfer that could have been perfected against a bona fide purchaser under applicable law. ................................................................... 16

    II.  Even if the Court determines the ORRI is a personal property interest, the confirmation of the Plan did not strip Larson of his interest because Larson had no claim at the time of confirmation............................................................. 18

        A.  Movants cite inapplicable caselaw in arguing that Larson had a "claim" which was "extinguished." ........................................................... 22

    III.  The Motion should be denied as to the alleged "excess" payments. ..................... 23

        A.  Summary judgment as to the allegedly "excess" payments is not appropriate at this time as demonstrated by Larson's 56(d) Motion ............. 24

        B.  The alleged "excess" payments neither constitute unjust enrichment, nor do they constitute fraudulent transfers, nor are they avoidable under the Bankruptcy Code .......................................................... 24

        C.  The existence of disputed issues of material fact concerning BWAB's affirmative defenses compels the denial of the Motion............................... 26

    IV.  The Motion should be denied because the Bullock Declaration upon which it relies lacks foundation......................................................................... 27

CONCLUSION............................................................................................. 29

# TABLE OF AUTHORITIES

## CASES

*Akmakjian v. Haider*, 2008 WL 484335 (Cal. App. 4th Feb. 25, 2008) ........................ 12

*Austin v. Hallmark Oil Co.*, 134 P2d 777 (Cal. 1943) ................................................. 11

*Bothin v. The California Title Ins. Co.*, 96 P. 500 (Cal. 1908) .................................... 17

*Butner v. United States*, 440 U.S. 48 (1979) ............................................................... 11

*Far W. Sav. & Loan Assn. v. McLaughlin*, 246 Cal. Rptr. 872 (Cal. App. 1988) ........................ 17

*Gillan v. Stansbury*, 217 P2d 1016 (Cal. App. 1950) .................................................. 11

*Harris v. 25 Hill Properties, Inc.*, 2007 WL 2774483 (Cal. Ct. App. Sep. 25, 2007) ................... 11

*Honolulu Oil Corp. v. Kennedy*, 251 F.2d 424 (9th Cir. 1957) ...................................... 11

*In re Am. Home Mortg. Holding*, 458 B.R. 161 (Bankr. D. Del. 2011) ........................... 26

*In re Am. Remanufacturers, Inc.*, 2010 WL 1027803 (Bankr. D. Del. Mar. 19, 2010) ................ 28

*In re Bake-Line Group, LLC*, 359 B.R. 556 (Bankr. D. Del. 2007) ................................. 18

*In re Bridge*, 18 F.3d 195 (3d Cir. 1994) .................................................................. 16

*In re Colonial Ctr., Inc.*, 156 B.R. 452 (Bankr. E.D. Pa. 1993) .................................... 19

*In re Day*, 443 B.R. 338 (Bankr. D.N.J. 2011) .......................................................... 16

*In re Dean*, 317 B.R. 482 (Bankr. W.D. Pa. 2004) ..................................................... 22

*In re Dyckman*, 2012 WL 1302613 (Bankr. M.D. Pa. Apr. 16, 2012) ............................. 19

*In re Exide Technologies*, 2013 WL 85193 (Bankr. D. Del. Jan. 8, 2013) ................. 15, 19, 20, 21

*In re Granati*, 307 B.R. 827 (E.D.Va. 2002) ........................................................ 19, 22

*In re Hathaway Ranch P'ship*, 127 B.R. 859 (Bankr. C.D. Cal. 1990) ......................... 17

*In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461 (Bankr. D. Del. 2006) .......................... 25

*In re Hurst*, 27 B.R. 740 (Bankr. E.D. Tenn. 1983) .................................................. 16

*In re Investment Sales Diversified, Inc.*, 38 B.R. 446 (Bankr. D. Minn. 1984) ................ 17

*In re Network Access Solutions, Corp.*, 330 B.R. 67 (Bankr. D. Del. 2005) ................... 26

*In re Nielsen*, 1998 WL 3379 (Bankr. D. Minn. Jan. 7, 1998) ..................................................... 18

*In re Reynolds*, 470 B.R. 138 (Bankr. D. Colo. 2012) ................................................................... 15

*In re Safety-Kleen Corp.*, 410 B.R. 164 (Bankr. D. Del. 2009) .................................................... 13

*In re Texaco Inc.*, 254 B.R. 536 (Bankr. S.D.N.Y. 2000) ............................................................. 19

*In re Yepremian*, 116 F.3d 1295 (9th Cir. 1997) .......................................................................... 17

*Kabayan v. Yepremian*, 190 B.R. 389 (C.D. Cal. 1995) ............................................................... 17

*Kudokas v. Balkus*, 26 Cal. App. 3d 744 (Cal. Ct. App. 1972) .................................................... 12

*La Laguna Ranch Co. v. Dodge*, 114 P.2d 351 (Cal. 1941) ......................................................... 11

*Leeds LP v. U.S.*, 2010 WL 3070349 (S.D. Cal., Aug. 5, 2010) ............................................ 12, 13

*Martin v. Kehl*, 145 Cal. App. 3d 228 (Cal. App. 2d 1983).......................................................... 12

*Martinez v. Barrios*, 2009 WL 3402314 (Cal. App. 2d Oct. 23, 2009) ........................................ 12

*Missouri Breaks, LLC v. Burns*, 791 N.W. 2d 33 (N.D. 2010)............................................... 22, 23

*Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773 (3d Cir. 2001).... 15

*Moore v. Tristar Oil & Gas Corp.*, 528 F. Supp. 296 (S.D.N.Y. 1981) ....................................... 11

*Riley v. McDonald*, 2009 WL 1478918 (Cal. App. 6th May 26, 2009)......................................... 12

## STATUTES

11 U.S.C. § 101................................................................................................................................ 19

11 U.S.C. § 363................................................................................................................................ 26

11 U.S.C. § 503................................................................................................................................ 25

11 U.S.C. § 507................................................................................................................................ 25

11 U.S.C. § 544................................................................................................................................ 16

11 U.S.C. § 549................................................................................................................................ 25

11 U.S.C. § 726................................................................................................................................ 25

43 U.S.C. § 1333.............................................................................................................................. 11

Cal. Civ. Code § 19.......................................................................................................................... 17

7571225 v1

**OTHER AUTHORITIES**

56 A.L.R.4th 539 (Originally published in 1987)..........................................................................11

Aleron Larson, Jr., ("Larson") by and through his attorneys, submit this Response in Opposition to Plaintiffs' Motion for Summary Judgment ("Motion") and Incorporated Memorandum of Law in Opposition Thereto.

### PRELIMINARY STATEMENT

In this case, the Plaintiffs seek to extinguish an overriding royalty that Larson has owned since 1999 (the "1999 ORRI") which was granted to Larson by the Debtor, Delta Petroleum Corporation ("Delta"). The 1999 ORRI covers various oil and gas properties off the coast of Santa Barbara, California, including certain oil and gas leases that later became known as the Point Arguello Unit. For the past 13 years the 1999 ORRI has been paid timely and without objection.

