## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - -   x
    :
In re:    :    Chapter 11
    :
DELTA PETROLEUM CORPORATION, <u>et</u>  :    Case No. 11-14006 (KJC)
<u>al.</u>,    :
    :    Jointly Administered
    Debtors.    :
    :
- - - - - - - - - - - - - - - - - - - - - - - -   x
DELTA PETROLEUM GENERAL    :
RECOVERY TRUST    :
and    :
PAR PETROLEUM CORPORATION,    :
    :    Adv. Pro. No. 12-50877 (KJC)
    Plaintiffs,    :
    :
  v.    :
    :
ALERON LARSON, JR.,    :
    :
    Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR SUMMARY JUDGMENT

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Anthony W. Clark (I.D. No. 2051)
Kristhy M. Peguero (I.D. No. 4903)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000


SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Ron Meisler
David R. Pehlke
155 North Wacker Drive
Chicago, Illinois 60606-1720
(312) 407-0700


Dated: Wilmington, Delaware
       April 5, 2013


*Counsel for Plaintiffs Delta Petroleum
General Recovery Trust and Par Petroleum
Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT .......................................................................... 1

ARGUMENT ........................................................................................................ 4

I.     LARSON HELD A DISCHARGEABLE PERSONAL
PROPERTY INTEREST, NOT A NON-DISCHARGEABLE
REAL PROPERTY INTEREST. ................................................................. 4

     A.     The Transfer Between Delta And Whiting Did Not Convey
A Real Property Interest. ............................................................. 4

          1.     In 1999, Whiting conveyed to Delta only what it
could convey – a net operating interest, not a real
property interest. ................................................................. 5

          2.     The 1999 net operating interest is not a rejected
executory contract. ............................................................. 6

          3.     The 1999 Agreement conveyed to Larson a personal
property right to payment that became a general
unsecured pre-petition claim when bankruptcy was
filed. ................................................................................. 7

     B.     There Is No Basis In Equity To Save Larson's Claims From
Discharge. .................................................................................. 10

     C.     Larson Could Have Perfected His Interest In The Purported
Real Property And, Therefore, His Interest May Be
Avoided Under Section 544(a)(3). .............................................. 12

II.     THE EXCESS PAYMENTS TO LARSON SHOULD BE
DISGORGED. ........................................................................................ 15

     A.     The Post-Petition Payments To Larson Were Not
Authorized By The Court, And The Bankruptcy Code
Provides No Basis To Protect Them From Disgorgement
Now. .......................................................................................... 15

     B.     Larson's Laches Defense Is Without Merit. ................................. 16

CONCLUSION .................................................................................................. 18

# TABLE OF AUTHORITIES

## CASES

Page

*Aguayo v. Amaro*, 213 Cal. App. 4th 1102 (Cal. App. 2d Dist. 2013) .............................14

*In re APF Co.*, 270 B.R. 567 (Bankr. D. Del. 2001) ..........................................................9

*B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust* (In re B. Cohen
& Sons Caterers, Inc.), 97 B.R. 808 (Bankr. E.D. Pa. 1989), *aff'd in
part & remanded in part*, 108 B.R. 482 (E.D. Pa. 1989), *appeal
dismissed*, 908 F.2d 961 (3d Cir. 1990) ................................................................11

*Cohen v. TIC Financial Systems* (In re Amspace Corp.), 279 B.R. 145
(Bankr. D. Del. 2002) ...........................................................................................11

*In re Estill Medical Technologies, Inc.*, No. 4-01-48064-DML-11, 2004
Bankr. LEXIS 333 (Bankr. N.D. Tex. Mar. 26, 2004) .........................................11

*Exide Technologies v. Enersys Delaware, Inc.* (In re Exide Technologies),
No. 02-11125 (KJC), 2013 Bankr. LEXIS 66 (Bankr. D. Del. Jan.
8, 2013) ..............................................................................................................9, 12

*FCC v. NextWave Personal Communications Inc.*, 537 U.S. 293 (2003) ..........................8

*In re JZ, L.L.C.*, 371 B.R. 412 (B.A.P. 9th Cir. 2007) ........................................................5

*L.R.S.C. Co. v. Rickel Home Centers, Inc.* (In re Rickel Home Centers,
Inc.), 209 F.3d 291 (3d Cir. 2000) ........................................................................16

*Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635 (3rd Cir.
1991) .....................................................................................................................16

*Midlantic National Bank v. Bridge* (In re Bridge), 18 F.3d 195 (3d Cir.
1994) ................................................................................................................13, 14

