**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - x
                                                :
In re:                                          :     Chapter 11
                                                :
DELTA PETROLEUM, <u>et al.</u>,                 :     Case No. 11-14006 (KJC)
                                                :
         Debtors.                               :     Jointly Administered
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - x
DELTA PETROLEUM GENERAL                          :
RECOVERY TRUST, and PAR                          :
PETROLEUM CORPORATION,                           :
                                                :     Adv. Pro No. 12-50877 (KJC)
         Plaintiffs,                             :
v.                                              :
                                                :
ALERON LARSON, JR.                               :
                                                x
         Defendant, Counterclaimant.

**ALERON LARSON, JR.'S MEMORANDUM IN SUPPORT OF HIS CROSS-
MOTION FOR SUMMARY JUDGMENT**

BENESCH, FRIEDLANDER, COPLAN          JONES & KELLER, P.C.
& ARONOFF LLP

                                       Barry L. Wilkie (Colo. Bar No. 10751)
Raymond H. Lemisch (No. 4204)          Stuart N. Bennett (Colo. Bar No. 5682)
222 Delaware Avenue, Suite 801         1999 Broadway, Suite 3150
Wilmington, DE 19801                   Denver, CO 80202
(302) 442-7010                         (303) 573-1600

*Counsel to Aleron Larson, Jr.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ 3

PRELIMINARY STATEMENT ...................................................................................... 4

SUMMARY OF ARGUMENT ....................................................................................... 6

STATEMENT OF FACTS .............................................................................................. 7

ARGUMENT ................................................................................................................. 14

    A.    The 1999 ORRI is a real property interest that is not Delta's property. ............ 14

    B.    The 1999 ORRI was not a transfer that could be perfected versus a bona fide purchaser, so it cannot be avoided and it remains Larson's property. ........... 18

    C.    Mr. Bullock has no personal knowledge concerning the relevant events in this case, and the Court should therefore disregard Plaintiffs' Motion as it relies on Mr. Bullock's speculation. ...................................................................... 21

    D.    Plaintiffs' discovery responses to date—or lack thereof—demonstrate the Court should grant the Cross-Motion. ................................................................... 21

CONCLUSION .............................................................................................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Aguayo v. Amaro*, 213 Cal. App. 4th 1102 (Cal. App. 2d Dist. 2013) ................. 19, 20, 21

*B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust* (In re B. Cohen & Sons Caterers, Inc.), 97 B.R. 808, 817 (Bankr. E.D. Pa. 1989) ............................................... 17

*Bachrach v. Salzman*, 981 P.2d 219 (Colo. Ct. App. 1999) ............................................ 18

*Glenn Arms Associates v. Century Mortgage & Inv. Corp.*, 680 P.2d 1315 (Colo. Ct. App. 1984) ............................................................................................................................... 17

*In re Silver Fox, LLC*, 2010 WL 2572602 (D.N.J. June 24, 2010)............................. 15, 16

*Reiner v. Danial*, 211 Cal. App. 3d 682 (Cal. App. 2d Dist. 1989)................................. 19

*Richmond Wholesale Meat Co. v. Franchise Tax Bd.*, 42 Cal. Rptr. 2d 854 (Cal. App. 4th 1995) ............................................................................................................................... 15

*Scott v. Boma Inv. Co.*, 72 P.2d 274 (Colo. 1937) .......................................................... 17

**Statutes**

Cal. Civ. Code § 1060 ....................................................................................................... 18

Cal. Civ. Code § 760.020(a) ............................................................................................. 19

Cal. Pub. Res. Code § 3316.11 ......................................................................................... 15

Cal. Stats. 1969, c. 155, p. 409, § 2 ................................................................................. 19

California Code of Civil Procedure § 1060 ................................................................. 19, 20

Aleron Larson, Jr. ("Larson"), by and through his attorneys, submits this Memorandum in Support of his Cross-Motion for Summary Judgment ("Cross-Motion").

## PRELIMINARY STATEMENT

In this case, the Plaintiffs seek a declaration that Delta Petroleum Corporation's ("Delta") Plan of Reorganization (the "Plan") extinguished an overriding royalty interest that Larson has owned since 1999 ("1999 ORRI"), which was granted to Larson by the Debtor, Delta Petroleum Corporation ("Delta").  For the past 13 years the 1999 ORRI has been paid timely and without objection, even throughout Delta's bankruptcy.  On February 12, 2013, Plaintiffs moved for summary judgment on their claims and filed a memorandum in support thereof (Adv. D.I. 34-35).  On March 12, 2013, Larson filed his opposition to Plaintiffs' Motion for Summary Judgment (Adv. D.I. 44, henceforth "Opposition") as well as a Motion to Permit Discovery Pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56(d) prior to the court's decision on Plaintiffs' Motion (henceforth "56(d) Motion") (Adv. D.I. 45).  On March 26, 2013, Plaintiffs filed their Objection to Larson's 56(d) Motion (Adv. D.I. 48).  On April 5, 2013, Larson filed his reply in support of his 56(d) Motion (Adv. D.I. 51) and Plaintiffs filed their reply in support of their Motion for Summary Judgment (Adv. D.I. 52, henceforth "Reply").  On May 29, 2013, the Court held a hearing on the 56(d) Motion and granted Larson until June 21, 2013 to supplement his opposition to Plaintiffs' Summary Judgment Motion and to file, if he so chose, a cross-motion for summary judgment.

