# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| DELTA PETROLEUM CORPORATION, *et al.*, | : | Case No. 11-14006 (KJC) |
| | : | Jointly Administered |
| Debtors. | : | |
| DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM CORPORATION, | : | |
| | : | Adv. Pro. No. 12-50877 (KJC) |
| Plaintiffs, | : | |
| v. | : | |
| ALERON LARSON, JR., | : | |
| Defendant. | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO LARSON'S CROSS-MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| Anthony W. Clark (I.D. No. 2051) Kristhy M. Peguero (I.D. No. 4903) One Rodney Square P.O. Box 636 Wilmington, Delaware 19899-0636 (302) 651-3000 | Ron Meisler David R. Pehlke 155 North Wacker Drive Chicago, Illinois 60606-1720 (312) 407-0700 |
| Dated: Wilmington, Delaware July 5, 2013 | *Counsel for Plaintiffs Delta Petroleum General Recovery Trust and Par Petroleum Corporation* |

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ....................................................................................................2

ARGUMENT .........................................................................................................................5

I.  THE 1999 AGREEMENT BETWEEN WHITING AND DELTA DID NOT ASSIGN AN INTEREST IN REAL PROPERTY TO DELTA, IT ASSIGNED A NET OPERATING INTEREST, OR "CASH FLOW" TO DELTA. .................................5

II.  LARSON HOLDS ONLY A RIGHT TO PAYMENT FROM THE NOI AND THAT RIGHT TO PAYMENT WAS DISCHARGED IN THE BANKRUPTCY. ...........7

III.  IF LARSON'S 1999 INTEREST ACTUALLY WERE A REAL PROPERTY INTEREST, THEN LARSON COULD HAVE PERFECTED THAT INTEREST. ..........8

CONCLUSION .....................................................................................................................10

# **TABLE OF AUTHORITIES**

**Page**

## **CASES**

*In re APF Co.*,
    270 B.R. 567 (Bankr. D. Del. 2001) ................................................................................8

*Environmental Defense Project of Sierra City. v. City. of Sierra*,
    158 Cal. App. 4th 877 (Cal. Ct. App. 2008) ....................................................................9

*FCC v. NextWave Personal Communications Inc.*,
    537 U.S. 293 (2003) ........................................................................................................7

*Indian River Homes, Inc. v. Sussex Trust Co.*,
    108 B.R. 46 (D. Del. 1989) .............................................................................................7

*Stewart Foods v. Broecker* (In re Stewart Foods),
    64 F.3d 141 (4th Cir. 1995) ............................................................................................8

*In re Waste Systems International*, *Inc.*,
    280 B.R. 824 (Bankr. D. Del. 2002) ...............................................................................8

## **STATUTES**

11 U.S.C. § 101(5)(A) ................................................................................................................7

## **OTHER AUTHORITES**

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ..........................................7

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887 ..............................................7

Plaintiffs respectfully submit this brief in opposition to Defendant Larson's cross-motion for summary judgment. (D.I. 74, 75 ("Cross-Motion" or "CMSJ").)[1]

## PRELIMINARY STATEMENT

Larson's cross-motion restates the arguments he presented in response to Plaintiffs' motion for summary judgment. (*See* D.I. 44.) As a result, there is virtually nothing new here for the Court to consider. This dispute still boils down to a simple question of contract interpretation. Plaintiffs argue that the relevant contracts (the 1999 NOI and the 1999 Assignment (Roitman Decl. (D.I. 44-1) Ex. 7; Larson Decl. (D.I. 44-2) Ex. 3))[2] unambiguously establish that Larson's interest was not an interest in real property, but was instead a right to payment from a specifically defined cash flow. As a right to payment, this interest constituted a claim under the Bankruptcy Code. That claim was extinguished after the Plan was approved.

All of Larson's arguments to the contrary—whether in response to Plaintiffs' motion or in his cross-motion—rest upon the same assertion: regardless of what the contracts say, Larson received an interest in real property. As set forth below, Larson repeatedly advances that assertion without identifying any basis for it in the contracts. Instead, Larson relies upon conjecture from a deponent about the nature of an interest with which he *admitted* he was entirely unfamiliar. (*See infra* Section I (discussing Larson's reliance on Mr. Nanke's testimony regarding the NOI while ignoring Mr. Nanke's admission that the NOI was an entirely novel deal structure for him).) In fact, Larson's cross-motion devotes almost no attention to the actual language used in any of the relevant contracts. That absence is telling.

