# EXHIBIT B

Case 12-50877-KJC   Doc 84-2   Filed 07/05/13   Page 2 of 7

In Re: Delta Petroleum Corp. (Debtor)    ALERON H. LARSON, JR.                        6/6/2013

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

Case No. 11-14006(KJC)     (Jointly Administered)
Adv. Pro No. 12-50898(KJC)
Adv. Pro No. 12-50877(KJC)

IN RE:

DELTA PETROLEUM CORPORATION, et al.,

Debtors,

DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
CORPORATION,

Plaintiffs,

v.

BWAB LIMITED LIABILITY COMPANY,

Defendant.

and

DELTA PETROLEUM GENERAL RECOVERY TRUST and PAR PETROLEUM
CORPORATION,

Plaintiffs,

v.

ALERON LARSON, JR.,

Defendant.

---

DEPOSITION OF:   ALERON H. LARSON, JR. - June 6, 2013

---

Case 12-50877-KJC   Doc 84-2   Filed 07/05/13   Page 3 of 7

In Re: Delta Petroleum Corp. (Debtor)     ALERON H. LARSON, JR.                         6/6/2013

Page 19

1   written here, but as you describe it?

2        A.   Yes.  This was just a mistake Steve did or

3   his attorney did or something, at least that's my

4   opinion; I don't know, you'd have to ask Steve.

5        Q.   So in your mind, a net revenue interest is

6   a lesser interest than a gross revenue interest?

7        A.   Yes.

8        Q.   So let's go to option two, Should Delta

9   acquire a net operating interest, BWAB's overriding

10  royalty interest will be calculated as 3 percent of

11  the actual gross revenue generated from and accrued to

12  Delta's interest.  The term "net operating interest,"

13  is that -- prior to this deal, was that a common term

14  that you had seen in the oil and gas business, a net

15  operating interest?

16       A.   It's a -- it's not a definitive term,

17  legal term of art.  It's sort of an oil and gas slang,

18  catch-all, for a number of things that could probably

19  be considered a net operating interest. You can't

20  tell by looking at these words what that means.  If

21  you go to the -- I wish I could remember, a yellow

22  back that has -- I can't remember the name of it.

23            But if you look at oil and gas terms, it

24  will have a loose thing in it that can't -- you can't

25  go from here and see what net operating interest --

Case 12-50877-KJC   Doc 84-2   Filed 07/05/13   Page 4 of 7

In Re: Delta Petroleum Corp. (Debtor)     ALERON H. LARSON, JR.                                    6/6/2013

Page 36

1       A.      I vaguely recall it, yes.

2       Q.      Do you know what precipitated the drafting

3   of this amendment?

4       A.      Let me read through it and see.

5       Q.      Take your time.

6       A.      This is 14 years ago.  Oh, yes, I

7   remember.

8       Q.      Do you recall what precipitated the

9   amendment?

10      A.      Whiting -- the partners out there in the

11  Point Arguello unit wanted Whiting to retain its

12  obligation to -- for the abandonment costs, because

13  Whiting had a parent at the time, essentially it was

14  spun off into a public company; it had been one, then

15  it was purchased.

16              And the parent was a large utility, and

17  they wanted to keep the parent that -- the parent had

18  made a -- had underwritten or guaranteed the

19  obligation of Whiting, and they wanted to keep Whiting

20  in some fashion on there so that they could have that

21  guarantee.  And Delta was too small and we couldn't

22  get guarantee that would equal that big a utility.

23      Q.      Under the original form of the agreement,

24  which is ahead of the amendment and as we reviewed in

25  the prior 8-K, the June 9 8-K, if you recall at

Case 12-50877-KJC   Doc 84-2   Filed 07/05/13   Page 5 of 7

In Re: Delta Petroleum Corp. (Debtor)     ALERON H. LARSON, JR.                                6/6/2013

Page 37

1   Article 9.1, there was a commitment, and that's on

2   page 2442 of this document.  In Article 9.1, it had

3   been anticipated in the original form of the agreement

4   that Whiting would retain liability for all

5   abandonment costs.

6           A.    Yes.

7           Q.    Given the conclusion of that in particular

8   in the original form of the agreement, how would that

9   amendment fit into a need for Whiting to retain

10  liability or abandonment costs if it was already in

11  the agreement?

12          A.    I see what you're saying.  Whiting

13  assigned -- Whiting conveyed to Delta -- I have to

14  make sure I don't say "us," because I don't want to

15  confuse my individual capacity with Delta.  But

16  Whiting was to convey its interest to Delta, and it

17  did so; it conveyed its interest with the one change

18  that was that Whiting retain legal title on behalf of

19  Delta, they actually conveyed everything they had and

20  retained legal title so that they could -- which

21  seemed to be acceptable for the partners out there.

22                And this was an arrangement whereby Delta

23  obtained the ownership of the whole thing except for

24  the -- except for legal title.

25          Q.    Just to make sure I understand that, so

Case 12-50877-KJC   Doc 84-2   Filed 07/05/13   Page 6 of 7

In Re: Delta Petroleum Corp. (Debtor)    ALERON H. LARSON, JR.                    6/6/2013

Page 38

1   the amendment addresses a concern on the part of

2   Whiting's partners that Whiting retain legal title?

3         A.   The concern, as I understand it, was that

4   Whiting retain its obligations and that legal title

5   might be a way to do it.

6         Q.   Okay.

7         A.   So I can't tell you exactly what the

8   thinking was on their part.  We were concerned only

9   that we got all the incidences of ownership, which we

10  did.  When I say "we," again, I'm talking about Delta.

11        Q.   Did you ever have any conversations with

12  anyone at Whiting about the net operating interest?

13        A.   I didn't personally; Roger and perhaps

14  others in our company did, some of our land people and

15  whatnot.

16        Q.   Do you know who initially came up with the

17  structure of a net operating interest for this deal?

18        A.   I don't know whether it came through us

19  for them or even if it perhaps came from BWAB; I don't

20  know the individual party who suggested it.

21        Q.   Okay.

22        A.   It may have even been an attorney

23  someplace.

24        Q.   And do you know if the net operating

25  interest was ever discussed with any of Whiting's

Case 12-50877-KJC   Doc 84-2   Filed 07/05/13   Page 7 of 7

In Re: Delta Petroleum Corp. (Debtor)    ALERON H. LARSON, JR.                                                  6/6/2013

Page 60

1      Q.    Did you record the 1999 assignment?

2      A.    No.

3      Q.    Why did you not record it?

4      A.    Whiting asked us not to, asked Delta not

5   to record it. I don't believe Whiting had even

6   recorded its interest. Much of that was taken care of

7   at the MMS, and whether it was recorded or not, they

8   couldn't go to the MMS and make a change without the

9   MMS approval, so nobody really worries about that too

10  much. We did not want to do anything that would

11  compromise Whiting, and that's what they asked us to

12  do, so we did it.

13            When I say "we," that was Delta. Once

14  Delta didn't record it, we derived our interest from

15  Delta. You know, number one, we wanted to make sure

16  we, as officers and directors, were in compliance with

17  our understanding of Whiting; and, number two, it

18  wouldn't have made any difference anyway because there

19  was no chain of title there. You know, the legal

20  title was kept safely by Whiting for us.

21     Q.    If you look at Exhibit 13, which is the

22  2001 Kaiser-Francis assignment, you'll see at the top

23  a stamp. Is it correct based on that stamp -- or does

24  that stamp indicate to you that Kaiser-Francis

25  recorded this assignment?