In 1994, BWAB Limited Liability Company's ("BWAB") affiliate, BWAB Incorporated, acquired an option to purchase a large number of properties from Union Pacific Resources Corp., including the Point Arguello properties and adjacent Rocky Point properties. The option to purchase was later assigned to the Whiting Petroleum Corporation ("Whiting"). These transactions took place five years before Delta acquired any interest in the Point Arguello Properties. The properties were unitized in 1996 pursuant to the October 1, 1996 Point Arguello Unit Agreement and the Point Arguello Operating Agreement.

Throughout its bankruptcy Delta referred to its interest in the Point Arguello Unit as a real property interest. For the first time after the confirmation of Delta's bankruptcy plan ("Plan"), the Reorganized Debtor, not Delta, asserted in this lawsuit that the 1999 ORRI was not a real property interest but was instead only a prepetition contractual right to payment that was extinguished by the Plan. Larson had no notice of any kind during

the bankruptcy that Delta disputed his entitlement to the 1999 ORRI or Delta's ongoing obligation to pay the 1999 ORRI from oil production revenues it received from Whiting as Whiting's nominee.

The Reorganized Debtors seek to convert the 1999 ORRI. Delta assigned the 1999 ORRI to Larson as consideration for his personal guarantee of a loan of $2,000,000 to Delta for the purpose of acquiring the Point Arguello Properties from Whiting. Without this personal guarantee, Delta would not have been able to purchase the Point Arguello Properties.

Delta acquired all of Whiting's beneficial interest in the Point Arguello Unit, but was unable to acquire bare legal title because other working interest owners objected. After Whiting conveyed to Delta its beneficial interest (called a "Net Operating Interest" or "NOI"), Whiting received monthly revenues from production of the Point Arguello Unit and transmitted them to Delta. From 1999 until September 2012, Delta timely distributed to Larson the revenues owned by Larson, per the 1999 ORRI, which Delta received on Larson's behalf. Even during Delta's bankruptcy, it continued to deliver Larson's share of the revenues as they were received from Whiting in the ordinary course of business. At no time during its bankruptcy did Delta notify Larson that it disputed Larson's ownership or entitlement to the 1999 ORRI or the share of production attributable thereto.

Only after confirmation of the Plan did the Reorganized Debtors, again not Delta, claim for the first time in this law suit that the 1999 ORRI was either extinguished by the Plan or that it could be avoided under the bankruptcy code. There is, however, no legal or factual basis for extinguishing or avoiding Larson's ownership of the 1999 ORRI.

## NATURE AND STAGE OF PROCEEDINGS

Larson largely agrees with Plaintiffs' description of the nature and stage of the proceedings, and supplements that description by noting that in addition to this Response, Larson is contemporaneously filing a Motion to Permit Discovery Pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(d) Prior to Decision Regarding Plaintiffs' Motion for Summary Judgment ("56(d) Motion").

Larson does not, however, agree with Plaintiffs' declaration that "there are no disputed material facts." Motion at 3. As set forth below, disputed material facts exist in this case which prevent summary judgment in favor of Plaintiffs.

## SUMMARY OF ARGUMENT

1.      The 1999 ORRI is a real property interest, as is Delta's NOI and Plaintiffs are estopped to deny otherwise. The NOI is not a perfected real property interest because it was not recorded. There is no basis to avoid the 1999 ORRI under Section 544(a)(3) of the Code. Delta's NOI in the Point Arguello Unit was, itself, not perfected by recording, nor was its predecessor's interest, from whom Delta received its NOI, and any effort to record the 1999 ORRI would have merely been a wild deed, outside of the chain of title. Recording the 1999 ORRI would therefore not have perfected it against a hypothetical *bona fide* purchaser which is a prerequisite to avoidance under Section 544(a)(3).

2.      The Plaintiffs argue that the 1999 ORRI was nothing more than a contractual right to payment and as such was a prepetition unsecured claim that was extinguished upon confirmation of the Plan. Even if construed as a personal property interest, the 1999 ORRI was still a conveyance of property and is still Larson's separate property. Characterizing the interest as personal does not change the property interest

into a contractual interest to which Delta is a party. The interest was not part of Delta's assets and could not have been extinguished by its Plan. Moreover, Delta paid Larson timely all funds owned by Larson, and therefore due to Larson under the 1999 ORRI from the monies it received from Whiting until after confirmation of the Plan so at no time, either pre- or post-petition, did Larson have a claim in the chapter 11 case.

3.      Finally, with respect to the 1999 ORRI, Delta was obligated to pay the production revenues earned by the overriding royalty to Larson, having previously conveyed such property to Larson and Delta has no basis to avoid Larson's interest or convert Larson's funds to its own. Moreover, as to the 1999 ORRI, the Debtor sought and obtained court approval to make such payments post-petition and such payments were made in the ordinary course of business.

## STATEMENT OF FACTS

1.      In 1994, BWAB's affiliate BWAB Incorporated acquired an option to purchase a large number of properties from Union Pacific Resources Corporation, including properties that are known as the Point Arguello Properties. Declaration of Steven Roitman ("Roitman Dec."), attached as Exhibit A, at ¶ 7.

2.      The Point Arguello Properties are the oil and gas properties described in Exhibit 1 to the Roitman Dec. *See* Roitman Dec. at ¶ 6

3.      Steven Roitman has been a managing member of BWAB since its inception in 1994. Roitman Dec. at ¶ 1. Steven Roitman has also been a 50% co-owner and the Secretary-Treasurer of BWAB Incorporated since September 15, 1992.

4.      BWAB Incorporated later assigned the option to purchase the Point Arguello Properties to Whiting pursuant to a letter agreement dated July 28, 1994,

between Whiting and BWAB Incorporated ("Whiting Letter Agreement"). Roitman Dec. at ¶ 7; *id.* at Ex. 2.

5.    Whiting exercised the option and acquired the Point Arguello Properties on or about December 16, 1994, pursuant to the Whiting Letter Agreement. Roitman Dec. at ¶ 11.

6.    Both Whiting's interest and BWAB's 1994 ORRI in the Point Arguello Properties were earned or purchased five years before Delta ever had any kind of ownership interest. *See* Roitman Dec. at ¶ 11; *id.* at Exs. 3-4.

7.    During the fall of 1996, some or all of the leases comprising the Point Arguello Property were unitized into the Point Arguello Unit, pursuant to a Unit Agreement dated effective October 1, 1996, between Whiting and a number of other working interest owners ("Unit Agreement"). A unit agreement is an agreement among the owners of several oil and gas leases to operate and produce those leases as one unit. Only owners of oil and gas leases are parties to such unit agreements. Roitman Dec. at ¶ 15; *id.* at Ex. 1.

8.    During the latter half of 1999, pursuant to the Purchase Agreement and Amendment, Delta attempted to acquire Whiting's ownership interest in the Point Arguello Properties. Roitman Dec. at ¶ 18; Declaration of Aleron H. Larson ("Larson Dec.") attached as Exhibit B, at ¶ 8.

9.    If successfully closed, the transaction as initially contemplated by Delta, Whiting and BWAB, would have resulted in Delta's acquisition of all of Whiting's legal and beneficial interest in the Point Arguello Properties. *See* Roitman Dec. at ¶ 20; Larson Dec. at ¶ 10.