*N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513 (1984) ........................................................7

*Octagon Gas Systems, Inc. v. Rimmer,*
995 F.2d 948 (10th Cir. 1993) ................................................................................8

*Official Committee of Unsecured Creditors v. Aust* (In re Network Access
Solutions, Corp.), 330 B.R. 67 (Bankr. D. Del. 2005)..........................................17

*Reiner v. Danial*, 211 Cal. App. 3d 682 (Cal. App. 2d Dist. 1989)...................................14

*In re Reynolds*, 470 B.R. 138 (Bankr. D. Colo. 2012).................................................12, 13

*In re Silver Fox, LLC*, No. 07-19443 (NLW), 2010 WL 2572602 (D.N.J. June 24, 2010) ....................................................................................................5, 7

*Stewart Foods, Inc. v. Broecker* (In re Stewart Foods), 64 F.3d 141 (4th Cir. 1995) .........................................................................................................9

*In re Waste Systems International, Inc.*, 280 B.R. 824 (Bankr. D. Del. 2002) .......................................................................................................7, 9

*In re Worldwide Direct, Inc.*, 280 B.R. 819 (Bankr. D. Del. 2002)..................................10

## STATUTES AND RULES

11 U.S.C. § 101(5)(A)..........................................................................................3, 8

11 U.S.C. § 363(b)(1) ...............................................................................................16

11 U.S.C. § 542(a) ....................................................................................................16

11 U.S.C. § 544(a)(3)...............................................................................3, 13, 14, 15

11 U.S.C. § 549(a) ..............................................................................................15, 16

11 U.S.C. § 550(a) ....................................................................................................16

Cal. Civ. Code § 1060................................................................................................14

## OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ................................8

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887.....................................8

Plaintiffs respectfully submit this reply brief in support of their motion for summary judgment[1] (D.I. 34) against defendant Larson in response to Larson's opposing memorandum of law (the "Response").  (D.I. 44)

## PRELIMINARY STATEMENT

Plaintiffs' Opening Brief makes a straight-forward case for summary judgment based on undisputed, and unequivocally supporting, facts.  The strategy in Larson's Response is transparent:  it attempts to obfuscate, confuse and complicate the issues with alternative and illusory theories that have no support in fact or law, all in an effort to make it appear that summary judgment at this stage would be premature.  But Larson's arguments ignore the undisputed facts and basic principles of bankruptcy law.  This case presents nothing more than a garden variety prepetition unsecured claim that has been discharged.  No amount of argument or additional discovery will change that.

As set forth in Plaintiffs' Opening Brief, the undisputed facts establish that Larson held only a personal property interest in connection with the Leases at issue.  These undisputed facts – each of which Larson concedes – include the following:

- In 1999, Delta and Whiting entered into a transaction which initially contemplated that Whiting would convey its complete interests in the Leases – *i.e.*, including Whiting's real property interests.  But as things turned out, Whiting admittedly was unable to convey its real property interests to Delta.  As a result, Whiting only conveyed to Delta the economic benefit of the Leases – what the parties referred to as a "net operating interest," which, undeniably, is only a contractual right to payment.  (Response at 5-8)

- To compensate Larson for his assistance in the 1999 deal with Whiting, Delta conveyed to Larson a portion of what Delta received from Whiting – *i.e.*, a right to payment from the revenues Delta received from the Leases (the "1999 Agreement").  (*Id.* at 6-7)

---

[1]    Terms defined, and record citation forms used, in Plaintiffs' opening memorandum of law in support of the summary judgment motion (the "Opening Brief") (D.I. 35) are used herein.

Larson's right to payment under the 1999 Agreement is the claim that the bankruptcy discharged.  The post-petition payments Delta made pursuant to the 1999 Agreement are the funds that must be disgorged.

Larson's only response to these straight-forward and well-supported facts is to assert that, regardless of the facts, his interest is a real property interest that is not dischargeable in bankruptcy.  Larson focuses on the fact that the 1999 Agreement calls his interest an overriding royalty interest ("ORRI"), which Larson says makes it a real property interest, while glossing over the additional fact that, for more than a decade, he never bothered to record the interest.  Larson asks the Court to ignore the facts – most significantly, that Delta did not own a real property interest that it could convey to Larson in 1999 – and the law – most significantly, the black letter principle that a party cannot convey an interest greater than it holds – and to decide this case based on the *label* attached to the interest, rather than on the *true nature* of the interest.  In the final analysis, labels must yield to substance – the true nature of the conveyances here, as established by the undisputed facts, show that Larson held only a right to payment under a prepetition contract, and that right constitutes a claim that is dischargeable in bankruptcy and was discharged in this case.