Larson served written discovery requests on Plaintiffs on March 11, 2013 to which Plaintiffs responded on April 10, 2013.  During the week of June 3, 2013, the

4

parties conducted the depositions of party representatives and a former employee of Delta.

This memorandum brief supplements Larson's Opposition to Plaintiffs' Motion for Summary Judgment in light of the discovery taken since the March 12 filing of Larson's Opposition and supports Larson's Cross-Motion for Summary Judgment filed contemporaneously herewith (the "Cross-Motion").

Larson's Cross-Motion is based upon his affirmative defenses and counterclaims raised in his answer, affirmative defenses and counterclaims filed January 18, 2013 (Adv. D.I. 26). Larson has a counterclaim (the Fourth) for declaratory judgment that the 1999 ORRI is not extinguished, stripped or avoided by the confirmation order in Delta's bankruptcy, and that the interest is owned by Larson and is full force and effect, unaffected by the Confirmation Order.

The first three counterclaims raise three separate legal grounds to recover from Plaintiffs the monies that are due and payable by Delta with respect to the 1999 ORRI, but which have either simply been withheld without justification or excuse or which have been escrowed pursuant to the parties' stipulation (D.I. 1208). The three counterclaims are for "money had and received" (First Counterclaim); for conversion (Second Counterclaim); and for restitution based upon unjust enrichment (Third Counterclaim). Larson's affirmative defenses arise in part out of Delta's pre- and post-filing conduct of paying Larson's ORRI without objection for 13 years. His defenses are also based upon Delta's conduct during the bankruptcy of listing the ORRI as real property on its Schedule of Assets and Liabilities ("Schedules"), of listing Larson as an owner of his ORRIs on the Schedules, of failing to give Larson any notice of any objection or dispute

with respect thereto, seeking and obtaining court approval for the payment of pre- and post-petition royalties, and making payments to Larson pursuant to the court's authorization. Based on these actions, Larson asserts affirmative defenses of estoppel, laches, unclean hands, waiver, ratification, account stated, violation of due process and violations of public policy.

The indisputable facts upon which Larson's Cross-Motion is based are set out in detail in his Opposition to Plaintiffs' Motion for Summary Judgment and the declarations and exhibits filed in support thereof. They will not be repeated herein, but appropriate references to the materials filed with the Opposition will be provided. In addition, supplementary materials from discovery taken since the filing of Larson's Opposition will be provided herein.

## SUMMARY OF ARGUMENT

1.      The 1999 ORRI is a real property interest, as is Delta's Net Operating Interest ("NOI") and Plaintiffs are estopped to deny otherwise. The 1999 ORRI is not a perfected real property interest because it was not recorded. There is, however, no basis to avoid the 1999 ORRI under Section 544(a)(3) of the Code. Delta's NOI in the Point Arguello Unit was, itself, not perfected by recording, nor was its predecessor's interest, from which Delta received its NOI. As such, any effort to record the 1999 ORRI would have merely resulted in a wild deed, outside of the chain of title. Recording the 1999 ORRI would therefore not have perfected it against a hypothetical *bona fide* purchaser which is a prerequisite to avoidance under Section 544(a)(3).

2.      The Plaintiffs argue that the 1999 ORRI was nothing more than a contractual right to payment and as such was a prepetition unsecured claim that was

6

extinguished upon confirmation of the Plan.  Even if construed as personal property interests, the 1999 ORRI was still a conveyance of property and is still Larson's separate property.  Characterizing the interest as personal does not change the property interest into a contractual interest.  The 1999 interest was not part of Delta's assets and could not have been extinguished by Delta's Plan.  Moreover, Delta paid Larson timely all funds owned by Larson, and therefore due to Larson under the 1999 ORRI from the monies it received from Whiting Petroleum Corporation ("Whiting") until after confirmation of the Plan. At no time, either pre- or post-petition, did Larson have a claim in the chapter 11 case.

3. With respect to the 1999 ORRI, Delta was obligated to pay the production revenues earned by the overriding royalty to Larson, having previously conveyed such property to Larson and Delta has no basis to avoid Larson's interest or convert Larson's funds to its own.  Moreover, the Debtor sought and obtained court approval to make such payments post-petition and such payments were made in the ordinary course of business.