---

[1] Unless otherwise noted, terms defined, and record citation forms used in Plaintiffs' opening memorandum of law in support of its summary judgment motion (D.I. 35) are used herein.

[2] Wherever possible, and in order to avoid unnecessarily repetitive filings, Plaintiffs will cite to exhibits to the parties' prior filings.

Larson knows that the contracts say what they say and that he has no contract-based arguments for his position. As a result, rather than discuss what the contracts say, Larson attempts to cloud the waters with unsupported assertions about what the contracts mean according to the "industry," or according to some witness unfamiliar with the type of financial instrument at issue, or according to the self-serving interpretations of the individuals who will lose money if the contracts are interpreted *as written*.

There is no need for the Court to consider Larson's extraneous conjecture. The Court need only look to the unambiguous language of the contracts to determine that there is simply no way to extract an actual ORRI from those documents. That one fact eliminates all of Larson's arguments and requires summary judgment in favor of Plaintiffs.

## STATEMENT OF FACTS

As Larson's cross-motion is largely a rehash of his response to Plaintiffs' motion for summary judgment, the underlying facts are generally identical to those set forth in support of Plaintiffs' motion. In order to avoid unnecessary repetition, Plaintiffs hereby incorporate their prior statements of facts from their briefing in support of their motion for summary judgment. Plaintiffs will only add here the relevant deposition testimony from certain witnesses, as it relates to the specific contracts at issue.

In 1999, defendant BWAB advised Delta of a possible opportunity to acquire Whiting's interests in the Point Arguello Properties (the "Properties"). (Roitman Dep. 43:20-44:1 (attached hereto at Exhibit A).) In exchange for BWAB's assistance, Delta and BWAB executed a proposed fee schedule that would confer different interests on BWAB, depending on the interest that Delta ultimately acquired. (*Id.* 44:2-8; Roitman Decl. Ex. 6 (April 1, 1999, Agreement).) According to that fee schedule, if Delta were to acquire Whiting's full interest, then BWAB would receive a "proportionally reduced 3.0% overriding royalty interest out of the net revenue

2

interest acquired by Delta, in recordable from and containing warranties of title by, through, and under Delta, but not otherwise." (Roitman Decl. Ex. 6 ¶ 3(2).) If, however, Delta only acquired a "net operating interest, BWAB's overriding royalty interest will be calculated as 3.0% of the actual gross revenue generated from and accrued to Delta's interest." (*Id.*) The "net operating interest" option does not require an interest in recordable form or warranties of title. (*Id.*) The "net operating interest" option was included in case Delta could not secure the consents necessary to acquire Whiting's full interest. (Roitman Dep. 48:10-14 ("I believe that the reason net operating interest was contemplated is because of the approvals needed by the other working interest owners within the unit to approve Delta to buy all of Whiting's right, title, and interest.").)

On July 30, 1999, Delta's Board of Directors resolved to assign to Larson a 1% overriding royalty interest in the Whiting interests when and if Delta acquired any Whiting interests. (July 30, 1999, Delta Board Minutes, ¶ 4(a) (attached hereto as <u>Exhibit D</u>)). The Board noted that, at that time, there were still two alternative forms of acquisition that Delta might close with Whiting. (*Id.* ¶ 1.) Delta might secure either "a working interest or an equivalent net operating profits interest, or NOPI" from Whiting. (*Id.*)

Delta was ultimately unable to acquire Whiting's full right, title, and interest due to the refusal of other unit holders in the Properties to consent to that acquisition. (Larson Dep. 36:8-38:10 (describing circumstances that lead to Delta acquiring "all the incidences of ownership," as opposed to "legal title") (excerpts attached hereto as <u>Exhibit B</u>).) As a result, Delta acquired from Whiting the Net Operating Interest ("NOI"), as defined in the 1999 NOI Agreement, instead of Whiting's full right, title, and interests in the Properties. (*Id.*; *see also* Roitman Decl. Ex. 7 (1999 NOI).) Because Delta only acquired an NOI, as opposed to Whiting's full right, title

3

and interest in the Properties, Larson was assigned a 1% interest in that NOI. (Ex. D; Larson Decl. Ex. 3 (1999 Assignment).)