10.     Whiting was unable, however, to obtain the consents of the other working interest owners in the Point Arguello Properties to the transfer of all of Whiting's interest in the property because of concerns that Delta did not have the financial strength necessary to fulfill Whiting's working interest obligations, particularly those relating to plugging and abandonment of the offshore wells and platforms.  The other working interest owners had no objection, however, if Whiting conveyed to Delta all of its ownership in the Point Arguello Properties, except for legal title. *See* Roitman Dec. at ¶ 21; Larson Dec. at ¶ 11.

11.     As part of the Purchase Agreement and Amendment transaction, Delta was required to make a $1,000,000 earnest money deposit.  Because Delta did not have access to such funds, Larson loaned the money to Delta.  Larson Dec. at ¶ 15.  In addition, the Purchase Agreement and Amendment required that Delta make a $2,000,000 installment payment on August 2, 1999.  *Id.*  Delta did not have such funds when the installment payment was due and was unable to borrow such funds without Larson's personal guarantee of its loan.  *Id.*

12.     Larson provided that personal guarantee of Delta's loan.  Larson Dec. at ¶ 15.  Larson provided that personal guaranty at great personal risk to himself.  *Id.*  Had Larson not provided that guaranty, Delta would have lost its $1,000,000 earnest money deposit.  *Id.*  Larson's personal guaranty enabled Delta to get one step closer to the Purchase of the Point Arguello Properties.

13.     As a result, Whiting and Delta's transaction eventually closed in December of 1999, when Whiting executed and delivered to Delta a Conveyance and Assignment dated December 1, 1999, pursuant to which Whiting conveyed what was

6

labeled a Net Operating Interest in the Point Arguello Properties to Delta (the "1999

Delta NOI"), including Whiting's interest in the Unit Agreement dated effective

October 1, 1996 ("Point Arguello Unit Agreement") and the Unit Operating Agreement

dated October 1, 1996 ("Point Arguello Unit Operating Agreement"), as described

therein.  Roitman Dec. at ¶ 22; *id.* at Ex. 7; Larson Dec. at ¶ 12.  The 1999 Delta NOI

states in part: "Whiting Petroleum Corporation . . . does hereby grant, convey, transfer

and assign to Delta Petroleum Corporation . . . a net operating interest (as herein defined)

in, to and under the following: . . . " *Id.* at Ex. 7, pp. 1-2.

14.    As part of the closing of the Purchase Agreement and Amendment, Delta

executed and delivered the 1999 ORRI to Larson as consideration for his personal

guaranty.  Larson Dec. at ¶ 15.

15.    The term Net Operating Interest is defined in the 1999 Delta NOI as the

following:

> g. . . . The net operating interest ("NOI") herein conveyed and assigned is defined
> as the monthly payable positive or negative cash flow resulting to the Interests
> from the following eight step calculation:
>
> (i)    oil and gas sales revenue:
>
> (ii)    **less** royalties and **overriding royalties**:
>
> (iii)    Less Unit lease operating expenses;
>
> (iv)    less severance, production or ad valorem taxes, if any;
>
> (v)    less capital expenditures;
>
> (vi)    less Unit fees to the Unit operator; and
>
> (vii)    plus the positive or less the negative cash flow from the
> Partnerships.
>
> (viii)    plus or minus any other miscellaneous costs or revenues that may
> be related to these interests or operations . . . .

7

**In the event of positive cash flow, Assignor will pay the excess to Assignee; in the event of a negative cash flow, Assignee will pay the deficit to Assignor.**

Roitman Dec. at Ex. 7, pp. 2-3 (emphasis added).

16.      The parties' intended and the definition of Net Operating Interest makes clear that Whiting retained bare legal title to the Point Arguello Properties but conveyed all of its beneficial interest to Delta except for previously granted royalties and overriding royalties owed to third parties.  Roitman Dec. at ¶ 23; Larson Dec. at ¶ 13.

17.      When Delta acquired the 1999 Delta NOI, it agreed with Whiting that it would not record such document in any county recording office because of Whiting's concern that its other working interest owners would consider such action as a conveyance of legal title in violation of its agreements with them.  Roitman Dec. at ¶ 25; Larson Dec. at ¶ 18.  As of February 14, 2013, the 1999 Delta NOI had not been recorded in the public records of the Santa Barbara County, California Recorder's Office. Declaration of Fred Gayner Rappleye ("Rappleye Dec.") attached hereto as Exhibit C, at ¶ 3.  There is also no evidence that Whiting had recorded its ownership interest in the Point Arguello Properties, either before or after, it conveyed the NOI to Delta.  *Id.*

18.      Similarly, Larson did not record or file the 1999 ORRI for the same reason that Delta did not record the 1999 Delta NOI in any county recording or filing office. Larson Dec. at ¶ 19.  Whiting was notified and made aware of Delta's delivery of the 1999 ORRI and conveyance of part of its newly acquired interest in the Point Arguello Properties to Larson.  *Id.*

19.      Subsequent to Whiting's conveyance of the 1999 Delta NOI to Delta, Whiting acted on behalf of Delta as its nominee and agent as to operations under the Point Arguello Unit Agreement and Point Arguello Operating Agreement for the Point

8

Arguello Properties, including whether to participate or not participate in the drilling of wells in the Point Arguello Unit.  Delta would make the decisions, would instruct Whiting to implement such decisions, and Whiting would do so.  Larson Dec. at ¶ 14; *id.* at Ex. 2, p. 24, fourth paragraph.

20.     Following Delta's acquisition of its interest in the Point Arguello Properties, Whiting distributed to Delta for distribution to Larson monthly revenues owned by Larson pursuant to his 1999 ORRI in the ordinary course of business.  Delta in turn timely distributed such revenues to Larson until September of 2012.  Larson Dec. at ¶ 20.  Even after Delta filed bankruptcy on December 16, 2011, Delta continued to deliver such revenues to Larson in the ordinary course of business when they were received from Whiting.  *Id.* at ¶ 21.

21.     Seth Bullock, whose Declaration Plaintiffs have offered in support of the Motion, began consulting with Delta in November 2011, but did not become an officer of Delta or PAR Petroleum Corporation ("PAR") until July 2012.  *See* Declaration of Seth Bullock ("Bullock Dec.") at ¶ 1, attached to the Motion.

22.     During its bankruptcy proceedings, Delta repeatedly referred to its interests in the Point Arguello Properties as interests in real property on its Bankruptcy Schedule A.  *See, e.g.*, D.I. 140 at 9; *id.* at 112; D.I. 402 at 106; D.I. 492 at 11.

23.     Delta did not at any time include its NOI among the executory contracts described in its Bankruptcy Schedule G, nor did it ever request court authorization to assume the NOI.  *See* D.I. 140 at 279; D.I. 417 at 5; D.I. 492 at 214; D.I. 714; D.I. 891.

24.     However, Delta repeatedly and frequently referred to the Point Arguello Unit Agreement and Point Arguello Unit Operating Agreement as executory contracts to

7571225 v1

which it was a party on its Bankruptcy Schedule G, and in its motions to assume

executory contracts.  *See* D.I. 140 at 289-90, 308, 316-17, 330-31, and 338; D.I. 417 at

19, 38, 45-47, 60, 61, and 66; D.I. 492 at 225, 244, 251-53, 266-67, and 274; D.I. 714 at

7, 16, 21, 29-30, and 32; D.I. 891 at 33-34.  At no time prior to the latter part of

September of 2012 did Delta or Plaintiffs ever provide notice to Larson that they disputed

the 1999 ORRI or any amounts earned or previously paid pursuant thereto.  *See* Larson

Dec. at ¶ 27.