Larson also ignores basic bankruptcy principles to argue that the Debtors had no actionable interest in the 1999 interest.  To the contrary, Delta's interest in the Leases was burdened by Larson's interest.  By operation of the Plan, Plaintiffs can extinguish that interest, as here sought.  Larson's argument that he held no "claim" in the Debtors' bankruptcy cases because he received timely post-petition payments fares no better.  Larson's interest constituted a right to payment under a prepetition contract.  Any

2

such right to payment falls squarely within the definition of a "claim" under section 101(5)(A) of the Bankruptcy Code and is, therefore, subject to discharge and was, in fact, discharged.

But Larson argues that none of this matters because he held, not a dischargeable personal property claim but, rather, a real property interest outside of the Debtors' estates. However, as Plaintiffs argued alternatively in their Opening Brief (at 11-15), even if Larson's interest was a real property interest, it can be avoided under the strong arm provision of section 544(a)(3). Larson's counter – that it would have been "impossible" for him to record his interest, and that, therefore, section 544(a)(3) does not apply – is wrong. It was not "impossible" for Larson to record and perfect his interest in 1999 or at some point over the next 10+ years. As explained below, Larson had many options to record. At bottom, Larson's argument is that, even though none of the parties ever recorded anything related to the 1999 Agreement, and even though Delta admittedly received only the economic benefit of the Leases from Whiting and not title to them, his interest is nonetheless a real property interest. That makes no sense. The simplest conclusion is the right one: Larson held only a personal property interest, and that is why he never recorded the interest.

Finally, Larson's arguments against disgorgement have no merit. Laches fails because this action was filed well within the statutorily prescribed period. Larson's other arguments fail, as a matter of law, because, as a result of the bankruptcy, and once his 1999 interest was extinguished, he was not entitled to any post-petition payments, which must be disgorged.

Accordingly, for the reasons set forth below and in Plaintiffs' Opening Brief, the Court should grant summary judgment to Plaintiffs.

**ARGUMENT**

## I.    LARSON HELD A DISCHARGEABLE PERSONAL PROPERTY INTEREST, NOT A NON-DISCHARGEABLE REAL PROPERTY INTEREST.

Larson concedes that Delta had originally intended to acquire a real property interest from Whiting in 1999, but Whiting was unable to convey legal title. (Response at 5-8)  So, instead, Whiting conveyed only the economic benefit of Whiting's interests in the Leases – what the parties to the agreement designated as a "net operating interest."  (*Id.*)  Yet, the Response (at 11-13) argues that Delta was nonetheless able to convey to Larson a real property interest and, therefore, his interest is outside of the Debtors' estates.  Moreover, Larson's supposed "real property" interest is one that he never sought to record, despite holding it for well over a decade, and which he received from another party with an unrecorded supposed "real property" interest.   The facts plainly reflected in the unambiguous controlling contracts refute Larson's unbelievable and convoluted contentions based on a history of unrecorded titles.  Larson got only what Delta could, and did, convey – a personal property interest, not a fictional real property interest.

### A.    The Transfer Between Delta And Whiting Did Not Convey A Real Property Interest.

Larson's argument that his interest must be considered a real property, not a personal property, interest ultimately rests upon a false choice.  According to Larson, the Court has only two choices – it must either find that (i) the "1999 [net operating interest] was an executory contract which has been rejected" or (ii) the "1999 [net

4

operating interest] was in fact an interest in real property." (Response at 14) Larson

needs the 1999 assignment of a net operating interest from Whiting to Delta to be a real

property interest – since he could not have acquired more than Delta owned – so Larson

tries to distract the Court with this false choice and lead it to the unsupported conclusion

that the 1999 net operating interest could not have been a personal property interest.

Larson's argument ignores the undisputed facts and controlling provisions of the

Bankruptcy Code.

The applicable facts and legal principles are simple: (1) Whiting

conveyed to Delta only what it could convey, a contractual right to payment (*i.e.*, a net

operating interest), not a real property interest; (2) even if the contract between Whiting

and Delta were executory, and it is not, that makes no difference, because the contract

could have ridden through the bankruptcy;[2] and (3) Larson's 1999 Agreement with Delta

supports only a personal property claim, because it is nothing more than a simple

factoring agreement that conferred a right of payment to Larson in exchange for his

assistance to Delta in the Whiting deal.