4. There is no basis for Plaintiffs' continued conversion of Larson's property, and Larson is entitled to summary judgment on his counterclaims adjudicating and decreeing that Larson is entitled to all sums wrongfully withheld by Plaintiffs and that Larson is the lawful owner of the 1999 ORRI unaffected by the order of confirmation of Delta's Bankruptcy Plan.

## STATEMENT OF FACTS

1. Given the similarities between the issues to be decided in this Cross-Motion and the facts set forth in Larson's Response to Plaintiffs' Motion for Summary

7

Judgment, Larson incorporates the facts asserted in the Opposition as if fully set forth herein.

2.        The property at issue in this case is a unitized property made up of federal government leases known as the "Point Arguello Properties," which are defined at Exhibit 1 to the Declaration of Steven Roitman ("Roitman Dec.") which is attached to the Opposition as Exhibit A.

3.        In 1994, BWAB Limited Liability Company's ("BWAB") affiliate BWAB Incorporated acquired an option to purchase a large number of properties from the Union Pacific Resources Corp, including the Point Arguello Properties.  The option to purchase such properties was later assigned to Whiting pursuant to a letter agreement dated July 28, 1994 ("Whiting Letter Agreement"), between Whiting and BWAB Incorporated (Roitman Dec. at Ex. 2).

4.        During the fall of 1996, some or all of the leases comprising the Point Arguello Property were unitized into the Point Arguello Unit pursuant to a Unit Agreement dated effective October 1, 1996, between Whiting and a number of other working interest owners (henceforth "Unit Agreement," *see* Roitman Dec. at Ex. 1 at 2). The Unit Agreement, by its terms, describes covenants that run "with the land" to which the Unit Agreement pertains (*see* Transcript of Deposition of Kevin Nanke (henceforth "Nanke Depo.") attached hereto as Exhibit A[1] at 24:12-15; *id.* at 28:1-14; *id.* at Exh. 19, ¶ 21.1).  A unit agreement is an agreement among the owners of several oil and gas leases

---

[1] For brevity, the deposition transcripts attached to this Cross-Motion contain only the referenced page ranges.  Attached as Exhibit A-1 is a master list of all deposition exhibits in this case, along with the deposition exhibits referenced herein.

to operate and produce those leases as one unit.  Only owners of oil and gas leases are parties to such unit agreements (Roitman Dec. at ¶ 15; *id.* at Ex. 1).

5.    During the latter half of 1999, pursuant to the Purchase Agreement and Amendment, Delta attempted to acquire Whiting's ownership interest in the Point Arguello Properties (Roitman Dec. at ¶ 18; Larson Dec. at ¶ 8).

6.    If successfully closed, the transaction as initially contemplated by the Purchase and Sale Agreement would have resulted in Delta's acquisition of all of Whiting's legal and beneficial interest in the Point Arguello Properties, including legal title (Roitman Dec. at ¶ 20; Larson Dec. at ¶ 10; Nanke Depo. at 14:25-15:5; Transcript of Deposition of Seth Bullock (attached hereto as Exhibit B, henceforth "Bullock Depo.") at 86:24-87:9 (the Purchase and Sale Agreement relates to all the seller's interest in the oil and gas leases described on Exhibit A thereto)).

7.    Kevin Nanke was employed at Delta for 17 years (Nanke Depo. at 7:21-23).  During that time, he served as controller, Chief Financial Officer, and treasurer of Delta.  *Id.* at 8:4-21.

8.    Mr. Nanke confirmed that Delta initially contemplated the purchase from Whiting of "a direct working interest in the Point Arguello acquisition."  Nanke Depo. at 15:3-5.

9.    Whiting was unable, however, to obtain the consents of the other working interest owners in the Point Arguello Properties to the transfer of Whiting's legal ownership to the property because of concerns that Delta did not have the financial strength necessary to fulfill Whiting's working interest obligations, particularly those relating to plugging and abandonment of the offshore wells and platforms (Nanke Depo.

9

at 15:13-20; Roitman Dec. at ¶ 21; Larson Dec. at ¶ 11).  The other working interest owners had no objection, however, if Whiting conveyed to Delta all of its ownership in the Point Arguello Properties, **except for legal title** (Roitman Dec. at ¶ 21; Larson Dec. at ¶ 11).

10.    As a result, the Purchase Agreement was amended by an Amendment dated June 8, 1999, and was eventually closed in December of 1999, when Whiting executed and delivered to Delta a Conveyance and Assignment dated December 1, 1999, pursuant to which Whiting conveyed what was labeled a Net Operating Interest in the Point Arguello Properties to Delta (henceforth the "1999 Delta NOI," or "1999 NOI," or "NOI," *see* Roitman Dec. at Ex. 7).