The 1999 NOI Agreement defined the NOI as follows:

> The net operating interest ("NOI") herein conveyed and assigned is defined as the monthly payable positive or negative cash flow resulting to the Interests from the following eight step calculation:
>
> (i)     oil and gas sales revenue;
> (ii)    less royalties and overriding royalties;
> (iii)   less Unit lease operating expenses;
> (iv)    less severance, production or ad valorem taxes, if any;
> (v)     less capital expenditures;
> (vi)    less Unit fees to the Unit operator; and
> (vii)   plus the positive or less the negative cash flow from the Partnerships;
> (viii)  plus or minus any other miscellaneous costs or revenues that may be related to these interests or operation. . .
>
> In the event of positive cash flow, Assignor will pay the excess to the Assignees; in the event of a negative cash flow, Assignees will pay the deficit to Assignor.

(Roitman Decl. Ex. 7.) In its annual report, Delta described the NOI as a "financial arrangement" that is intended to be "equivalent" to a "working interest." (Larson Decl. Ex. 2 (Delta Annual Report).) Delta's CEO considered the NOI to be a lesser interest than the interest Delta originally wanted to acquire from Whiting. (Larson Dep. 19:5-7.) The financial arrangement of a net operating interest was a novel structure unfamiliar to Delta. (Nanke Dep. 103:6-14 (excerpts attached hereto at <u>Exhibit C</u>); Larson Dep. 19:16-20.)

4

**ARGUMENT**

I.    **THE 1999 AGREEMENT BETWEEN WHITING AND DELTA DID NOT ASSIGN AN INTEREST IN REAL PROPERTY TO DELTA, IT ASSIGNED A NET OPERATING INTEREST, OR "CASH FLOW" TO DELTA.**

Larson misstates the record when he asserts that "all evidence in this case points to the fact that the NOI was in fact a real property interest." (CMSJ 14.)  The *only* support Larson offers for this assertion is the testimony of Mr. Nanke that the NOI interest appeared to him to be a "working interest." (*Id.* 15)  Larson relies on this statement exclusively despite the fact that Mr. Nanke later admitted that he had never dealt with an "NOI" before and that "[i]t was not a typical structure that [he] was used to applying." (Nanke Dep. 103:6-14.)  The unique nature of this interest was reiterated by Larson in his deposition. (Larson Dep. 19:16-20 ("[I]t's not a definitive term, legal term of art. . . .  You can't tell by looking at these words what that means.").)  Larson also ignores the significant additional evidence that directly contradicts his thinly supported assertion that Delta acquired a real property interest from Whiting:

- Delta originally contemplated two possible forms of acquisition from Whiting: "a working interest **or** an equivalent net operating profits interest, or NOPI." (Ex. D (July 30, 1999, Delta Board Minutes).)

- Larson considered the second option, the NOI, to be a *lesser* interest (Larson Dep. 19:5-7).

- According to the fee agreement between Delta and defendant BWAB, if Delta only acquired the NOI, then BWAB's 3% finder's fee interest would not need to be assigned in recordable form or with warranties of title. (Roitman Decl. Ex. 6 (April 1, 1999, BWAB Fee Agreement).)

- Delta and Whiting drafted an amendment to their agreement that would be triggered if Delta was not able to acquire the full bundle of rights it originally intended to acquire. (Bullock Decl. Ex. C (August 25, 1999, Delta 8-K).)  Once triggered, that amendment would change the nature of the interest conveyed from the full bundle of rights Delta initially sought to acquire, to the NOI as defined in the agreement. (*Id.*)

- The amendment was triggered because the other unit holders would not consent to Delta's full acquisition of Whiting's interests. (Larson Dep. 36:8-38:10.)

5

- Delta and all of its subsequent assigns were specifically instructed *not* to record their interests. (Larson 60:4-6.)

- Delta described the NOI in its own Annual Report as a "financial arrangement." (Larson Decl. Ex. 2.)

Larson wants the Court to believe that the NOI, a novel financial arrangement contrived specifically to get around Delta's *inability* to acquire Whiting's full working interest, nonetheless conveyed to Delta the *same* bundle of real property rights as originally intended. But Larson does not, and cannot, address how the NOI could have cured the concerns of other unit holders *and* conveyed a co-extensive bundle of rights in the Properties. (*See, e.g.*, Roitman Dep. 63:9-14 ("Q: If the outcome was the same [between the originally intended transaction and the NOI], how does that cure the concerns of the other partners and the lack of consents? A: That's a question I don't have an answer to.").) That is because the truth is far simpler. When it became clear to Delta that it could not acquire the full bundle of Whiting's rights—all its "right title, and interest" in the properties—Delta instead acquired the economic equivalent of Whiting's interest in the form of a novel "financial arrangement," the NOI. That outcome is reflected in the unambiguous language of the 1999 NOI.