25.     Larson did not have any claim whatsoever against Delta, pre-petition or

post-petition, as of August 31, 2012.  The last payment of production revenues by Delta

to Larson was a check dated August 21, 2012 and received on August 27, 2012.  Larson

Dec. at ¶ 24.

26.     At no time did Larson participate in Delta's bankruptcy proceeding prior

to being sued in this lawsuit.  Larson Dec. at ¶ 29.

27.     On January 16, 2013, Plaintiffs served their initial disclosures pursuant to

Fed. R. Civ. P. 26(a)(1).

28.     On March 11, 2013, Larson propounded discovery requests to Plaintiffs.

*See* Declaration of Barry L. Wilkie ("Wilkie Dec."), attached to Larson's 56(d) Motion as

Exhibit A thereto, at ¶ 18.  Along with those discovery requests, Larson indicated that it

sought the depositions of Seth Bullock, Plaintiffs and Whiting following Larson's receipt

of responses to those requests.  Wilkie Dec. at ¶ 19.

## ARGUMENT

**I.      The 1999 ORRI is a real property interest and is not avoidable.**

Movants correctly assert that California law governs real property interests and

the perfection of such interests in this case.  Motion at 12-14; *see also Butner v. United*

*States*, 440 U.S. 48, 55 (1979) (a)(2)(A). Application of California law and the doctrine of judicial estoppel lead to the conclusion that the 1999 ORRI is a real property interest that is not avoidable.

### A.    The 1999 ORRI is a real property interest.

The leading California case interpreting the nature of overriding royalty interests concluded that "the purpose and scope of all such royalty interests are so similar" to "the right to receive future rents from real property" that "overriding royalties [are], therefore, interests in real property." *La Laguna Ranch Co. v. Dodge*, 114 P.2d 351 (Cal. 1941).[1]

Movants acknowledge, as they must, that the 1999 ORRI, by its plain language, conveyed an "overriding royalty interest[.]" Motion at 6. Movants also correctly state that overriding royalty interests are "a real property interest[.]" Motion at 14.

Now, however, Movants argue precisely the opposite: "[Delta] did not[] convey [a real property interest] to Larson under the 1999 Agreement." Motion at 10. This argument makes a fundamental error at the outset—it is premised on the assertion that merely because Whiting may not have conveyed title to the Point Arguello leases, Delta did not have an ownership interest in real property. There is certainly nothing to prevent

---

[1] *See also Harris v. 25 Hill Properties, Inc.*, 2007 WL 2774483 (Cal. Ct. App. Sept. 25, 2007) (unpublished) ("overriding royalty interests created by an operating lessee for the duration of a specific oil and gas lease are interests in real property"); *Moore v. Tristar Oil & Gas Corp.*, 528 F. Supp. 296, 309 (S.D.N.Y. 1981) ("under California law, both an overriding royalty and a working interest are interests in real property"); *Honolulu Oil Corp. v. Kennedy*, 251 F.2d 424, 429 (9th Cir. 1957) ("The decisions of California courts establish that a stipulation that there be an overriding royalty, consisting of a share of the produce in kind, does create an interest in real property."). This conclusion, at least as to <u>future/unaccrued</u> royalties, is supported by secondary sources as well. 56 A.L.R.4th 539 (Originally published in 1987) ("unaccrued royalties, pertaining to future production of minerals, are real property interests"; *citing*, at §26[a], *Austin v. Hallmark Oil Co.*, 134 P2d 777 (Cal. 1943); *Gillan v. Stansbury*, 217 P2d 1016 (Cal. App. 1950)). Situations relevant to this case where overriding royalty interests are held to be personal property interests appear limited to claims to <u>previously-accrued</u> royalties. *See* 56 A.L.R.4th 539 at §§ 26[b]-27 and 28[b].

two parties from simultaneously having interests in the same real property.[2]  For instance, as here, Whiting conveyed equitable ownership in the Point Arguello leases to Delta without conveying legal title.  *Leeds LP v. U.S.*, 2010 WL 3070349 at *4 (S.D. Cal., August 5, 2010) ("'A nominee is one who holds bare legal title to property for the benefit of another.'") (citations omitted); *Martin v. Kehl*, 145 Cal. App. 3d 228, 238 (Cal. App. 2d 1983) ("a resulting trust arises . . . where the purchase price, or a part thereof, is paid by one person and the title is taken in the name of another") (citations omitted).  It is also clear from the language of the 1999 Delta NOI that Whiting conveyed all of its ownership interest in the Point Arguello Properties except title.  *See* Bullock Dec. at Ex. D.[3]  That Delta did not have record title did not prevent it from conveying an interest in such real property to Larson.

Indeed, the plain language of the 1999 ORRI supports the conclusion that it is an interest in real property.  Larson Dec. at Ex. 3 (conveyance of overriding royalty interest "in and to the oil and gas leases and lands . . . which shall burden all the oil, gas and other leased minerals produced, saved and sold from or allocated to the lands covered by said Leases").  The actions of the parties support the conclusion that the 1999 ORRI is an interest in real property.  Roitman Dec. at ¶ 28; Larson Dec. at ¶ 21.  Delta's assertion that Whiting held the Point Arguello Properties as Delta's "nominee" (*see, e.g.,* Larson

---

[2] *See Martinez v. Barrios*, 2009 WL 3402314 at *7 (Cal. App. 2d Oct. 23, 2009) (unpublished) (discussing a debtor's failure to disclose "the equitable ownership of [real] property"); *Akmakjian v. Haider*, 2008 WL 484335 at *4 (Cal. App. 4th Feb. 25, 2008) (unpublished) (noting that "equitable ownership of the property… may differ substantially from the title as reflected in the official records"); *Riley v. McDonald*, 2009 WL 1478918 at *15 (Cal. App. 6th May 26, 2009) (unpublished) (discussing a vendee's "'equitable ownership of the property,'" quoting *Kudokas v. Balkus*, 26 Cal. App. 3d 744, 757 (Cal. Ct. App. 1972)).

[3] Stating, *inter alia*, that "[Whiting]…hereby grant[s], convey[s], transfer[s] and assign[s] to [Delta]…a net operating interest…to and under the [Leases, interests in the Lands, the Wells, the Units]", and Equipment, licenses, permits, contracts, agreements, instruments, payments, and rights to receive payments incident to same.

Dec. at ¶ 14; *id.* at Ex. 2, p. 24) supports the conclusion that the 1999 ORRI is an interest in real property. *Leeds LP*, 2010 WL 3070349 at *4. The fact that Delta made all decisions as to the conduct of operations of the Point Arguello Properties demonstrates property ownership. Larson Dec. at ¶ 14. Delta's inclusion of its interest in Point Arguello as an interest in real property in its Bankruptcy Schedules reflects that it was an interest in real property.