> **1.    In 1999, Whiting conveyed to Delta only what it could convey – a net operating interest, not a real property interest.**

The 1999 net operating interest that Whiting conveyed to Delta transferred

only the economic benefit of the Leases. Section (g) of the Conveyance Agreement

defined the "net operating interest" that Delta purchased from Whiting as the net of the

---

[2]    *See, e.g.*, *In re Silver Fox, LLC*, No. 07-19443 (NLW), 2010 WL 2572602, at *6 (D.N.J. June 24, 2010) ("An executory contract that is not assumed in a chapter 11 case is not 'deemed rejected.' As a matter of straightforward statutory construction, it follows that some other alternative, i.e. 'ride through,' must be available." (quoting *In re JZ, L.L.C.*, 371 B.R. 412 (B.A.P. 9th Cir. 2007)).

oil and gas revenues after deducting certain expenses, fees, and overriding royalties. As Larson concedes, the parties agreed to this specific conveyance – the sale of only the economic benefit in the Leases – because Whiting was unable to convey anything more than that (*e.g.*, title to its interests). (Response at 6-7; *see also* Bullock Decl. ¶ 8) Because Whiting could not convey a real property interest, it conveyed what it could – the economic (but not legal) equivalent of a real property interest.

Larson ignores these facts and, instead, asks the Court to proceed in reverse. Larson starts with the assertion that his interest was described as an "overriding royalty interest" and, therefore, was a real property interest, and then concludes that the preceding 1999 net operating interest conveyed from Whiting to Delta must also have been a real property interest. (Response at 11-13) In other words, Larson would have the Court move backwards from his preferred outcome, rather than assess each conveyance when made and determine, at each stage, what the *true nature* of that conveyance was. Considering the true nature of each conveyance as made, the only possible conclusion is that Whiting conveyed a net operating interest to Delta, and Delta conveyed a right to payment to Larson. Neither a net operating interest nor a right to payment is a real property interest. The inquiry should end there.

### 2. The 1999 net operating interest is not a rejected executory contract.

Larson argues that the Court cannot find that the 1999 net operating interest conveyed exactly that – a net operating interest – without also finding that the interest is an executory contract that has been rejected. (Response at 13) Once again, in his effort to avoid summary judgment, Larson obfuscates to make the issues here more complex than they really are.

With the 1999 net operating interest transfer, Whiting sold the economic benefits in the Leases to Delta.  It is a fully executed contract, but for the payment of money and, therefore, is not an executory contract.[3]  And even if the contract were executory, Larson ignores basic principles of bankruptcy law to argue that it then must be a *rejected* executory contract.  Larson bases this argument on the incorrect conclusion that any executory contract that is not assumed must necessarily be rejected.  (Response at 13)  But a debtor's estate is not required to assume or reject an executory contract, and if it does neither – as was the case here – then the contract rides through bankruptcy.[4]

What Larson asserts are the Court's only choices – finding that the 1999 net operating interest is either a real property interest or a rejected executory contract – are contrary to the relevant facts and law.  The 1999 transfer did not convey an interest in real property, because Delta didn't own one, and that fact does not transform the fully executed 1999 net operating interest into an impliedly rejected executory contract.

> **3.    The 1999 Agreement conveyed to Larson a personal property right to payment that became a general unsecured pre-petition claim when bankruptcy was filed.**

Larson's characterization of his interest from Delta as a real property right assumes and proceeds from his desired outcome, rather than the facts.  The facts establish that Larson held a personal property interest in the form of a right to payment, and not a real property interest.

---

[3]    *In re Waste Systems Int'l, Inc.*, 280 B.R. 824, 827 (Bankr. D. Del. 2002) ("[A] contract is not executory if the only remaining obligation is the payment of money by the debtor.").

[4]    *In re Silver Fox*, 2010 WL 2572602, at *6; *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 546 n.12 (1984) (holding that if "contract is neither accepted nor rejected, it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted" (citations omitted)).

As explained in Plaintiffs' Opening Brief and above, Larson's interest cannot be considered a real property interest because Delta did not have a real property interest to convey. Delta only held the economic benefit of the Leases. Larson assisted Delta in connection with the 1999 deal with Whiting. As compensation for that assistance, Delta agreed to pay Larson a portion of the economic benefit it had purchased from Whiting. In essence, this is akin to a simple factoring agreement. Larson received a right to payment in exchange for helping Delta with its acquisition. Delta did not convey an interest in real property – as it could not convey more than it held – it conveyed only a right to payment.[5] The fact that the agreement refers to the interest as an ORRI cannot alter what it actually is.[6]

Larson also argues that because Delta timely made all payments due under the 1999 Agreement, Larson never held a "claim" subject to the bankruptcy. (Response at 4, 21)   This argument ignores the broad definition of a "claim" under Bankruptcy Code section 101(5)(A) – a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"[7] Larson's interest gives him only a

---

[5]    *See* Opening Brief at 9-10.