11.    The Amendment to the Purchase Agreement changed the form of the assignment of the properties to Delta, but did not change the definition of the properties being purchased as set forth in paragraph 1.2 of the Purchase Agreement (*Compare* Nanke Depo. at Ex. 21 *with id.* at Ex. 22).  Moreover, the exhibits setting forth the interest purchased are identical between the Purchase Agreement and the Assignment of NOI (Nanke Depo. at 45:1-8; c*ompare* Nanke Depo. at Ex. 21 *with id.* at Ex. 22).

12.    The 1999 Delta NOI states in part: "Whiting Petroleum Corporation … does hereby grant, convey, transfer and assign to Delta Petroleum Corporation… a net operating interest (as herein defined) in, to and under the following:…" (Roitman Dec. at Ex. 7 at 1-2).  The term Net Operating Interest is defined in the 1999 Delta NOI as the following:

> a.  The net operating interest ("NOI") herein conveyed and assigned is defined as the monthly payable positive or negative cash flow resulting to the Interests from the following eight step calculation:

10

(i)    oil and gas sales revenue:
(ii)    **less** royalties and **overriding royalties**:
(iii)    Less Unit lease operating expenses;
(iv)    less severance, production or ad valorem taxes, if any;
(v)    less capital expenditures;
(vi)    less Unit fees to the Unit operator; and
(vii)    plus the positive or less the negative cash flow from the
Partnerships.
(viii)    plus or minus any other miscellaneous costs or revenues
that may be related to these interests or operations….

**In the event of positive cash flow, Assignor will pay the excess to
Assignee; in the event of a negative cash flow, Assignee will pay
the deficit to Assignor.**

(Roitman Dec. at Ex. 7 at 2-3, emphasis added).

13.    The NOI precisely describes the rights and obligations that an owner of
what is known in the oil industry as a "working interest" owner would have, except for
the obligations associated with future costs relating to abandonment of the of the wells
and drilling platforms (Nanke Depo. at 38:20-39:17).

14.    The parties' intended and the definition of Net Operating Interest makes
clear that Whiting retained bare legal title to the Point Arguello Properties but conveyed
all of its beneficial interest to Delta subject to previously granted royalties and overriding
royalties owed to third parties (Roitman Dec. at ¶ 23).

15.    As part of the Purchase Agreement and Amendment transaction, Delta
was required to make a $1,000,000 earnest money deposit.  Because Delta did not have
access to such funds, Larson loaned the money to Delta (Larson Dec. at ¶ 15).  In
addition, the Purchase Agreement and Amendment required that Delta make a
$2,000,000 installment payment on August 2, 1999 (*id.*).  Delta did not have such funds

11

when the installment payment was due and was unable to borrow such funds without Larson's personal guarantee of its loan (*id.*).

16.    Larson provided that personal guarantee of Delta's loan (Larson Dec. at ¶ 15).  Larson provided that personal guaranty at great personal risk to himself (*id.*).  Had Larson not provided that guaranty, Delta would have lost its $1,000,000 earnest money deposit (*id.*).  Larson's personal guaranty enabled Delta to get one step closer to the Purchase of the Point Arguello Properties.

17.    As a result, Whiting and Delta's transaction eventually closed in December of 1999, when Whiting executed and delivered to Delta a Conveyance and Assignment dated December 1, 1999, pursuant to which Whiting conveyed what was labeled a Net Operating Interest in the Point Arguello Properties to Delta (the "1999 Delta NOI"), including Whiting's interest in the Unit Agreement dated effective October 1, 1996 ("Point Arguello Unit Agreement") and the Unit Operating Agreement dated October 1, 1996 ("Point Arguello Unit Operating Agreement"), as described therein (*see* Roitman Dec. at ¶ 22; *id.* at Ex. 7; Larson Dec. at ¶ 12).  The 1999 Delta NOI states in part: "Whiting Petroleum Corporation … does hereby grant, convey, transfer and assign to Delta Petroleum Corporation… a net operating interest (as herein defined) in, to and under the following:…" *Id.* at Ex. 7, pp. 1-2.

18.    As part of the closing of the Purchase Agreement and Amendment, Delta executed and delivered the 1999 ORRI to Larson as consideration for his personal guaranty (Larson Dec. at ¶ 15).

19.    Delta accounted for the 1999 ORRI as an "overriding royalty interest…." Nanke Depo. at 19:2-7.

20.     When Delta acquired the 1999 Delta NOI, it agreed with Whiting that it would not record such document in any county recording office because of Whiting's concern that its other working interest owners would consider such action as a conveyance of legal title in violation of its agreements with them (Roitman Dec. at ¶ 25; Larson Dec. at ¶ 18).  As of February 14, 2013, the 1999 Delta NOI had not been recorded in the public records of the Santa Barbara County, California Recorder's Office (*see* Declaration of Fred Gayner Rappleye attached to the Opposition as Exhibit C, at ¶ 3).  There is also no evidence that Whiting had recorded its ownership interest in the Point Arguello Properties, either before or after, it conveyed the NOI to Delta (*id.*).