The 1999 Delta-Whiting Agreement unambiguously defines the NOI as the net "cash flow" that results from a specific calculation. (*See supra* Statement of Facts.) That calculation deducts certain expenses and burdens from the gross revenues to Whiting's interests. (*Id.*) The *result* of that calculation—the net cash flow—is what Delta received from Whiting. (*Id.*) Delta did not receive an interest in land or hydrocarbons. It received a cash flow. A cash flow is not an interest in real property.[3]

---

3   Larson's last ditch effort to transform the 1999 NOI from a financial arrangement into a real property interest is to argue that the NOI can only be a rejected executory contract or a real property interest. (CMSJ 27-28.) The NOI, however, is neither of these things. The NOI is a fully executed contract

*(cont'd)*

6

## II.  LARSON HOLDS ONLY A RIGHT TO PAYMENT FROM THE NOI AND THAT RIGHT TO PAYMENT WAS DISCHARGED IN THE BANKRUPTCY.

The undisputed fact that Delta acquired only a cash flow when it acquired the NOI quickly dispenses with Larson's argument that the 1999 Assignment conveyed to him an interest in real property.  Delta held an interest in a cash flow, not real property, therefore it could only assign an interest in that cash flow, not real property.  Through the 1999 Assignment, Larson held a 1% interest in the net cash flow that Whiting sent to Delta after running the NOI calculation each month.  That 1% interest therefore constituted nothing more than a right to payment from the proceeds of the NOI.  Under black letter bankruptcy law, a right to payment is a dischargeable claim.

Section 101(5)(A) of the Bankruptcy Code defines a "claim" to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"[4]  As discussed above, the 1999 NOI granted Delta a specifically defined net cash flow.  That defined cash flow is Delta's property.  In exchange for his assistance in financing the Whiting-Delta deal, Delta then assigned to Larson a 1% interest in that cash flow.  Accordingly,

---

*(cont'd from previous page)*
that requires only the payment of money.  *See Indian River Homes, Inc. v. Sussex Trust Co.*, 108 B.R. 46, 50 (D. Del. 1989) (citing *In re Murtishi*, 55 B.R. 564, 569 (Bankr. N.D. Ill. 1985) ("It is well established that where all the elements of performance have been accomplished leaving only an obligation to pay money, the contract is not executory within the meaning of the statute.")).  Accordingly, there was no need for the debtor to accept, reject, or elect to allow that contract to ride through the bankruptcy.

[4] 11 U.S.C. § 101(5)(A).  *See also* H.R. Rep. No. 95-595, at 309 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6266; S. Rep. No. 95-989, at 21-22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5887, 5807-08 (stating that the term "claim" encompasses the "broadest possible definition" and "contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case [and] permits the broadest possible relief in the bankruptcy court").  *See also FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (noting that the term "claim" "has 'the broadest available definition'" (citation omitted)).

every month, Delta paid Larson his 1% interest from out of Delta's NOI cash flow.  Thus, Larson's 1% interest is nothing more than a right to payment created through a standard non-executory prepetition contract with Delta (the debtor).  Under relevant bankruptcy law, that right to payment is a prepetition claim.[5]

The fact that Larson received payments through the bankruptcy does not alter that fact.  Larson's claim is triggered by the *right to payment*, not the absence of payment.  Similarly, the fact that Larson has not received any payments since the debtor discovered the improper payments that were made to Larson in connection with this discharged claim does not constitute conversion or unjust enrichment.  (*See* Pl.'s Motion for Summary Judgment.)  Larson's right to payment was a claim upon the debtor estate.  That claim has been extinguished.  (*Id.*)

### III. IF LARSON'S 1999 INTEREST ACTUALLY WERE A REAL PROPERTY INTEREST, THEN LARSON COULD HAVE PERFECTED THAT INTEREST.