If not an interest in real property, Delta's 1999 NOI can be only one other thing: an executory contract. An executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *In re Safety-Kleen Corp.*, 410 B.R. 164, 167 (Bankr. D. Del. 2009) (citation and quotation marks omitted). If in fact the 1999 NOI is not an interest in real property as Plaintiffs claim, it appears to be an executory contract as it in fact required continuing performance—failure of which by either party would constitute material breach—by both Whiting and Delta. *See* Roitman Dec. at Ex. 7, 2-3 ("In the event of positive cash flow, Assignor will pay the excess to Assignee; in the event of a negative cash flow, Assignee will pay the deficit to Assignor.").

If Plaintiffs now claim that the 1999 NOI was in fact not a real property interest, but an executory contract, it has been rejected because Delta did not assume it in its bankruptcy proceedings. *See* D.I. 714 at 7, 16, 21, 29, 30, and 32 (Unit Agreements to be assumed, but no assumption of the 1999 NOI); D.I. 891 (no assumption of 1999 NOI); D.I. 896 (notice of rejection of any executory contracts not listed); D.I. 918 (order authorizing assumption of executory contracts does not include 1999 NOI). Plaintiffs do

not appear to be arguing that the 1999 NOI has been rejected as an executory contract which was not assumed, as indeed such rejection would severely harm the bankruptcy estate.

Rather than twist the plain language of the relevant real property conveyances beyond recognition and reach the conclusion that the 1999 NOI was an executory contract which has been rejected—which none of the parties are arguing—the Court should reach the more reasonable conclusion that the 1999 NOI was in fact an interest in real property. Indeed, at no point in Delta's bankruptcy proceedings did it declare the 1999 NOI to be a contract, executory or otherwise. *See* § I.B., *infra*; Roitman Dec. at 28. In fact, Delta claimed quite the opposite, repeatedly stating the 1999 NOI was an interest in real property. Delta is bound by those statements.

**B.    Plaintiffs are judicially estopped from claiming the 1999 ORRI is anything but a real property interest.**

Repeatedly and throughout Delta's bankruptcy, Delta referred to its interests in the Point Arguello Leases as real property interests. *See, e.g.*, D.I. 140 at 9 (Schedule A—Real Property, listing Point Arguello Gross Working Interest of 6.07% of Net Revenue Interest conveyed by 1999 NOI); D.I. 140 at 112 (Schedule A—Real Property, listing Point Arguello prospect). By contrast, Delta did not refer to its interests in the Point Arguello Leases as personal property or executory contracts. *See, e.g.*, D.I. 140 at 151-54 (Schedule B—Personal Property, making no mention of 1999 NOI); D.I. 140 at 279 (Schedule G—Executory Contracts and Unexpired Leases, making no mention of the 1999 NOI). Movants are judicially estopped from claiming that Delta's interests in the leases comprising the Point Arguello Unit—from which the 1999 ORRI was carved—are anything except real property interests.

The Third Circuit Court of Appeals applies the doctrine of judicial estoppel in the
following circumstances:

> (1) the party estopped must have taken two positions that are
> irreconcilably inconsistent, (2) the party changed his or her position in
> bad faith, i.e., with intent to play fast and loose with the court, and
> (3) the judicial estoppel sanction is tailored to address the harm
> identified and no lesser sanction would adequately remedy the damage
> done by the litigant's misconduct.

*In re Exide Technologies*, 2013 WL 85193 (Bankr. D. Del. Jan. 8, 2013) (*citing Montrose
Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779-80 (3rd Cir.
2001)); *see also* (*In re Reynolds*, 470 B.R. 138, 145 (Bankr. D. Colo. 2012)) (deeming
debtors bound by bankruptcy schedules and applying doctrine of judicial estoppel
because "Debtors are responsible for their own sworn statements").

The doctrine of judicial estoppel prevents Movants' assertion that the overriding
royalty interests are interests in personal property.  Movants' current position is
irreconcilably inconsistent with Delta's own repeated assertions before this court that its
ownership interest in the Point Arguello Properties was a real property interest (not to
mention contrary to the plain language of the overriding royalty interests and established
caselaw).  Notably, throughout its bankruptcy proceeding, Delta also represented that it
was a party to the Point Arguello Unit Agreement which is the agreement among the
owners of the leases in the unit to unitize their leases.  Roitman Dec. at ¶ 15.  That
Movants now argue to deprive Larson of his interest after confirmation of its plan,
despite never previously disputing such property ownership for over a decade both before
and during its bankruptcy, is evidence of Movants' bad faith.  Application of the doctrine
of judicial estoppel in this instance is narrowly tailored: during its bankruptcy, by

7571225 v1

claiming in no uncertain terms that its interests in Point Arguello were interests in real property, Delta made its bed and now Movants must lie in it.

At the very least, a question of disputed material fact exists as to whether Larson's ORRI is an interest in real property. *Compare* Motion at 9 (calling the ORRI "a personal property interest") *with* Roitman Dec. at ¶¶ 22-23 (1999 NOI is a conveyance of all Whiting's ownership interest except legal title). As Larson demonstrates below, the real property nature of the ORRI compels denial of the Motion.

**C.     The 1999 ORRI is not avoidable because the transfer was not a transfer that could have been perfected against a bona fide purchaser under applicable law.**

Not only did Delta not record its 1999 NOI in the recording offices of Santa Barbara County, California, but Whiting did not record its interest in the Point Arguello Properties either. Rappleye Dec. at ¶ 3. Avoidance under Bankruptcy Code Section 544(a)(3) is limited to a transfer of real property of the debtor that is voidable by a hypothetical bona fide purchaser "against whom applicable law permits such transfer to be perfected . . . " If under applicable law, it is not possible for a transferee to perfect such transfer, then such transfer is not avoidable under Section 544(a)(3) of the Bankruptcy Code as of the petition date. *In re Bridge*, 18 F.3d 195, 200 (3rd Cir. 1994) (quoting legislative history stating that "the language 'against whom applicable law permits such transfer to be perfected' was included in § 544(a)(3) 'so as not to require a creditor to perform the impossible in order to perfect his interest.'"); *In re Day*, 443 B.R. 338, 343 (Bankr. D.N.J. 2011) (same, *citing In re Bridge*); *In re Hurst*, 27 B.R. 740, 743 (Bankr. E.D. Tenn. 1983) (citing legislative history and stating that "the bona fide

7571225 v1

purchase test of § 544(a)(3)" does not require perfection, "vis-a-vis the bankruptcy

trustee, of a transfer if the applicable law does not permit perfection.").

When Larson was conveyed the 1999 ORRI in 1999, it was impossible under

California law for Larson to perfect his transfer against a future bona fide purchaser for

value.[4]  If Larson had recorded the 1999 ORRI, it would have been outside the chain of

record title (a "wild" deed); record title would not have reflected any conveyance from

Whiting to Delta, and thus Delta's conveyance to Larson would be outside the chain of

title.  California does not charge subsequent purchasers with notice of wild deeds:

> If an instrument cannot be located by searching the "grantor" and
> "grantee" indices of the public records, the instrument does not
> constitute constructive notice and later bona fide purchasers or
> encumbrances are not charged with knowledge of its existence . . . .
>
> [A] "wild" document [is] one recorded outside the chain of title. As
> such, a search of the grantor/grantee indices could not have disclosed
> its existence. "One who is not connected by any conveyance whatever
> with the record title to a piece of property and makes a conveyance
> thereof, does not thereby create any defect in the record title of another
> when such title is deducible by intermediate effective conveyances
> from the original owners to that other . . . .  Such a deed would not
> even be constructive notice."