[6]    *Octagon Gas Systems, Inc. v. Rimmer*, 995 F.2d 948, 952 n.3 (10th Cir. 1993) (looking past description of interest as an "overriding royalty interest" and finding the use of the term incorrect "for lack of an oil and gas leasehold estate").

[7]    11 U.S.C. § 101(5)(A).  *See also* H.R. Rep. No. 95-595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; S. Rep. No. 95-989, at 21-22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887, 5807-08 (the term "claim" encompasses the "broadest possible definition" and "contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case [and] permits the broadest possible relief in the bankruptcy court").  *See also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (the term "claim" "has 'the broadest available definition'" (citation omitted)).

right to payment due under the terms of the prepetition contract.  Non-executory

prepetition contracts requiring a debtor to pay money are routinely dealt with in

bankruptcy as giving rise to prepetition claims.[8]

      Even *In re Exide Technologies*, upon which Larson relies, adopts the

broad definition of "claim" that includes a prepetition contract that provides for a right to

payment.[9]  The court specifically noted that "[t]he definition of a 'claim' includes a 'right

to payment' that may be contingent or unmatured, but it necessarily requires a pre-

confirmation event that triggers a 'right to payment,' whether based upon a breach of

contract, tortious conduct, *or a prepetition contract that provides for a right to payment*,

even if that right to payment is contingent."[10]

      That precisely describes the facts here:  Larson held a right to payment

under a prepetition contract.  In contrast, the *Exide Technologies* court ultimately found

that the agreement there did not give rise to a claim because it did *not* confer a "right to

payment," and the debtor had only alleged a "potential rejection damage claim."[11]  But

---

[8]    *Stewart Foods v. Broecker* (In re Stewart Foods), 64 F.3d 141, 145 (4th Cir. 1995) ("[R]egardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings."); *In re Waste Systems Int'l, Inc.*, 280 B.R. 824, 827 (Bankr. D. Del. 2002) (royalty payments due to non-debtor under a non-executory prepetition contract gave rise to general unsecured claims); *In re APF Co.*, 270 B.R. 567, 572 (Bankr. D. Del. 2001) (debtors' payment obligations due under deferred compensation portion of prepetition merger agreement was prepetition claim).  There can be no dispute that Larson's agreement with Delta is non-executory.  There is no additional performance required from Larson under the 1999 Agreement.

[9]    *See Exide Technologies v. Enersys Delaware, Inc.* (In re Exide Technologies), No. 02-11125 (KJC), 2013 Bankr. LEXIS 66, at * 20 (Bankr. D. Del. Jan. 8, 2013).

[10]    *Id.* (emphasis added) (analyzing when claim arose under prepetition trademark license that required payment only upon breach).

[11]    *Id.* at *25.

here, Larson's interest *is* a right to payment conferred by a prepetition contract.  That Larson received payments through the bankruptcy does not alter that fact.[12]

### B.    There Is No Basis In Equity To Save Larson's Claim From Discharge.

Larson also attempts to raise equitable arguments to avoid discharge of his claim.  These arguments ultimately rest upon Larson's complaint that he was somehow unaware that his interest was even potentially implicated in this bankruptcy.  The undisputed facts and applicable law refute this assertion.

Larson concedes that he received notice of Plan confirmation.  (Ans. ¶ 50) The Debtors' Plan (§ 10.14(a)) reserves "[a]ll Causes of Action … rights of setoff and other legal and equitable defenses of any Debtor or any Estate … for the benefit of the Recovery Trusts unless expressly released, waived, or relinquished under [the] Plan or Confirmation Order."[13]  Under the Plan (§ 1.1), Causes of Action include all Avoidance Actions, which, in turn, include all actions under Bankruptcy Code section 544.  Contrary to Larson's suggestion (Response at 23), a plan need not spell out every possible defense or objection; a broad reservation of rights is sufficient to alert creditors of potential causes of action.[14]  Accordingly, the Plan's reservation of the general right to pursue

---

[12]    Larson may argue that because he received payments up to and through the bankruptcy, any claims he has are post-petition claims.  Such an argument would ignore the basic bankruptcy principles that apply here.  Larson's claim is triggered by the *right to payment*, not the absence of payment.  That right to payment is the only thing that was conferred upon Larson in the subject agreement, and it existed at the time of the chapter 11 petition.