21.     Similarly, Larson did not record or file the 1999 ORRI for the same reason that Delta did not record the 1999 Delta NOI in any county recording or filing office (Larson Dec. at ¶ 19).  Whiting was notified and made aware of Delta's delivery of the 1999 ORRI and conveyance of part of its newly acquired interest in the Point Arguello Properties to Larson (*id.*).

22.     Following Delta's acquisition of its interest in the Point Arguello Properties, Whiting distributed to Delta for distribution to Larson monthly revenues owned by Larson pursuant to his 1999 ORRI in the ordinary course of business.  Delta in turn timely distributed such revenues to Larson until September of 2012 (Larson Dec. at ¶ 20).  Even after Delta filed bankruptcy on December 16, 2011, Delta continued to deliver such revenues to Larson in the ordinary course of business when they were received from Whiting (*id.* at ¶ 21).

23.     After Delta filed bankruptcy on December 16, 2011, Delta continued to deliver revenues owned by virtue of Larson's overriding royalties to Larson in the

13

ordinary course of business when they were received from Whiting.  At no time did Delta have an ownership interest in those revenues (Larson Dec. at ¶ 21).

24.     The last payment of production revenues by Delta to Larson was a check dated and received in the latter part of August, 2012.  Notably, the check identified Larson as an "owner" (Larson Dec. at ¶ 24).  Larson has received no further payments on the 1999 ORRI from either Delta, Plaintiffs, or Whiting since that check.

25.     Larson was listed on Delta's Schedule of Assets and Liabilities as an owner of his ORRI (*see* D.I. 140 at 210).  At no time prior to the latter part of September of 2012 did Delta or Plaintiffs ever provide notice to Larson that they disputed the 1999 ORRI, or any amounts owned or previously paid pursuant thereto.

26.     Delta's confirmed Plan and its Disclosure Statement made no mention of Larson's overriding royalty interest, did not indicate that Larson's property interest was disputed, and did not deal with Larson's property interest.  At no time prior to confirmation of its Plan did Delta commence an adversary proceeding to determine the validity, extent and priority of Larson's property interests.

## ARGUMENT

**A.      The 1999 ORRI is a real property interest that is not Delta's property.**

Plaintiffs assert that Larson is no longer entitled to the 1999 ORRI because the NOI did not convey a real property interest to Delta, and that Delta therefore could not have conveyed a real property interest to Larson (Adv. D.I. 35 at 12-13).  However, all evidence in this case points to the fact that the NOI was in fact a real property interest. Plaintiffs' argument that Larson did not receive a real property interest, therefore, fails.

14

In the words of Delta's former Chief Financial Officer, the NOI describes all the rights and obligations that an owner of what is known in the oil industry as a "working interest" would have, except for the obligations associated with future costs relating to abandonment of the of the wells and drilling platforms (Nanke Depo. at 38:20-39:17).  A working interest in an oil lease is an interest in real property.  *Richmond Wholesale Meat Co. v. Franchise Tax Bd.*, 42 Cal. Rptr. 2d 854, 862 (Cal. App. 4th 1995) ("Joint working interest owners are essentially tenants in common in an estate in real property, namely, the right to exploit oil and gas beneath a particular tract of land[,]" *citing*, *inter alia*, Cal. Pub. Res. Code § 3316.11).  The Court should accept the straightforward testimony of Delta's own former high-ranking officer that Delta considered the NOI to be an interest in real property.

Larson furthermore demonstrated in his Opposition that the Plaintiffs' argument the NOI was not a real property interest lacks merit because the consequence of Plaintiffs' argument is that Delta rejected the NOI as an executory contract that was not assumed (Opposition at 13-14).  Plaintiffs retort that "even if the contract between Whiting and Delta were executory…that makes no difference, because the contract could have ridden through the bankruptcy[.]"[2]  Reply at 5 (*citing In re Silver Fox, LLC*, 2010 WL 2572602 (D.N.J. June 24, 2010).  Plaintiffs misstate the bankruptcy record, however, as Delta's "Notice of Rejection of Executory Contracts and Unexpired Leases" explicitly states the following:

---

[2] Plaintiffs also assert, for the first time in this litigation, that the 1999 ORRI was "nothing more than simple factoring agreement that conferred a right of payment to Larson in exchange for its assistance to Delta in the Whiting deal."  Reply at 5.  Plaintiffs cite neither fact nor law for this position concerning "factoring[.]"  *Id.*  Indeed, there is nothing in the plain language of the 1999 NOI that suggests it constitutes a factoring type of arrangement rather than a conveyance of an interest in real property.