Larson argues that his 1999 interest is a real property interest *and* that it would have been impossible for it to perfect that interest due to Delta's failure to record the NOI (which Larson also contends is a real property interest).  (CMSJ 18-21.)  On that basis, Larson asserts that the 1999 Interest is not avoidable under section 544(a)(3).  (*Id.*)  The parties briefed this issue extensively in connection with Plaintiffs' motion for summary judgment.  The only new argument that Larson raises in the cross-motion is the assertion that it could not have sought a declaration as to its property rights because it would not have had standing to do so.  (*Id.*)

---

[5]   *Stewart Foods v. Broecker* (In re Stewart Foods), 64 F.3d 141, 145 (4th Cir. 1995) ("[R]egardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings."); *In re Waste Sys. Int'l, Inc.*, 280 B.R.824, 827 (Bankr. D. Del. 2002) (noting that royalty payments due to non-debtor under a non-executory prepetition contract gave rise to general unsecured claims); *In re APF Co.*, 270 B.R. 567, 572 (Bankr. D. Del. 2001) (noting that debtors' payment obligations due under deferred compensation portion of prepetition merger agreement was prepetition claim).  There can be no dispute that Larson's agreement with Delta is non-executory.  There is no additional performance required from Larson under the agreement.

Larson argues that because it had received payments pursuant to the 1999 Interest, there was no existing controversy to form the basis for a declaratory action. (*Id.* 19-20.)

Larson's argument fails because a declaratory action could have been brought on the basis of the immediate controversy regarding Larson's ability to record its supposed real property interest. *See Environmental Defense Project of Sierra Cty. v. Cty. of Sierra*, 158 Cal. App. 4th 877, 884 (Cal. Ct. App. 2008) ("The purpose of declaratory relief is 'to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission or wrongs.'") (citation omitted). According to Larson, in 1999, he believed that he was receiving an interest in real property, even though this interest in real property was being conveyed by an entity that had been instructed not to record its own supposed real property interest, and that then instructed all subsequent assignees not to record *their* supposed real property interest. (*See* Larson 60:4-6 ("Whiting asked us not to [record] . . . I don't believe Whiting had even recorded its interest."); Roitman Dep. 80:8-17 ("It was requested by Delta that we don't record our assignment, and it had to do with notice to the other working interest owners in the unit and any of the partnerships they were involved with at point Arguello.").) Moreover, all of the instructions not to record came after Delta had been forced to *change* the subject of its acquisition of Whiting's interest from all of Whiting's right, title, and interest in the properties, to a novel device called a Net Operating Interest. (*See supra* Section I.)

As a supposed real property holder, at any point after the execution of the 1999 Assignments, Larson could have challenged Delta's objection to recording the 1999 Interest as well as Delta's attempt to enforce that objection by refusing to record its own interest, and sought a declaration of his rights in the Properties. *See Environmental Defense Project of Sierra Cty.*, 158 Cal. App. 4th at 885 (A "controversy is 'ripe' when it has reached, but has not passed,

9

the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made."). Indeed, it is difficult to fathom why anyone who believes they hold an interest in real property would simply accept an instruction not to record, rather than, at some point, seeking to perfect and protect his interest. Larson cannot use his *choice* not to perfect his rights to nullify section 544(a)(3).

The fact that Larson could have taken steps to attempt to perfect his supposed real property interest ultimately does not matter. Any such effort would have failed—not because of any non-existent standing problem, but because the 1999 Assignment did not convey a real property interest. Once again, Larson's argument ultimately returns to and relies upon the same underlying assumption—that he was assigned a genuine ORRI. But, as Plaintiffs have demonstrated here and in their own motion for summary judgment, the contracts at issue unambiguously contradict Larson's foundational assumption. Larson never held anything more than a right to payment from a defined cash flow.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court deny Larson's cross-motion and grant Plaintiffs' motion for summary judgment.[6]

---

[6] Larson includes in his cross-motion a complaint regarding the discovery he has received to date in this action. (CMSJ 21-23.) Larson, however, never raised any of his discovery issues with the Court, and instead allowed the discovery window to close on June 7, 2013. Larson also conceded to the Court at the June 25, 2013, status hearing that no further discovery was needed for the resolution of the parties' cross-motions for summary judgment. Larson's untimely complaint regarding discovery has no bearing on the cross-motions for summary judgment currently pending before the Court.

Dated: July 5, 2013
Wilmington, Delaware

*/s/ Anthony W. Clark*
Anthony W. Clark (I.D. No. 2051)
Kristhy M. Peguero (I.D. No. 4903)
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Ron E. Meisler
David R. Pehlke
Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Counsel for Plaintiffs Delta Petroleum General Recovery Trust and Par Petroleum Corporation*

11