*Far W. Sav. & Loan Assn. v. McLaughlin*, 246 Cal. Rptr. 872, 875 (Cal. App. 1988)

(quoting *Bothin v. The California Title Ins. Co.*, 96 P. 500 (Cal. 1908)).

---

[4] Movants acknowledge, as they must, that this "hypothetical bona fide purchaser" would be "'deemed to
have conducted a title search of [the] property[.]'"  Motion at 14 (first brackets in original).  Such a search
would have revealed that neither Whiting, nor Delta, nor Larson held record title to Point Arguello
interests.  This ambiguity in the record title would have put any buyer on inquiry notice of record title
issues per California law.  Cal. Civ. Code § 19 ("Every person who has actual notice of circumstances
sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself
in all cases in which, by prosecuting such inquiry, he might have learned such fact.").  Neither Whiting, nor
Delta, nor Larson could have transferred their interests to a bona fide purchaser for value under the
California recording statutes because they, themselves, lacked record title.  *See Kabayan v. Yepremian*, 190
B.R. 389, 394 (C.D. Cal. 1995) *aff'd sub nom. In re Yepremian*, 116 F.3d 1295 (9th Cir. 1997).  *See also*
the analysis in *In re Hathaway Ranch P'ship*, 127 B.R. 859, 865 (Bankr. C.D. Cal. 1990) (examining *In re
Investment Sales Diversified, Inc.*, 38 B.R. 446 (Bankr. D. Minn. 1984), where "avoidance under Section
544(a)(3) was disallowed was due to constructive notice" of record title issues).

17

Because Delta's 1999 NOI was not recorded, Larson did not have a method to perfect his interest in the 1999 ORRI via real property recording statutes.  Such recording would have been ineffective to convey record notice to potential purchasers because it would have constituted a wild deed.  Bankruptcy Code § 544(a)(3) does not authorize avoidance of the 1999 ORRI under such circumstances, particularly—as here—where such interest had never been in dispute.

II.     **Even if the Court determines the ORRI is a personal property interest, the confirmation of the Plan did not strip Larson of his interest because Larson had no claim at the time of confirmation.**

Movants argue that Larson's interest in the 1999 ORRI constitute unsecured personal property claims which were released and discharged under the Plan.  Motion at 9-11.  As discussed above, that analysis is incorrect, as the ORRI was a real property interest.  Even assuming, *arguendo*, that the ORRI constituted personal property, Movants' argument fails.  When the Plan was confirmed, Larson had no claims, as the amounts owed under the ORRI had been paid according to the parties' then-understanding of those amounts.  Larson Dec. at ¶¶ 28, 31.

The Plan vested Delta's property—not Larson's property—in the reorganized entities.  The bankruptcy process does not permit the bankruptcy estate to acquire property it never owned in the first place.  *In re Bake-Line Group, LLC*, 359 B.R. 556, 570 (Bankr. D. Del. 2007) ("A debtor may not increase its rights to property through the filing of a bankruptcy petition."); *In re Nielsen*, 1998 WL 3379 at *3 (Bankr. D. Minn. Jan. 7, 1998) (deeming it "axiomatic" that, subject to inapplicable exceptions, "only property that is owned by the debtor as of the commencement of the case may constitute

property of the estate").[5]  Moreover, Delta's property re-vested free and clear of pre-

confirmation liens and claims only.  Larson, however, had no such claims as of the Plan's

August 31, 2012 effective date.

The definition of claim in 11 U.S.C. § 101(5) does not include a future claim.

Indeed, it is "not surprising that no court has ever held that future claims for possible

future breaches of contract constitute 'claims' under Section 101(5) that must be filed

pre-confirmation." *In re Texaco Inc.*, 254 B.R. 536, 559 (Bankr. S.D.N.Y. 2000) (claims

arising after confirmation from a pre-petition contractual relationship are not barred by a

confirmation order).  *See also In re Granati,* 307 B.R. 827 (E.D.Va. 2002), *aff'd* 63 F.

App'x 741 (4th Cir. 2003) (right to future payments pursuant to an equitable assignment

is not a claim; it is property right).  It is also axiomatic that the definition of claim does

not encompass a party's claim or future claims against a third party such as Whiting.  *In*

*re Exide Technologies*, 2013 WL 85193 at *5 (Bankr. D. Del. Jan. 8, 2013) ("While the

Bankruptcy Code's definition of claim is undeniably broad, it is not without limit. The

definition of a 'claim' includes a 'right to payment' that may be contingent or unmatured,

but it necessarily <u>requires a pre-confirmation event</u> that triggers a 'right to payment,'

whether based upon a breach of contract, tortious conduct, or a prepetition contract that

provides for a right to payment, even if that right to payment is contingent."  Emphasis

added.).

*In re Exide Technologies* is particularly informative to the issues in this case.

Exide sought to reject a trade mark licensing agreement with EnerSys. This court initially

---

[5] *See also In re Colonial Ctr., Inc.*, 156 B.R. 452, 463 (Bankr. E.D. Pa. 1993) ("the scope of a debtor's interest in property is defined by relevant nonbankruptcy law and not expanded by the bankruptcy filing"); *In re Dyckman*, 2012 WL 1302613 at *2 (Bankr. M.D. Pa. Apr. 16, 2012) ("the bankruptcy Code itself does not create property interests").

7571225 v1

permitted rejection of licensing agreement, but its order was reversed by the Third

Circuit. After remand, Exide brought an adversary proceeding seeking a declaration that

a boilerplate provision of its Plan purported to divest Enersys of its interest by default.

This court characterized Exide's assertion as "disingenuous" and held that the default rule

of Code section 1141(c) should not override the specific information disclosed to the

parties and the court regarding the manner in which Enersys' interests were being treated

under the Plan. 2013 WL 85193 at *4. Having chosen to deal with Enersys' rights by

rejection the court did not allow Exide to subsequently deprive Enersys' rights by

boilerplate language in the Plan. *Id.*

     Exide also argued, as do the Plaintiffs here, that Enersys' rights under the license

agreement amounted to a "claim" under the Code that was discharged by the confirmed

Plan. This Court, held, however, that Exide did not allege any facts that would give rise

to a "pre-confirmation 'right to payment.'" As this Court observed, the complaint merely

alleged that Enersys was a holder of an unsecured claim, but did not allege that Exide had

breached its obligations relating to the use of the mark triggering a right to payment. 2013

WL 85193 at *6. In conclusion, the Court held that "Exide's Complaint does not allege

facts to support its position that a 'claim' exists under Bankruptcy Code § 101(5) (A)

based upon a pre-confirmation breach of contract, tortious conduct, or contract provision

triggering a pre-confirmation right to payment . . . . " *Id.* Plaintiffs in the present cases

similarly have not alleged, and the undisputed facts show that there was no pre-

confirmation breach by Delta that would have given Larson a right to payment and

therefore a "claim" that could be extinguished by the Plan.