[13]    The Plan (§ 10.14(a)) further provides that "[n]o Person may rely upon the absence of a specific reference under [the] Plan or Disclosure Statement to any Cause of Action … against them as an indication that the Recovery Trusts will not pursue a Cause of Action … against them."

[14]    *In re Worldwide Direct, Inc.*, 280 B.R. 819, 823 (Bankr. D. Del. 2002) (holding broad reservation of rights is sufficient to alert creditors of potential causes of action because it is "impractical and unwarranted to require a debtor to provide . . . excruciating detail [for all]

avoidance actions post-confirmation was sufficient to place Larson on notice that an avoidance action might be brought against him.[15]  Despite this notice, Larson elected to take no action to preserve whatever rights he believed he had.[16]  As a result, Larson's claim was extinguished by the Plan.  Larson cannot now penalize the estate and escape the consequences of his own failure to act.

Larson's judicial estoppel argument (Response at 14-16) does nothing to avoid the consequences of his inaction.   The fact that Delta referred to its own interests in the Leases as real property interests does not preclude Plaintiffs from exercising the right to extinguish Larson's personal property claim.[17]  Larson's interest was discharged by the Plan because that interest is a dischargeable claim under the Bankruptcy Code and the Plan.  How Delta referred to its own interests during the bankruptcy – mistakenly – does not alter the status of Larson's claim.  It also does not give rise to grounds to apply judicial estoppel to block the discharge of Larson's claim, and the cases Larson relies on do not say otherwise.

---

possible defenses or objections which the estate may have to every single claim being treated in plan").

[15]  *See Cohen v. TIC Fin. Sys.* (In re Amspace Corp.), 279 B.R. 145, 160 (Bankr. D. Del. 2002) ("[A] general reservation in a plan of reorganization indicating the type or category of claims to be preserved should be sufficiently specific to provide creditors with notice that their claims may be challenged post-confirmation.").

[16]  *See In re Estill Med. Techs., Inc.*, No. 4-01-48064-DML-11, 2004 Bankr. LEXIS 333, at *12 (Bankr. N.D. Tex. Mar. 26, 2004) (the "very absence of disclosure of the Eagle/Debtor relationship should have alerted Eagle to its peril" and Eagle could and should have protected its interest by raising it during confirmation process).

[17]  While the Schedules and Statements (Jan. 6, 2012) listed the Debtors' interest in the Leases on the Schedule of Real Property (D.I. 148), the Debtors and Plaintiffs are not bound by such designation.  *See B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust* (In re B. Cohen & Sons Caterers, Inc.), 97 B.R. 808, 817 (Bankr. E.D. Pa. 1989) (finding debtor not bound by schedules), *aff'd in part & remanded in part*, 108 B.R. 482 (E.D. Pa. 1989), *appeal dismissed*, 908 F.2d 961 (3d Cir. 1990).

In *In re Exide Technologies*, the debtors attempted to reject certain licensing agreements as executory contracts.[18]  After an eight-day trial, an appeal to the district court, and an appeal to the Third Circuit, the circuit court determined that the licensing agreements were not executory contracts.[19]  Following that decision, the debtor brought an adversary proceeding to declare the licensee's claims discharged under the Plan.[20]  In that action, the court applied the "extraordinary remed[y]"[21] of judicial estoppel in part because the debtors' switch in position was "made in bad faith to circumvent the decision of the Third Circuit in the Rejection Litigation."[22]  As pointed out above, *Exide Technologies* is inapposite, because the interest at issue was a trademark licensing agreement that did not confer a right to payment.  But more to the point here, that case is also inapposite because Plaintiffs have not switched positions or sought to avoid the effect of a court ruling but, rather, are simply seeking to enforce the plain terms of the Plan.

In re Reynolds[23] is also inapposite.  There, the debtors listed debts they owed to a bank and credit card companies in their schedules, but later objected when the creditors filed proofs of claim solely on the basis that the creditors failed to include the agreements on which their claims were based.[24]  The court applied judicial estoppel to

---

[18]    *In re Exide Techs.*, 2013 Bankr. LEXIS 66, at *5.

[19]    *Id.* at *5-8.

[20]    *Id.* at *7-8.

[21]    *Id.* at *26 (alteration in original) (citation omitted).