**IF AN EXECUTORY CONTRACT OR UNEXPIRED LEASE DOES NOT APPEAR ON AN EXHIBIT TO THE NOTICE OF REVISED EXHIBITS THE EXECUTORY CONTRACT OR UNEXPIRED LEASE WILL BE REJECTED AS OF THE EFFECTIVE DATE.**

D.I. 896 (emphasis in original).  The NOI does not appear on the Notice of Revised Exhibits (D.I. 891).  The order authorizing the assumption of executory contracts does not include the NOI (D.I. 918).

The very case that Plaintiffs cite for the proposition that, if it is a contract, the NOI "rode through" the bankruptcy itself states that the "ride through" doctrine only applies where "a debtor has failed to expressly assume or reject a prepetition lease agreement or executory contract…."  *In re Silver Fox, LLC*, 2010 WL 2572602 at *6 (citation and quotation marks omitted).  If the NOI is a contractual interest as Plaintiffs claim, the foregoing language in Delta's "Notice of Rejection of Executory Contracts and Unexpired Leases" is an express rejection, so the "ride through" doctrine does not apply.  Plaintiffs cannot simply ignore the plain language of Delta's bankruptcy filings and cannot escape the conclusion that the NOI was either an executory contract which has been rejected—which no one is arguing—or that it was an interest in real property (*see* Opposition at 13-14).  As the latter result comports with Delta's repeated assertions in bankruptcy that its interest in Point Arguello was a real property interest—*see*, *e.g.*, D.I. 140 at 9 (Schedule A—Real Property, listing Point Arguello Gross Working Interest of 6.07% of Net Revenue Interest conveyed by 1999 NOI) and D.I. 140 at 112 (Schedule A—Real Property, listing Point Arguello prospect)—the Court should conclude that both the NOI and the 1999 ORRI from which it was carved are interests in real property.  This is the correct factual result, and Plaintiffs have utterly failed to rebut Larson's argument

16

that they are judicially estopped from reversing the positions Delta staked out in its bankruptcy schedules.[3]

Given this conclusion, the plain language of the 1999 ORRI—which is language of conveyance of real property from the NOI, which is also an interest in real property—should control.  Mr. Bullock admits that his assertions in his declaration to the contrary, upon which Plaintiffs rely, are not based on his experience or knowledge (Bullock Depo. at 99:4-12) and he has no basis to say whether the NOI is or is not a real property interest.  As such, the Court should grant summary judgment against Plaintiffs with respect to their claims that Larson lost his 1999 ORRI interests under contract theories.

Under the doctrine of money had and received Plaintiffs are obligated to pay all withheld funds to Larson.  *Scott v. Boma Inv. Co.*, 72 P.2d 274, 275 (Colo. 1937).  Plaintiffs continue to exercise unlawful dominion and control over Larson's property and Plaintiffs' positions in this dispute demonstrate their intent to permanently deprive Larson of this property; in short, Plaintiffs actions constitute the tort of conversion.  *Glenn Arms Associates v. Century Mortgage & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. Ct. App. 1984).  Moreover, Plaintiffs have knowingly received the benefit of the 1999 ORRI proceeds under circumstances where it would be unjust for Plaintiffs to retain the

---

[3] Plaintiffs' sole authority in response to Larson's judicial estoppel argument that Plaintiffs are bound by the representations in their schedules is *B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust* (In re B. Cohen & Sons Caterers, Inc.), 97 B.R. 808, 817 (Bankr. E.D. Pa. 1989), cited in the Reply at 11, n. 17.  That case permitted a debtor to recover $50,000 for lost property, even though her schedule listed the value at $16,500.  97 B.R. at 817.  That the debtor was not bound by her schedules was due to "the context of [the] case" and the fact that the court "firmly believe[d] that [the schedules] *were* inaccurate" in light of competent testimony at trial concerning the value of that property.  *Id.* (emphasis in original).  There is no such reason for the Court to reach a similar conclusion here.  Unlike the *B. Cohen & Sons* debtor, Plaintiffs have not even made "efforts to explain why the Schedules were filled out incorrectly."  *Id.*  Moreover, *B. Cohen & Sons* stands only for the proposition that property valuation, rather than categorization of type, may ultimately differ from the bankruptcy schedules.  Indeed, the Court should heed *B. Cohen & Sons*' admonition that "We cannot emphasize strongly enough that it is important that debtors complete their Schedules accurately."  *Id.*

17

funds. This constitutes unjust enrichment and requires Plaintiffs to disgorge the funds that they have wrongfully retained. *Bachrach v. Salzman*, 981 P.2d 219, 222 (Colo. Ct. App. 1999) *aff'd and remanded*, 996 P.2d 1263 (Colo. 2000). As such, the Court should grant Larson's Cross-Motion and enter summary judgment in favor of Larson and against Plaintiffs concerning Larson's counterclaims.