     Delta not only paid the sums due up until its bankruptcy filing (Larson Dec. at

7571225 v1

¶¶ 21-29), but took affirmative steps to ensure that those payments continued through the bankruptcy case. D.I. 9, 66, 296. Rather than put Larson on notice of any dispute, Delta instead lulled Larson into thinking his interest was safe, while Movants laid in wait to ambush Larson after confirmation. This behavior is exactly what this Court refused to condone in *In re Exide Technologies*.

Having received what he believed was owed via the stream of payments ending with the check dated August 21, 2012, Larson had no claim at all against Delta/PAR when the Effective Date occurred ten days later. If indeed Larson has claims against PAR, they arose or were "triggered" <u>after</u> the Effective Date, only after minerals were produced and sold, and only after Whiting received production revenues from the sale of those minerals, and only after Whiting delivered to Delta the production proceeds attributable to Larson's ORRI property interests for distribution of the amounts owed to Larson, and only if Movants ceased their thirteen-year practice of monthly distribution of such monies to Larson. Larson Dec. at ¶ 22. Each time PAR fails to pay the monies received from Whiting for distribution to Larson, a new claim arises. If Whiting does not transfer Larson's funds to PAR for distribution, Larson has no claim against PAR, but would have a claim against Whiting and/or the operator. Plaintiffs confuse a pre-petition conveyance of property with a pre-petition contract. Moreover, Whiting may have a claim against PAR for its failure to honor its agreement with Whiting to distribute funds to Larson, but that is an issue between Whiting and PAR. *See* Motion at Ex. B, ¶ 10.2 (providing for Delta's indemnification of Whiting for any failure to distribute unpaid funds owed by Whiting to third parties).

Furthermore, Movants' argument that the monies owed under the 1999 ORRI are

claims against the estate is simply incorrect as a matter of law.  Assignment of a property

interest strips a debtor of its interest, and the assignee's claims which may arise in the

future, post-petition, on account of that interest are not dischargeable claims.  *See In re*

*Dean*, 317 B.R. 482, 487 (Bankr. W.D. Pa. 2004) (determining that debtor's pre-petition

assignment of interest gave debtor "no right, legal or equitable" to that interest); *In re*

*Granati*, 270 B.R. 575, 586-87 (Bankr. E.D. Va. 2001) *aff'd* 307 B.R. 827 (E.D. Va.

2002) *aff'd* 63 F. App'x 741 (4th Cir. 2003) (deeming assigned interest "not a claim"

which "has not been discharged").

> **A.**    **Movants cite inapplicable caselaw in arguing that Larson had a "claim" which was "extinguished."**

Even assuming, *arguendo*, that Movants' "claim" analysis controls the

determination of the Motion—which it does not, as the correct analysis sounds in real

property jurisprudence—Movants' argument fails because they cite several inapplicable

cases to argue that Larson has lost its opportunity to assert his alleged "claims".

For instance, under their heading claiming that Larson's interest "has been

extinguished," Movants cite *Missouri Breaks, LLC v. Burns*, 791 N.W. 2d 33 (N.D.

2010).  *See* Motion at 11 n. 17.  There, however, the debtor's reorganization plan featured

the following language:

> On the Effective Date, the <u>Property of the Estate</u> and any and all other assets of the Debtor <u>shall be transferred to [Missouri Breaks]</u> free and clear of any and all Claims, Liens, <u>charges, encumbrances and interests</u>, except as otherwise provided in the Plan…. <u>and [Missouri Breaks] shall be deemed a purchaser in good faith…</u>

791 N.W. 2d at 36 (brackets in original, emphasis added).  The reorganization plan

language in *Missouri Breaks* is much broader than the Plan language here; the *Missouri*

*Breaks* plan transferred property of the estate to a good faith purchaser, free and clear of

not only claims and liens, but "charges, encumbrances and interests," while the Plan here is limited to revesting free and clear of "Liens, Claims and Equity Interests . . . . " in the reorganized debtor.  Plan at ¶ 10.1.

The decision in the *Missouri Breaks* case turned on the creditor's clear notice of his need to object to confirmation of the plan which conveyed his property to a good faith purchaser.  The *Missouri Breaks* creditor claimed he held a 5% working interest in the Missouri Breaks Unit No. 1 oil and gas well (the "Well"), which was allegedly transferred to him by the debtor shortly before the debtor filed for bankruptcy, but the conveyance was not recorded.  The debtor listed the creditor in its Schedules as an owner of a 5% working interest in the Well.  791 N.W. 2d at 36.  In addition to the quoted plan language above, the *Missouri Breaks* plan provided for the transfer of Debtor's 50% working interest in the Well to a new entity, Missouri Breaks, despite the fact that the creditor asserted that he had been transferred a 5% working interest out of such 50% before the bankruptcy.  791 N.W.2d at 36.  Because the creditor did not object to confirmation of the plan which expressly conveyed his purported property to a bona fide purchaser for value without constructive notice of the unrecorded interest, the Court determined that his claim to such interest was barred by res judicata.  791 N.W.2d at 39. Here, however, Larson was paid throughout the bankruptcy, he was not owed *any* amount prior to confirmation, there was no dispute as to his interest, and there was not any transfer of Larson's property to a purchaser in good faith.  *See* Larson Dec. at ¶¶ 21-29. *Missouri Breaks* is simply not applicable here.

III.    **The Motion should be denied as to the alleged "excess" payments.**

Movants make several fundamental errors in arguing that the alleged "excess" payments to Larson should be disgorged via summary judgment adjudication. A ruling on the Motion should await Larson's needed discovery. Finally, the transfers constitute neither unjust enrichment, nor fraudulent transfers, nor are they avoidable under the sections of the Bankruptcy Code cited by Movants.

    **A.**    **Summary judgment as to the allegedly "excess" payments is not appropriate at this time as demonstrated by Larson's 56(d) Motion**

In light of Larson's contemporaneously-filed Motion to Permit Discovery Pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(d) Prior to Decision Regarding Plaintiffs' Motion for Summary Judgment (henceforth "56(d) Motion"), the Court should decline to decide the alleged "excess" payment issue pending further discovery. The 56(d) Motion seeks the deposition Seth Bullock—Movants' principal declarant in support of their Motion—which will demonstrate that Movants' brief does not contain admissible evidence concerning the transactions at issue in this case, as Seth Bullock cannot possibly have first-hand knowledge of the nature of transactions which predated his involvement with Delta by over a decade. Furthermore, the 56(d) Motion seeks discovery from Whiting, which may demonstrate that Whiting intended that the NOI would convey Delta a real property interest, contrary to Plaintiffs' assertions.

    **B.**    **The alleged "excess" payments neither constitute unjust enrichment, nor do they constitute fraudulent transfers, nor are they avoidable under the Bankruptcy Code**

As Movants correctly note, Delta sought and received permission to pay post-petition amounts owned by Larson due to the 1999 ORRI by order of this Court. Motion at 16; D.I. 9, 66, 296. In fact, Delta explicitly represented to the Court that the post-petition payments were made pursuant to "the ordinary course of business . . . ." D.I. 9

at ¶ 14.  Had Delta not done so and instead refused to pay Larson, Delta would have been committing a tort as to the conversion of those monies received during the bankruptcy which were which were owned by, and therefore owed to, Larson.  Claims pertaining to torts during the administration of a Chapter 11 case are administrative claims under 11 U.S.C. 503(b)(1), entitled to priority distribution pursuant to 11 U.S.C. §§ 507(a)(2) and 726(a)(1).  *See also In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 480 (Bankr. D. Del. 2006) ("Damages arising from a post-petition tort committed by a debtor are entitled to administrative expense status.").  Because Larson was in fact paid during the pendency of the bankruptcy, Larson did not file petitions for allowance of administrative claims which would have been paid as part of the plan confirmation process.  *See* Larson Dec. at 24-25, 29.  That Larson did not file such claims constituted consideration for receipt of those payments.  As such, Delta did in fact receive reasonably equivalent value for the payments, and cannot claim they were fraudulent transfers.