[22]    *Id.* at *28.

[23]    470 B.R. 138 (Bankr. D. Colo. 2012).

[24]    *Id.* at 140-41.

prevent the debtor from "obtain[ing] a discharge of [the] debts by listing them in their bankruptcy schedules, and, in the same proceeding, repudiat[ing] the very same debt to avoid providing for them in their [C]hapter 13 plan."[25]  Again, nothing of the sort has happened here.  The Debtors gained no tactical advantage from listing their interests in the Leases on the Schedule of Real Property.  And, more importantly, that listing said nothing about Larson's interest and could not alter the fact that that interest was an extinguishable claim.

> **C.    Larson Could Have Perfected His Interest In The Purported Real Property And, Therefore, His Interest May Be Avoided Under Section 544(a)(3).**

Larson also argues that if it was impossible for him to perfect his alleged real property interest, then section 544(a)(3) does not apply, citing *In re Bridge*,[26] for the principle that "[i]f under applicable law, it is not possible for a transferee to perfect such transfer, then such transfer is not avoidable under Section 544(a)(3)."  (Response at 16-18)  Larson's argument turns the case on its head.

The court in *Bridge* did observe that section 544(a)(3) does not mandate the impossible – it does not require a party to record what cannot be recorded *by law* in order to defeat the strong arm powers of the trustee.[27]  The specific interest at issue in *Bridge* was an equitable lien, which the lienholder conceded was recordable and which the court held was avoidable under section 544(a)(3).[28]  But the court also noted that if

---

[25]    *Id.* at 147.

[26]    *Midlantic Nat'l Bank v. Bridge* (In re Bridge), 18 F.3d 195 (3d Cir. 1994).

[27]    *Id.* at 200-03.

[28]    *Id.*

the interest had been un-recordable  – that is, if it had been impossible to record as a matter of law – then it could have defeated a section 544(a)(3) avoidance action.[29] Larson, however, does not hold an un-recordable interest.  Larson asserts that he held a valid ORRI, which he concedes is recordable under California law.  (Response at 8, 16)  Accordingly, his interest is subject to avoidance under section 544(a)(3).

Larson's argument about "wild" deeds (Response at 17 n.4) does not alter this outcome.  It was always possible for Larson to perfect his interest – if he did, in fact, hold a real property interest as he asserts.  Larson could have initiated an action to quiet title, brought an action for declaratory relief or recorded evidence of his interest.[30]  The fact that Larson held a recordable interest that he could have recorded, but failed to record, ends the inquiry here.  Since section 544(a)(3) does in fact apply, Larson's interest is avoidable under the statute.

The recording options outlined above are likely what a true holder of a real property interest would have done here.  At some point since 1999, he or she would have taken the steps necessary to perfect his or her title.  That is perhaps the most remarkable aspect of Larson's argument.  Larson asserts that he holds an unrecorded real property interest at the end of a chain of unrecorded real property interests.  On these uncontested facts, the far more reasonable conclusion is that Delta's net operating interest and Larson's right to payment are *not* real property interests, and Larson knows it.

---

[29]    *Id.* at 203 n.6.

[30]    *See generally*  Cal. Civ. Code § 1060 (authorizing the commencement of actions for declaratory relief to determine an interest in property); *Aguayo v. Amaro*, 213 Cal. App. 4th 1102 (Cal. App. 2d Dist. 2013) (affirming superior court ruling quieting title in connection with a dispute involving a wild deed); *Reiner v. Danial*, 211 Cal. App. 3d 682, 690 (Cal. App. 2d Dist. 1989) (explaining that a bona fide purchaser can assert his status affirmatively in actions to quiet title or remove a cloud from title).

## II.    THE EXCESS PAYMENTS TO LARSON SHOULD BE DISGORGED.

### A.    The Post-Petition Payments To Larson Were Not Authorized By The Court, And The Bankruptcy Code Provides No Basis To Protect Them From Disgorgement Now.

Larson's various defenses to Plaintiffs' request to return the payments he received post-petition fail to overcome the clear bankruptcy provisions that require disgorgement of the payments.

Larson mistakenly argues that Bankruptcy Code section 549(a) is not available to Plaintiffs because the post-petition payments were made in the ordinary course of business and were authorized by the Court.  (Response at 25-26)  Larson ignores that the ORRI payments authorized by the December 19, 2011 and February 13, 2012 court orders (D.I. 66, 296) only applied to *true* ORRIs, *i.e.*, real property interests that were not property of the estate, and only to avoid the risk that the underlying leasehold interests would be terminated due to non-payment (*see* D.I. 9), and did not apply to Larson's prepetition general unsecured claim.  Moreover, even if Larson's interest was a real property interest – and it was not – it was avoided under section 544(a)(3) at the commencement of the case.  Thus, under the code, Larson had no right to receive any post-petition payments in connection with his interest.