**B.      The 1999 ORRI was not a transfer that could be perfected versus a bona fide purchaser, so it cannot be avoided and it remains Larson's property.**

As Larson set forth in his Opposition, the 1999 ORRI cannot be avoided in this action because it was not a transfer that could have been perfected against a *bona fide* purchaser due to Delta's failure to record its interests (Opposition at 16-18). Had Larson recorded the 1999 ORRI, it would have been a "wild deed" which would not have provided notice to a *bona fide* purchaser, and thus was not capable of being perfected against such a purchaser (*id.*).

Plaintiffs assert various frivolous replies to this point. First, Plaintiffs assert that merely because ORRIs are "recordable under California law[,]" the 1999 ORRI is an interest "subject to avoidance under section 544(a)(3)." *See* Reply at 14. However, the operative inquiry under 544(a)(3) is not recordability, but perfection versus a *bona fide* purchaser. The issue is whether recording would have had any legal affect as against a *bona fide* purchaser, not whether the interest was capable of being recorded.

Plaintiffs also assert that Larson should have "initiated an action to quiet title" or "brought an action for declaratory relief" to protect his interest. *See* Reply at 14. In support of this argument, Plaintiff cites "Cal. Civ. Code § 1060." Reply at 14 n. 30. However, Cal. Civ. Code § 1060 was repealed over forty years ago. *See* Cal. Stats. 1969,

18

c. 155, p. 409, § 2, operative July 1, 1970.  Even if Plaintiffs had cited the current California quiet title statute, it would not have helped Plaintiffs' argument. Quiet title actions are limited to the establishment of title "*against adverse claims* to real or personal property…." Cal. Civ. Code § 760.020(a) (emphasis added).  Plaintiffs may have intended to cite California Code of Civil Procedure § 1060, which provides for declaratory actions "in cases of actual controversy…."  Here, there was no indication that anyone—much less Delta—disputed Larson's ownership of the 1999 ORRI (Larson Dec. at ¶¶ 27-28).  Delta paid the 1999 ORRI prior to its bankruptcy and affirmatively sought leave from the court to pay the monies owed pursuant to the 1999 ORRI to Larson during its bankruptcy, and actually did pay the monies owed pursuant to the 1999 ORRI pursuant to the Court's order (D.I. 9, 66, 296; Larson Dec. at ¶¶ 20-21).  Simply put, there were no adverse claims against which Larson could have filed an action to quiet title.  Likewise, there was no "actual controversy" concerning which Larson could have filed a declaratory action.  Having quietly laid in wait during the pendency of Delta's bankruptcy, Plaintiffs cannot now ambush Larson in reliance on procedures which require actual claims or controversies.

Plaintiffs cite *Aguayo v. Amaro*, 213 Cal. App. 4th 1102 (Cal. App. 2d Dist. 2013) and *Reiner v. Danial*, 211 Cal. App. 3d 682 (Cal. App. 2d Dist. 1989) for the proposition that Larson should have initiated an action to quiet title or an action for declaratory relief. Reply at 14 n. 30.  Neither case assists Plaintiffs.

*Reiner*'s discussion of standing reinforces the conclusion that declaratory relief pursuant to California Code of Civil Procedure § 1060 was **not** available to Larson concerning the 1999 ORRI:

19

> Plaintiffs are not urging a *mere hypothetical situation* upon this court for determination. Their position is clearly adverse to that maintained by defendant, and an actual controversy exists capable of definite and conclusive relief.  Both plaintiffs clearly have standing to seek declaratory relief.

*Reiner*, 211 Cal. App. 3d at 689 (citation omitted, emphasis added).  By contrast, as discussed above, had Larson brought a declaratory relief action in California state courts pursuant to California Code of Civil Procedure § 1060 prior to the operation of the bankruptcy automatic stay, Larson would have been asking for adjudication of a truly hypothetical dispute.  Larson would be asking the following question:

> Will the court affirmatively declare Larson's rights under the 1999 ORRI where Delta has never challenged Larson's entitlement to the 1999 ORRI and, Delta has paid what is owed pursuant to the 1999 ORRI consistently since it first acquired the property in 1999?

The attenuated and hypothetical nature of any claim for declaratory relief that Plaintiffs assert Larson should have brought shows that Larson was not entitled to that relief.  *Reiner* does not assist Plaintiffs.

Plaintiffs' citation of *Aguayo* includes the following parenthetical description: "(affirming superior court ruling quieting title in connection with a dispute involving a wild deed)".  Reply at 14 n. 30.  The California Court of Appeals did indeed affirm the trial court in *Aguayo*.  Unfortunately, and in all other respects, Plaintiffs grossly misrepresent the nature of the case and its applicability to this dispute.  The trial court found the following:

> "The court is convinced that this 'wild deed' was recorded to insure the legal owners would not receive tax bills and thereby be reminded that property taxes were due." Additionally, the court found that "[t]he act of diverting property tax bills from the true owner was a deceitful act intended to insure the legal owner would not pay their property

20

> taxes and also appears to be a criminal act per Penal Code section
> 115.5."