As Plaintiffs' unjust enrichment theory of disgorgement is premised on the arguments that (i) Larson's alleged personal property interest has been stripped under the Plan or (ii) that Larson's personal property interest is avoidable (*see* Motion at 16)— neither of which are correct, as demonstrated above—the Court should decline to enter summary judgment on the disgorgement due to unjust enrichment theory.

Movants' argument concerning Bankruptcy Code section 549(a) similarly fails. Movants recognize that section permits avoidance where a transfer occurs that is not authorized "by the court."  Motion at 17.  Here, however, the payments were made pursuant to "the ordinary course of business" (D.I. 9 at ¶ 14) and the Court in fact authorized the payments.  D.I. 66 and 296.  Movants provide no support for their

statement that the post-petition payments to Larson "were not" under "the guise" of those orders. Motion at 18. If the Court is not inclined to simply reject Movants' argument, Larson requests that the Court defer judgment on this issue pending the sought discovery described in the 56(d) Motion to determine under what "guise" the payments were in fact made.

Finally, Movants' argument that Bankruptcy Code section 542(a) entitles Movants to summary judgment concerning the post-petition payments also fails. That section, through its incorporating reference to section 363(b)(1), makes clear that it only pertains to "property of the estate . . . . " 11 U.S.C. 363(b)(1) (emphasis added). As discussed above, the 1999 ORRI and funds payable thereunder were not property of the estate. Rather, the 1999 ORRI was duly conveyed out of the estate to Larson over a decade ago. Movants' argument on this point boils down to their contention that the 1999 ORRI is subject to avoidance. As described above, the 1999 ORRI cannot be avoided as a matter of law.

### C.    The existence of disputed issues of material fact concerning BWAB's affirmative defenses compels the denial of the Motion.

"The equitable defense of laches is available when a party has <u>knowledge</u> of a claim, there is an <u>inexcusable delay</u> in bringing the action, and the delay is <u>prejudicial</u> to the defendant." *In re Network Access Solutions, Corp.*, 330 B.R. 67, 79 (Bankr. D. Del. 2005) (emphasis added). "Whether to apply the equitable doctrine of laches is left to the sound discretion of the court." *In re Am. Home Mortg. Holding*, 458 B.R. 161, 172 (Bankr. D. Del. 2011). In Larson's Amended Answer to the Amended Complaint, Larson asserted, *inter alia*, the affirmative defense of laches to Counts II through VII of Plaintiffs' Amended Complaint. Adv. D.I. 26. These Counts encompass Plaintiffs'

claims regarding the 1999 ORRI payments.  Adv. D.I. 22; Motion at 9-19.  Because

disputed material facts exist concerning Larson's laches defense, the Court should deny

the Motion with respect to the alleged miscalculation of payments.

Plaintiffs make no attempt to explain why their claims, if now known, were not

asserted during the bankruptcy.  As such, there is a clear implication that Delta knew

about any potential claims regarding the 1999 ORRI during the bankruptcy.  Nor have

Plaintiffs demonstrated any reason for the delay in bringing those claims.  Plaintiffs'

delay in bringing their claim for the alleged miscalculation is prejudicial to Larson.  Had

Delta made its intentions concerning the 1999 ORRI clear during the bankruptcy, Larson

could have acted to protect his interest.  Delta's failure to do so further prejudices Larson

as he must defend his interests now, after confirmation of Delta's Plan has occurred.  In

sum, the elements of Larson's laches defense are genuinely disputed.  As such, the Court

should deny the Motion.

**IV.     The Motion should be denied because the Bullock Declaration upon
         which it relies lacks foundation.**

Repeatedly and throughout the Motion, Movants refer to the Declaration of Seth

Bullock ("Bullock Dec.") and the documents attached thereto.  *See* Motion, generally.

Although the transactions and events at issue in this case date back to 1994, the Bullock

Declaration plainly states the following:

> I have consulted for Par Petroleum or its predecessor, Delta Petroleum
> Corporation ("Delta"), since November 2011, and have held officer
> positions at Par Petroleum (or Delta) since July 2012.

Bullock Dec. at ¶ 1.  Mr. Bullock admits he is a relative newcomer to this dispute.

Mr. Bullock cannot possibly have sufficient personal, firsthand, non-hearsay

knowledge concerning transactions which predated his involvement with Delta and its

successors by over a decade.  Indeed he admits as much, stating that he bases his

Declaration on his "personal knowledge and/or upon [his] review of the books and

records . . . ."  Bullock Dec. at ¶ 4 (emphasis added).  Given his November 2011 arrival

at Delta, he has no more knowledge concerning the truth, accuracy, completeness,

genuineness, or authenticity of the documents attached to his Declaration (*see* Bullock

Dec. at ¶ 5) than a stranger to this case.  Nor can he opine with any authority concerning

the circumstances surrounding Delta's 1999 NOI (Bullock Dec. at ¶¶ 8-9).  Nor can he

opine as to Delta's normal business practices and the documents maintained pursuant

thereto, as he arrived only shortly before Delta's bankruptcy filing.

As the basis for the Bullock Declaration is in such doubt on its face, it cannot be

the basis for summary judgment.  Declarations must pass evidentiary muster, and as the

Bullock Declaration by its very terms offers numerous pieces of hearsay evidence, it

should not be considered as a basis for summary judgment.  *In re Am. Remanufacturers,*

*Inc.*, 2010 WL 1027803 at **4-5 (Bankr. D. Del. Mar. 19, 2010).  At the very least,

Larson should be permitted to depose Mr. Bullock, as requested in Larson's 56(d)

Motion, to discover the basis for his Declaration prior to the determination of the Motion.

7571225 v1

## CONCLUSION

For all of the foregoing reasons, Larson respectfully requests that the Court deny the Motion.  In the alternative, for the foregoing reasons and those set forth in Larson's contemporaneously-filed 56(d) Motion, Larson requests that the Court defer ruling on the Motion until Larson can conduct the discovery sought by the 56(d) Motion and submit briefing related thereto.

Dated: March 12, 2013

**BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP**

By:     _/s/ Raymond H. Lemisch_
Raymond H. Lemisch, Esquire (No. 4204)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
(302) 442-7010 telephone
(303) 442-7012 facsimile
rlemisch@beneschlaw.com

– and –

Barry L. Wilkie, Esq.
Stuart N. Bennett, Esq.
**JONES & KELLER, P.C**
1999 Broadway, Suite 3150
Denver, CO  80202
(303) 573-1600 telephone
(303) 573-8133 facsimile
bwilkie@joneskeller.com

*Counsel to Aleron Larson, Jr.*