Moreover, each of the relevant orders (in ¶ 5) explicitly provides that "[n]othing … in this Order shall be construed as impairing the Debtors' right to contest the validity, priority or amount of any Royalties or ORRI that may be due to any of the Royalty Owners or ORRI Owners."  Therefore, even if the post-petition payments to Larson had been made pursuant to those orders – and they were not – they were improperly made and are subject to the estates' reservation of rights to challenge the validity of the payments.  Thus, the post-petition excess payments to Larson can and

15

should be avoided under section 549(a) and recovered by the Reorganized Debtors under section 550(a).

The fact that Larson had no right to post-petition payments also disposes of his claim for conversion.  (*See* Response at 25)  And without a conversion claim, Larson cannot argue that his decision not to bring such a nonexistent claim served as reasonably equivalent value for the payments.[31]

Finally, Larson's argument that Bankruptcy Code section 542(a) does not apply is without merit because it ignores section 363(b)(1), under which the post-petition payments constitute "property of the estate" that the Debtors would have been authorized to use.[32]

**B.    Larson's Laches Defense Is Without Merit.**

Larson also raises a laches defense based upon the unsupported assertion that Mr. Bullock's testimony – that Plaintiffs only discovered the excess payments during the course of this litigation – lacks credibility.  (Response at 26-27)  But Larson never explains how he can bring a laches defense against an avoidance claim that was filed well within Bankruptcy Code section 546(a)(1)'s statutory filing period of two years from the

---

[31]    *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3rd Cir. 1991) ("The purpose of [fraudulent conveyance] laws is estate preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors.").

[32]    *L.R.S.C. Co. v. Rickel Home Ctrs., Inc.* (In re Rickel Home Ctrs., Inc.), 209 F.3d 291, 297 (3d Cir. 2000) ("'Property of the estate' includes, inter alia, 'all legal or equitable interests of the debtor in property as of the commencement of the case.'  As the legislative history makes clear, 'the scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of action . . . [and] also includes 'title' to property, which is an interest, just as are a possessory interest, or leasehold interest, for example.'") (alteration in original) (citations omitted).

appointment of a debtor-in-possession.  This action was timely filed and is not subject to a laches defense.[33]

Larson's argument also fails because it rests only upon vague complaints regarding Mr. Bullock's experience.   Larson questions whether Mr. Bullock has "sufficient personal, firsthand, non-hearsay knowledge concerning transactions which predated his involvement with Delta and its successors by over a decade."  (Response at 27-28)  But Mr. Bullock has only presented testimony regarding the calculation of the prepetition excess payments with which he is intimately familiar, as he oversaw and assisted in preparing the chart summarizing the historical overpayments.  (Bullock Dec. at Exhibit F)  That is the only testimony that was required here, because Plaintiffs' summary judgment motion rests entirely on basic bankruptcy law and the operative agreements as unambiguously written.

---

[33]    The case Larson cites is instructive in this regard.  *See Official Comm. of Unsecured Creditors v. Aust* (In re Network Access Solutions, Corp.), 330 B.R. 67, 77 (Bankr. D. Del. 2005).  It finds no facts supporting inexcusable delay where an avoidance action was filed by the creditors' committee within the statute of limitations for avoidance actions.  *Id.*  The court also found that the defendants had not met their burden to show prejudice necessary to invoke the equitable doctrine of laches where the pertinent records were not destroyed or beyond the defendants' reach using legal process.  *Id.*

## CONCLUSION

For all of the foregoing reasons and those stated in Plaintiffs' Opening Brief, Plaintiffs respectfully request that the Court (i) grant their motion in all respects and enter summary judgment in favor of Plaintiffs, and (ii) grant Plaintiffs such other and further relief, including costs, expenses and attorney's fees, as the Court deems just and proper.

Dated:      April 5, 2013
              Wilmington, Delaware

*/s/ Anthony W. Clark*
Anthony W. Clark (I.D. No. 2051)
Kristhy M. Peguero (I.D. No. 4903)
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Ron E. Meisler
David R. Pehlke
Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Plaintiffs Delta Petroleum General Recovery Trust and Par Petroleum Corporation*

18