*Aguayo*, 213 Cal. App. 4th at 1108.  The Court of Appeals found it was proper that the

trial court permitted the party defending against the fraudster's quiet title action to assert

the defense of unclean hands.  *Id.* at 1113-15.  Ultimately, *Aguayo* is a case about the

ineffectual nature of a fraudster recording a wild deed and that fraudster's failure to

obtain real property through quiet title.  Plaintiffs' citation of *Aguayo* only reinforces the

fact that had Larson recorded a wild deed, it would have been ineffectual.  Just like the

*Aguayo* trial and appellate courts, this Court should act to prevent Plaintiffs' attempted

theft of property and grant Larson's Cross-Motion.

**C.      Mr. Bullock has no personal knowledge concerning the relevant events in this case, and the Court should therefore disregard Plaintiffs' Motion as it relies on Mr. Bullock's speculation.**

Mr. Bullock's deposition revealed that he has little to no personal knowledge

concerning the relevant transactions and events in this case.  *See* Bullock Depo. at 29:1-6

(no knowledge of what was intended to be conveyed with 1999 NOI other than what is

written); *id.* at 29:22-30:10 (no knowledge of what was intended to be conveyed with

1999 ORRI other than what is written).  Plaintiffs rely on his admittedly uniformed

Declaration in their Motion for Summary Judgment.  As such, the Court should deny

Plaintiffs' Motion as it relies on inadmissible evidence: Mr. Bullock's uniformed

speculation.

**D.      Plaintiffs' discovery responses to date—or lack thereof—demonstrate the Court should grant the Cross-Motion.**

Additionally, on April 10, 2013, Plaintiffs responded to Larson's written

discovery requests (*see* Discovery Responses attached as Exhibit C).  Seth Bullock

signed the verification of those responses (*id.*).  While these responses asserted seventeen general objections, they omit any mention of the fact that Plaintiffs have 2,500 banker's boxes of records that Plaintiffs have not searched in connection with this case (Bullock Depo. at 79:24-80:17).  Likewise, there is no indication that Plaintiffs have undertaken a search of their electronic records for relevant documents in this case (Bullock Depo. at 80:18-81:4).  Plaintiffs' apparent disregard of their discovery obligations is consistent with the course of document production in this case; on May 31, 2013, Larson produced over 10,000 pages of documents to Plaintiffs that Larson obtained from Whiting, the vast majority of which were documents that Whiting sent to Delta and were thus squarely in Plaintiffs' possession.

Rather than provide full and timely discovery responses, Plaintiffs unilaterally determined that they would not do so; Plaintiffs instead opted to repeatedly state that they would provide complete responses "at the appropriate time…."  *See* Exh. C.  By way of further example, Plaintiffs objected to various fully-defined terms (such as "Whiting's Interest") or commonly-understood phrases (such as "ORRI owners" or "paid under protest").  *Id.*

On May 24, 2013, Larson's counsel in the related BWAB case sent Plaintiffs a letter highlighting the various deficiencies in Plaintiffs' discovery responses in that case (*see* Letter attached as Exhibit D).  The issues that letter highlighted pertain with equal force to this case.  Plaintiffs have yet to respond to that letter or supplement their deficient discovery responses in either case.  As such, Larson may be forced to move to compel Plaintiffs' provision of full and complete discovery responses pursuant to F.R.C.P. 37 as well as seek relevant sanctions under that rule.  Larson hereby reserves his

22

right to supplement this Cross-Motion should the Court enter any sanction on account of Plaintiffs' obstructionist approach to discovery.  Larson's discovery requests provided Plaintiffs' with an opportunity to bring forth evidence that would have demonstrated why the Court might not grant the Cross-Motion; the generally non-responsive nature of Plaintiffs' responses and apparent disinterest in searching their own files suggests that Plaintiffs have no such evidence.

## CONCLUSION

For the foregoing reasons, and those set forth in the Opposition and the attachments thereto, the Court should grant summary judgment in Larson's favor and against Plaintiffs concerning Plaintiffs' claims, and grant summary judgment in Larson's favor and against Plaintiffs concerning Larson's counterclaims.

Dated:        June 21, 2013

                                        **BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

                                        By:  /s/ Raymond H. Lemisch
                                                 Raymond H. Lemisch, Esquire (No. 4204)
                                                 222 Delaware Avenue, Suite 801
                                                 Wilmington, DE 19801
                                                 (302) 442-7010 telephone
                                                 (303) 442-7012 facsimile
                                                 rlemisch@beneschlaw.com

                                                 – and –

23

Barry L. Wilkie, Esq.
Stuart N. Bennett, Esq.
**JONES & KELLER, P.C**
1999 Broadway, Suite 3150
Denver, CO  80202
(303) 573-1600 telephone
(303) 573-8133 facsimile
bwilkie@joneskeller.com

*Counsel to Aleron Larson, Jr.*