## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 11-14006 (KJC) |
| DELTA PETROLEUM CORPORATION, | : | |
| *et al.*,[1] | : | Jointly Administered |
| Debtors | : | |
| | : | |
| | : | |
| DELTA PETROLEUM GENERAL | : | Adv. Proc. No. 12-50898  (KJC) |
| RECOVERY TRUST, | : | (Re: D.I. 34, 74) |
| and | : | |
| PAR PETROLEUM CORPORATION, | : | |
| Plaintiffs | : | |
| v. | : | |
| BWAB LIMITED LIABILITY | : | |
| COMPANY, | : | |
| Defendant | : | |
| | : | |
| DELTA PETROLEUM GENERAL | : | Adv. Proc. No. 12-50877  (KJC) |
| RECOVERY TRUST, | : | (Re: D.I. 34, 74) |
| and | : | |
| PAR PETROLEUM CORPORATION, | : | |
| Plaintiffs | : | |
| v. | : | |
| ALERON LARSON, JR., | : | |
| Defendant | : | |

## <u>MEMORANDUM</u>[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

---

[1] The debtors in the jointly administered chapter 11 cases are Delta Petroleum Corporation; DPCA LLC; Delta Exploration Company, Inc.; Delta Pipeline, LLC; DLC, Inc.; CEC, Inc.; Castle Texas Production Limited Partnership; Amber Resources Company of Colorado; and Castle Exploration Company, Inc.  (jointly, the "Debtors"). (*See* Main Case D.I.s 60, 181.)

[2] This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a).  This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A), (B), (E), (H), and (O).  At oral argument, the parties agreed that this Court has authority to enter a final order on this matter.  (Tr. 9/19/2013 at 55:14 - 57:7.)

Currently before the Court are the motions for summary judgment filed by Delta Petroleum General Recovery Trust (the "Trust")  and Par Petroleum Corporation ("PPC" or, together with the Trust, the "Plaintiffs")[3] seeking a determination about certain rights and claims of (i) the defendant BWAB Limited Liability Company ("BWAB"), based upon two sets of agreements signed in 1994 and 1999 with the Debtors or their predecessor, and (ii) defendant Aleron Larson, Jr. ("Larson"), based upon agreements signed in 1999 with the Debtors. The Plaintiffs argue that the Defendants' rights and claims under the agreements at issue constitute (i) contractual rights to payment or claims that have been discharged by the Debtors' confirmed chapter 11 plan of reorganization, or (ii) real property interests that may be avoided and recovered pursuant to Bankruptcy Code §§ 544(a)(3) and 550. (Adv. D.I.s 34, 35.)[4]  Also before the Court are cross-motions for summary judgment filed by BWAB and Larson, arguing that they hold real property interests that were not part of the Debtors' bankruptcy estate or passed through the bankruptcy case unaffected.  (Adv. D.I.s 74, 75.)

For the reasons stated below, the Plaintiffs' motion for summary judgment will be denied, in part, as to the 1994 ORRI (as defined herein), and granted, in part, as to the 1999 ORRIs (as defined herein).  BWAB's cross-motion for summary judgment will be granted, in part, as to the 1994 ORRI, and denied, in part, as to the 1999 BWAB ORRI.  Larson's cross-motion for summary judgment regarding the 1999 Larson ORRI will be denied.  The Plaintiffs' further

---

[3]The Trust is a general recovery trust created under the Debtors' Plan to liquidate certain trust assets and object to, settle and/or compromise any disputed claims.   PPC is one of the reorganized Debtors.

[4]Except where expressly noted herein, documents filed in both adversaries have the same docket item numbers.

request for summary judgment to recover "excess payments" and post-petition payments will be denied.

## **BACKGROUND**

### The 1994 Assignment from BWAB Incorporated to Whiting Petroleum Corporation

In 1994, BWAB's affiliate, BWAB Incorporated, acquired an option to purchase a large number of properties from Union Pacific Resources Corporation, including some known as the Point Arguello Properties. (Roitman Decl., ¶7).[5]  The Point Arguello Properties consist of interests in oil and gas leases related to certain property located off the coast of Santa Barbara, California (the "Properties").[6]  By letter agreement dated July 28, 1994, BWAB Incorporated assigned  its option to purchase the Properties.  (Roitman Decl., Ex. 2.)  As part of the consideration for the assignment of the option to Whiting, BWAB Incorporated received an assignment of either: (i) "an undivided 6.5% of the net rights acquired by Whiting in the Properties after the exercise of BWAB's option; or [(ii)] a proportionately reduced 3.5% overriding royalty interest out of the net revenue interest acquired by Whiting after the exercise of BWAB's option, in either case . . . by an assignment in recordable form and containing warranties of title by, through and under Whiting, but not otherwise."[7]  (Roitman Decl., Ex. 2, ¶2.)

---

[5]Declaration of Steven Roitman in Support of BWAB's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Adv. D.I. 44) ("Roitman Decl.").

[6]The Properties are described more fully in Ex. 1 to the Roitman Decl. (which is also Ex. A to the Delta's Net Operating Interest, described in more detail *infra.*.).

[7]The agreement also provided that BWAB Incorporated had the right to elect have the overriding royalty interest conveyed to one of its affiliates.  (Roitman Decl., Ex. 2, ¶6.)

3

On or about December 16, 1994, Whiting exercised the option and acquired the Properties.  On that same date, Whiting and BWAB entered into the Assignment of Overriding Royalty (the "1994 Assignment").  (Roitman Decl. Ex. 3.)  A copy of the 1994 Assignment was recorded in the Official Records of the County of Santa Barbara, California on January 25, 1995. (Roitman Decl., ¶11.) The 1994 Assignment was also filed with the Minerals Management Service, Pacific OCS Region, on January 11, 1995. (*Id.,* Roitman Decl., Ex. 4.)

The 1994 Assignment includes the following relevant terms:

1.  <u>Assignment of Interest.</u>  Whiting does hereby grant, convey, assign, set over, and deliver to BWAB an overriding royalty consisting of an undivided Three and One-Half Percent (3.5%) interest in Whiting's Net Revenue Interest from the Subject Properties, to be determined as set forth below. . . . . The interest conveyed and assigned to BWAB in this paragraph 1 is referred to herein as the "BWAB Interest."

2.  <u>Payment.</u> It is intended that Whiting will receive the full fractional or percentage share acquired by Whiting from UPRC of all net revenues payable by the operator(s) of the Subject Properties and by the purchaser(s) of production from the Subject Properties. . . . .
    . . . .
    c.      . . . . BWAB shall have the right to require, where practicable, direct payments to BWAB by the operator(s) or purchaser(s) if (i) David A. Frawley is no longer the President of Whiting, or (ii) Whiting is late in making payments to BWAB under Paragraph 2(b) for three consecutive months.
    . . . .

4.  <u>Preferential Right of Purchase.</u>  Whiting shall have a preferential right of purchase as to the BWAB interest, or any portion thereof, which preferential right of purchase shall apply to all the transfers, assignments or conveyances by BWAB other than transfers, assignments or conveyances to a BWAB Affiliate.

(Roitman Decl., Ex. 3.) The BWAB Interest granted in the 1994 Assignment is referred to herein as the "1994 ORRI."

During the fall of 1996, some or all of the leases comprising the Point Arguello Property were unitized into the Point Arguello Unit, pursuant to a unit agreement dated effective October 1, 1996, between Whiting and a number of other working interest owners (the "Unit Agreement"). (Roitman Decl., ¶15.) A unit agreement is an agreement among the owners of several oil and gas leases to operate and produce those leases as one unit. Only owners of oil and gas leases are parties to such unit agreements. (*Id.*) As a consequence of the unitization, BWAB and Whiting entered into a letter agreement dated June 25, 1997 (the "1997 Agreement"), to document BWAB's agreement "to reduce its overriding royalty by 14.15760% or one-half of the dilution at equalization on October 1, 1996 effective Unitization." (*Id.*, Ex. 5.)

The 1999 Assignments from Delta Petroleum Corporation to BWAB and Larson

In 1999, the debtor Delta Petroleum Corporation ("Delta") attempted to acquire Whiting's ownership interest in the Properties. Larson was the Chairman of the Board of Directors of Delta from May 1987 until sometime in 2005. (Larson Decl., ¶4.)[8] Larson also was the Chief Executive Officer of Delta from May 1987 until sometime in 2002. (*Id.*) Although Larson resigned as Chairman of the Board of Directors in 2005, he remained a Director of Delta until June 4, 2011. (*Id.*)

Delta and BWAB entered into an Agreement dated as effective April 1, 1999, in which Delta agreed to pay a fee, which included an overriding royalty interest, to BWAB in consideration of BWAB's direct efforts in assisting Delta with negotiations to acquire the Properties (the "Fee Agreement"). (Roitman Decl., Ex. 6.)

---

[8]The Larson Declaration is attached as Exhibit B to Larson's Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment (Adv. D.I. 44).

Delta entered into a Purchase Agreement with Whiting (the "Purchase Agreement"), but Whiting was unable to obtain the consents of the other working interest owners in the Properties due to concerns that Delta did not have the financial strength necessary to fulfill Whiting's working interest obligations, particularly those relating to plugging and abandonment of the offshore wells and platforms.  (Roitman Decl., ¶20-21; Bullock Decl., ¶8 and Ex. B.)[9]   As a result, Delta and Whiting amended the Purchase Agreement (the "Amendment") to provide that Whiting would convey to Delta a derivative product which would provide the economic equivalent of conveying title to the Properties.  (Bullock Decl., ¶8 and Ex. C.)  In December 1999, Whiting executed and delivered a Conveyance and Assignment to Delta (the "Conveyance"), in which Whiting conveyed a net operating interest ("NOI") in the Properties to Delta.  (Bullock Decl., ¶9 and Ex. D.)[10]   The NOI was defined in the Conveyance as follows:

> The net operating interest ("NOI") herein conveyed and assigned is defined as the monthly payable positive or negative cash flow resulting to the Interests from the following eight step calculation:
> (i)     oil and gas revenue;
> (ii)    less royalties and overriding royalties;
> (iii)   less Unit lease operating expenses;
> (iv)    less severance, production or ad valorem taxes, if any;
> (v)     less capital expenditures;
> (vi)    less Unit fees to the Unit operator; and
> (vii)   plus the positive or less the negative cash flow from the Partnerships[;]
> (viii)  plus or minus any other miscellaneous costs or revenues that may be related to these interests or operations.
> . . . .

---

[9]The Plaintiffs filed the Declaration of Seth Bullock in support of their Motion for Summary Judgment (BWAB Adv. No. 12-50898, D.I. 36) (the "Bullock Decl.").

[10]The Purchase Agreement, Amendment and Conveyance may be referred to jointly herein as the "1999 Whiting/Delta Agreements."

> [T]he above eight step calculation may result in a positive cash flow or negative cash flow.  In the event of positive cash flow, Assignor will pay the excess to Assignee; in the event of a negative cash flow, Assignee will pay the deficit to Assignor.

(Bullock Decl., Ex. D.)  Delta and Whiting agreed not to record the Conveyance due to Whiting's concern that the other working interest owners would consider such an action as a conveyance of legal title in violation of its agreements with them. (Roitman Decl. ¶25.)

(i)      The BWAB 1999 ORRI

On December 1, 1999, Delta and BWAB entered into an Assignment of Overriding Royalty Interest (the "1999 BWAB Assignment"), in which Delta granted BWAB:

> an OVERRIDING ROYALTY INTEREST of three percent (3.0%) in and to the oil and gas leases and lands described on Exhibit "A" attached hereto and by this reference made a part hereof (the "Leases"), which shall burden all the oil, gas and other leased minerals produced, saved and sold from or allocated to the lands covered by said Leases, and any extensions or renewals thereof.

(the "1999 BWAB ORRI"). (Bullock Decl., Ex. E.)  BWAB did not record or file the 1999 BWAB Assignment for the same reason the  Conveyance was not recorded by Delta.  (Roitman Decl., ¶26.)

Following Delta's acquisition of the NOI in the Properties, the monthly revenues due to BWAB based on the 1994 Assignment and the 1999 BWAB Assignment were distributed from Whiting to Delta. (Roitman Decl., ¶27.)  Delta, in turn, timely distributed such revenues to BWAB until September 2012.  (*Id.*)

(ii)      The Larson 1999 ORRI

Also on December 1, 1999, Delta and Larson entered into an Assignment of Overriding Royalty Interest (the "1999 Larson Assignment"), in which Delta granted Larson:

> an OVERRIDING ROYALTY INTEREST of one percent (1.0%) in and to the oil
> and gas leases and lands described on Exhibit "A" attached hereto and by this
> reference made a part hereof (the "Leases"), which shall burden all the oil, gas and
> other leased minerals produced, saved and sold from or allocated to the lands
> covered by said Leases, and any extensions or renewals thereof.

(the "1999 Larson ORRI"). (Bullock Decl., Ex. D.)  Delta entered into the 1999 Larson Assignment

in consideration for Larson's personal guarantee of a loan of $2 million obtained by Delta for the

purpose of acquiring the Properties from Whiting.  (Larson Decl., ¶15.)  The Purchase Agreement

and Amendment between Delta and Whiting required a $1 million earnest money deposit.  (*Id.*)

Because Delta did not have access to such funds, Larson loaned the money to Delta.  (*Id.*)  The

Purchase Agreement also required a $2 million installment payment on August 2, 1999.  (*Id.*)  Delta

did not have the funds for the installment payment and was unable to borrow funds without Larson's

personal guaranty of a loan.  (*Id.*)

Larson did not record the 1999 Larson Assignment for the same reason the Conveyance was

not recorded by Delta.  (Larson Decl., ¶19.)

Following Delta's acquisition of the NOI in the Properties, the monthly revenues due to

Larson based on the 1999 Larson Assignment were distributed from Whiting to Delta. (Larson Decl.,

¶20.)  Delta, in turn, timely distributed such revenues to Larson until September 2012.  (*Id.*)

The Bankruptcy Case

On December 16, 2011 (the "Petition Date"), the Debtors (except for one) filed chapter

11 petitions in this Court.[11]  On February 12, 2012, the Court entered an order setting March 23,

2012 as the deadline for filing general proofs of claim in the chapter 11 cases (the "Bar Date

Order") (Main Case D.I. 303).

---

[11]Debtor Castle Exploration Company, Inc. filed its chapter 11 petition on January 6, 2012.

On August 13, 2012, the Debtors filed the Third Amended Joint  Chapter 11 Plan of

Reorganization (Main Case D.I. 885) (the "Plan").   On August 16, 2012, the Court entered an

Order confirming the Plan (Main Case D.I. 925).  Pursuant to the terms of the Plan, on August

31, 2012 (the "Effective Date"), the Debtors' assets vested in the Trust, a joint venture, and the

Reorganized Debtors, free and clear of all claims, encumbrances, and liens.  (Main Case D.I.

947; Plan §§ 6.2(b), 10.1.)

In its Answer to the Amended Complaint, BWAB admits that it received the Bar Date

Notice, Plan and Confirmation Date Notice, and Effective Date Notice.  (Adv. No. 12-50898,

D.I. 29, ¶53.) BWAB also admits that it did not file a claim.  (*Id.,* ¶58)

Similarly, in his Answer to the Amended Complaint, Larson admits that he received the

Bar Date Notice, Plan and Confirmation Date Notice, and Effective Date Notice.  (Adv. No. 12-

50877, D.I. 26, ¶50.)  He also admits that he did not file a proof of claim.  (*Id.*, ¶55.)

The Adversary Proceedings

(i)     The BWAB Adversary (Adv. No. 12-50877)

On January 4, 2013, the Plaintiffs filed an "Amended Complaint for Avoidance and/or

Discharge of Interests, Enforcement of Bar Date Order, and Recovery of Property of the Estate"

against BWAB (the "BWAB Complaint," Adv. No. 12-50898, D.I. 22).  The BWAB Complaint

contains the following nine counts:

(I)     Avoidance and Recovery of the 1999 BWAB ORRI under Sections 544(a)(3)
        And 550 of the Bankruptcy Code;

(II)    Declaration that the 1999 BWAB ORRI, the 1999 BWAB Assignment
        Agreement, the 1994 BWAB Interest, the 1994 Assignment Agreement and any
        Rights Arising Thereunder were Discharged, thus Stripped from the Underlying
        OCS Leases held by The Debtors and, therefore, the 1999 BWAB ORRI, the 1999

BWAB Assignment Agreement, the 1994 BWAB Interest, the 1994 Assignment Agreement and any Rights Arising Thereunder are not Enforceable against the Reorganized Debtors upon Consummation of the Plan Confirmed under Bankruptcy Code Section 1141;

(III)    Declaration that Defendant's Claims against the Debtors' Estates for Payments under the 1999 BWAB ORRI, the 1999 BWAB Assignment Agreement, the 1994 BWAB Interest and the 1994 Assignment Agreement were Disallowed, Expunged and Discharged upon Confirmation and Consummation of the Plan by Virtue of Failure to File a Proof of Claim and the Plan Discharge Pursuant to Bankruptcy Code Section 1141;

(IV)    Unjust Enrichment and Clawback of Excess Payments and the Post-Petition Payments relating to the 1999 BWAB ORRI;

(V)    Post-Petition Fraudulent Transfers under State Law;

(VI)    Avoidance and Recovery of Post-Petition Payments Relating to the 1994 BWAB Interest and 1999 BWAB ORRI under Sections 549 and 550 of the Bankruptcy Code;

(VII)    Breach of Contract Relating to the 1994 Assignment Agreement;

(VIII)    Turnover of Post-Petition Payments Under Section 542(a) of the Bankruptcy Code; and

(IX)    Enforcement of Debtors' Plan Injunction;

On January 30, 2013, BWAB filed an Amended Answer, Affirmative Defenses and Counterclaim to the Amended Complaint (the "Answer") (Adv. 12-50898, D.I. 29).  The Plaintiffs filed an answer and affirmative defenses to the counterclaim on February 8, 2013 (Adv. No. 12-50898, D.I. 33).

The Plaintiffs filed a Motion for Summary Judgment (Adv. D.I. 34) on Counts (I) through (VI) and Count (VIII).  BWAB filed a Memorandum of Law in Opposition to the Plaintiffs' Summary Judgment Motion (Adv. D.I. 44), to which the Plaintiffs filed a Reply Memorandum (Adv. D.I. 52).

BWAB filed a Cross-Motion for Summary Judgment (Adv. D.I. 74, 75) on all of the Plaintiffs' claims. The Plaintiffs filed a Memorandum of Law in Opposition to BWAB's Cross-Motion for Summary Judgment (Adv. D.I. 84), to which BWAB filed a Reply Memorandum (Adv. D.I. 85).

(ii)    The Larson Adversary (Adv. No. 12-50877)

On January 4, 2013, the Plaintiffs filed an "Amended Complaint for Avoidance and/or Discharge of Interests, Enforcement of Bar Date Order, and Recovery of Property of the Estate" (the "Larson Complaint") (Adv. No. 12-50877, D.I. 23). The Larson Complaint contains eight counts against Larson which, for the most part, are similar to the counts in the BWAB Complaint, except there are no claims based on the 1994 ORRI.[12]

On January 18, 2013, Larson filed an Answer, Affirmative Defenses and Counterclaims

---

[12]The Larson Complaint asserts the following claims:

| | |
|---|---|
| Count I: | Avoidance and Recovery of the Larson ORRI pursuant to Sections 544(a)(3) and 550 of the Bankruptcy Code; |
| Count II: | Declaration that the Larson ORRI, the Larson Assignment Agreement and any Rights Arising Thereunder were Discharged, thus Stripped from the Underlying OCS Leases held by the Debtors and, Therefore, the Larson ORRI, the Larson Assignment Agreement and any Rights Arising Thereunder are not Enforceable against the Reorganized Debtors upon Consummation of the Plan Confirmed under Bankruptcy Code Section 1141 |
| Count III: | Declaration that Defendant's Claims against the Debtors' Estates for Payments under the Larson ORRI and the Larson Assignment Agreement were Disallowed, Expunged and Discharged upon Confirmation and Consummation of the Plan by Virtue of Failure to File a Proof of Claim and the Plan Discharge Pursuant to Bankruptcy Code Section 1141 |
| Count IV: | Unjust Enrichment and Clawback of Post-Petition Payments; |
| Count V: | Post-Petition Fraudulent Transfers under State Law |
| Count VI: | Avoidance and Recovery of Post-Petition Payments under Sections 549 And 550 of the Bankruptcy Code |
| Count VII: | Turnover of the Post-Petition Payments under Section 542(a) of the Bankruptcy Code |
| Count VIII: | Enforcement of Debtors' Chapter 11 Plan Injunction. |

11

to the Amended Complaint (the "Answer") (Adv. No. 12-50877, D.I. 26).  The Plaintiffs filed an answer and affirmative defenses to the counterclaims on February 8, 2013 (Adv. D.I. 33).

The Plaintiffs filed a Motion for Summary Judgment (Adv. D.I. 34) on Counts (I) through (VII).  Larson filed a Memorandum of Law in Opposition to the Plaintiffs' Summary Judgment Motion (Adv. D.I. 44), to which the Plaintiffs filed a Reply Memorandum (Adv. D.I. 52).

Larson filed a Cross-Motion for Summary Judgment (Adv. D.I. 74, 75) on all of the Plaintiffs' claims.  The Plaintiffs filed a Memorandum of Law in Opposition to Larson's Cross-Motion for Summary Judgment (Adv. D.I. 84), to which Larson filed a Reply Memorandum (Adv. D.I. 85).

The Court heard oral argument on the Plaintiffs' Motions for Summary Judgment and BWAB's and Larson's Cross-Motions for Summary Judgment.  The motions are ripe for decision.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of establishing the absence of a genuine dispute to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  ("[A] party seeking

summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").  When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence," *Sarko v. Penn-Del Directory Co.,* 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999), or by relying on "conclusory allegations, improbable inferences and unsupported speculation." *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996).  "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment." *Id. quoting Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir.1993).

Substantive law will determine which facts are material, and only disputes over facts that might affect the outcome of the suit will preclude summary judgment. *Anderson,* 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.  See also Delta Mills, Inc. v. GMAC*

*Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is

genuine "when reasonable minds could disagree on the result."). The Court must resolve all

doubts and consider the evidence in the light most favorable to the nonmoving party. *Anderson*,

477 U.S. at 255 ("the evidence of the nonmovant is to be believed, and all justifiable inferences

are to be drawn in his favor.").

## **DISCUSSION**

Before I address the myriad of claims raised in the competing motions for summary

judgment, I must consider the pivotal question of the nature of the 1994 ORRI, the 1999 BWAB

ORRI, and the 1999 Larson ORRI.

(A)    The 1994 ORRI from Whiting to BWAB

BWAB argues that the 1994 ORRI is a real property interest that never became part of the

Debtors' bankruptcy estate and was not extinguished by the Debtors' Plan.  The Plaintiffs,

however, argue that the 1994 ORRI was an interest in "net profits" rather than oil and gas

interests, and, therefore, was a contractual interest that was extinguished by the Debtors' Plan.

"It is well settled that property interests in bankruptcy, absent some compelling federal

interest, are determined by reference to state law." *D'Angelo v. Blue Chip Federal Credit Union

(In re D'Angelo),* 524 B.R. 624, 630 (Bankr. M.D.Pa. 2015) citing *Butner v. U.S.,* 440 U.S. 48,

55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).[13]  The 1994 Assignment provides that it should be

---

[13]In *Butner*, the United States Supreme Court wrote:
> Property interests are created and defined by state law.  Unless some federal interest
> requires a different result, there is no reason why such interests should be analyzed
> differently simply because an interested party is involved in a bankruptcy
> proceeding.  Uniform treatment of property interests by both state and federal courts
> within a State serves to reduce uncertainty, to discourage forum shopping, and to
> (continued...)

governed by and construed in accordance with the laws of the State of Colorado. (Roitman Decl.
Ex. 3, ¶10.)  The parties, however, cite generally to California case law (the location of the
Properties) in support of their positions.  The parties do not allege (and this Court does not
perceive) any material difference between the laws of California and Colorado regarding the
issues raised.

A land owner may enter into an oil and gas lease "which grants to an operating lessee the
privilege of entering upon the land for the purpose of producing oil and gas, [and] the interest
thus created in the lessee is a profit a prendre, that is, an incorporeal hereditament or interest in
real property." *La Laguna Ranch Co. v. Dodge,* 18 Cal.2d 132, 114 P.2d 351, 353 (Cal. 1941).[14]
"The term 'overriding royalty' is applied generally in the industry to such fractional interests in
the production of oil and gas as are created from the lessee's estate."  *Id. See also Foothills
Texas, Inc. v. MTGLQ Investors (In re Foothills Texas, Inc.)*, 476 B.R.143, 149 (Bankr. D.Del.
2012) (applying Texas law) ("In standard oil and gas parlance, the term 'overriding royalty'
means a given percentage of gross production carved from the working interest in the land but,
by agreement, not chargeable with any expenses of operation."); *AEC Indus., LLC v. Survivor
Oil, Inc.,* 7 P.3d 1052, 1054 (Colo. App. 1999) ("An overriding interest is an interest in oil and
gas produced at the surface, free of expenses of production. . . . It is an interest that is carved out

---

[13](...continued)
> prevent a party from receiving "a windfall merely by reason of the happenstance of
> bankruptcy."

*Butner,* 440 U.S. at 55 quoting *Lewis v. Mfr. Nat'l Bank*, 364 U.S. 603, 609, 81 S.Ct. 347, 350,
5 L.Ed.2d 323 (1961).

[14]A land owner "has the 'exclusive right' to drill for oil and gas upon his premises." *La Laguna
Ranch,* 114 P.2d at 353 (citations omitted).  This right, however, may be limited by statute.  *See* Cal. Pub.
Res. Code § 3600 *et seq.*; *See Hunter v. Justice's Court,* 36 Cal.2d 315, 223 P.2d 465 (Cal. 1950).

of the working interest created by an oil and gas lease, and is limited in duration to the life of the leasehold interest.") (citations omitted).

Both California and Colorado courts have determined that an overriding royalty interest is an interest in real property. *Honolulu Oil Corp. v. Kennedy,* 251 F.2d 424, 429 (9th Cir. 1957) ("The decisions of California courts establish that a stipulation that there be an overriding royalty, consisting of a share of the produce in kind, does create an interest in real property."); *Page v. Fees-Krey, Inc.,* 617 P.2d 1188, 1194 (Colo. 1980) ("An overriding royalty carved out of the working interest in an oil and gas lease is an interest in real property.") (citations omitted).

Did the 1994 Assignment create an overriding royalty interest in favor of BWAB?  The Supreme Court of Colorado has written:

> The primary goal of contract interpretation is to determine and give effect to the intent of the parties. . . . The intent of the parties to a contract is to be determined primarily from the language of the instrument itself. . . . Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language.

*Ad Two, Inc. v. City and County of Denver,* 9 P.3d 373, 376 (Colo. 2000) (citations omitted).

When BWAB assigned its option to purchase the Properties to Whiting, they agreed that BWAB would retain an interest therein.  When Whiting exercised the option, BWAB and Whiting entered into the 1994 Assignment, which is entitled "Assignment of Overriding Royalty," and agrees to "grant, convey, assign, set over and deliver to BWAB an overriding royalty consisting of an undivided Three and One-Half Percent (3.5%) interest in Whiting's Net Revenue Interest from the Subject Properties, . . . ."  (Roitman Decl., Ex. 3 at ¶1).

The analysis must look beyond titles. "[W]hether the interest is an overriding royalty (or something else) depends on the true nature of the particular conveyance which gives rise to the

16

interest.  Because merely calling an interest an overriding royalty interest is not conclusive of its

true status, provisions relevant to the grant of an overriding royalty interest are germane."

*Foothills Texas,* 476 B.R.. at 149 citing *Delta Drilling Co. v. Simmons*, 161 Tex. 122, 126-27,

338 S.W.2d 143 (Tex. 1960).

The Plaintiffs argue that the 1994 ORRI is not a true overriding royalty interest because

the 1994 Assignment granted BWAB an interest in Whiting's *Net Revenue Interest*, which, they

argue, is an interest in a revenue stream, rather than an interest in the land or hydrocarbons.[15]  At

least one California court, however, did not recognize this distinction:

> The rights of the holders of royalty assignments to an interest in the proceeds of
> oil produced by an assignee of the leasehold should not depend on whether the
> assignment is of a percentage of the oil 'to be produced, saved, and sold,' . . . or is
> of a percentage of the net proceeds as in the instant case.  Purchasers of royalty
> interests are generally investors who are not prepared to accept delivery of oil in
> kin[d], or to market their interest in the output of the well.

*Schiffman v. Richfield Oil Co. of Cal.,* 8 Cal.2d 211, 226, 64 P.2d 1081, 1088 (Cal. 1937).  A

Texas court (after recognizing one case holding that a net profits interest was "only a mere

---

[15]The 1994 Assignment defined "Net Revenues" as:
> the difference between (A) the gross revenues received by Whiting from the sale of
> its fractional or percentage share of Hydrocarbons from the Subject Properties, after
> the deduction of all lessors royalties, overriding royalties, and other burdens and
> payments out of gross production that burden Whiting's fractional or percentage
> share, and (B) the sum of Whiting's fractional or percentage share of third party (i)
> transportation expenses, (ii) treatment and processing expenses, (iii) compression
> expenses, and (iv) severance taxes, occupation taxes, and other like taxes based on
> the production of Hydrocarbons. The deductions set forth in items 1(B)(i), (ii), (iii)
> and (iv) will not include expenses or tariffs charged by the Point Arguello Pipeline
> Company (PAPCO), the Point Arguello natural Gas Line Company (PANGL),
> Gaviota Gas Plant Company (GGP), or by Whiting or its Affiliates. As used herein
> the term "Hydrocarbons" shall mean crude oil, natural gas, casinghead gas, coalbed
> methane, condensate, helium, sulphur, $SO_2$, $CO_2$, natural gas liquids, and other
> gaseous and liquid hydrocarbons or any combination thereof.

(Roitman Decl., Ex. 3, ¶1.)

contract interest, and not an interest in the land"),[16] decided to adopt the "better view" that "a net profits interest should be treated in much the same manner as an overriding royalty and that it should be classified as an interest in land." *T-Vestco Litt-Vada v. Lu-Cal One Oil Co.,* 651 S.W.2d 284, (Tex. App. 1983) quoting 2 Williams and Meyers, Oil and Gas Law § 424.1 at 440 (1981).[17]

In this case, the 1994 Assignment, particularly its definition of "Net Revenues," establishes the parties' intent to grant BWAB a fractional interest in the revenue received from the hydrocarbons produced by Whiting's working interest in the Properties, after specific deductions. I agree with the "better view" discussed above and conclude that the 1994 ORRI should be treated in the same manner as a typical overriding royalty interest and, therefore, consistent with California and Colorado law, the 1994 ORRI is an interest in real property. There is no dispute that the 1994 Assignment was recorded in the Official Records of the County

---

[16]The case cited by the Texas Court is *LeBus v. LeBus*, 269 S.W.2d 506 (Tex. App. 1954), which involved two brothers who had a partnership in an oil and gas working interest lease. When they learned about the opportunity to drill wells on adjacent property, the brother who had the financial ability to purchase the adjoining property lease (known as the "Mangold Lease") agreed orally to share the net profits from the Mangold Lease (after reimbursing himself for the amount expended in acquiring the lease, and all expenses in connection with the operations thereon) with his brother, John, as compensation for John acting as agent in acquiring the lease. The *LeBus* Court determined that John held "only a contractual right to have his share of the profits paid over to him when they were earned." *LeBus*, 269 S.W.2d at 511. The Court decided that John's interest in the profits from the Mangold Lease operations was not an "ownership" interest in the profits as a partner, but rather a right to compensation under "a profit-sharing agreement." *Id.*

A more recent Texas decision also held that a "net cash gain interest" (*i.e.,* an interest in the net profits realized by a natural gas processing plant from processing casinghead gas produced by wells) was personal property, not real property. *Berthelot v. Brinkman,* 322 S.W.3d 365, 371 (Tex. App. 2010). But the *Berthelot* Court determined that the interest "was derived from the operations of the plant, not the production of the leases." *Id.*

[17]2-4 Williams & Meyers, Oil and Gas Law § 424.1 (2014) provides: "There is some indication in early cases, at least by way of dictum, that the [net profits] interest is a mere contract interest. We believe, however, that a net profits interest should be treated in much the same manner as an overriding royalty and that it should be classified as an interest in land." (Footnotes omitted).

of Santa Barbara, California and with the Minerals Management Service, Pacific OCS Region.

The Plaintiffs also argue that the 1994 ORRI must be examined in light of the later 1999 NOI between Whiting and the Debtors. The Plaintiffs claim that the 1994 ORRI was expunged by the Debtors' Plan because the 1994 ORRI was paid from the Properties' net revenue stream and, in 1999, that net revenue stream, or cash flow, was conveyed to the Debtors, ultimately becoming part of the Debtors' bankruptcy estate. In response, BWAB argues that the 1994 ORRI was not part of the Debtors' bankruptcy estate and was not affected by the Debtors' Plan because it is a recorded real property interest between Whiting and BWAB - - the Debtors are not parties to the 1994 Assignment.

The NOI conveyed by Whiting to debtor Delta in 1999 consisted of the positive or negative cash flow resulting from the interest in the Properties, determined pursuant to an eight-step calculation, which specifically carved out royalties and overriding royalties. (Roitman Decl., Ex.7, p. 2.) Therefore, Delta's NOI consisted of the cash flow existing *after* deducting royalties and overriding royalties, such as the 1994 ORRI. The Debtors' Plan did not affect the 1994 ORRI between Whiting and BWAB.[18]

---

[18]The decision *Grynberg v. Waltman,* 946 P.2d 473 (Colo. App. 1996) does not change this result. In *Grynberg,* the defendant, Waltman, received a compensation package from the plaintiff, Grynberg, which included an overriding royalty interest in certain leases for which he had provided geologic information. Grynberg paid overriding royalties to Waltman during his employment from 1972 to 1977, and for approximately eight months thereafter. The payments then stopped. In 1981, Grynberg filed a chapter 11 proceeding. Although there was some dispute about whether Waltman received proper notice of the bankruptcy, it was undisputed that Waltman knew about the bankruptcy filing and testified at a hearing. Grynberg's schedules listed Waltman as a creditor with a disputed claim for royalty payments. However, Waltman never filed a claim

In April 1982, Grynberg's plan was confirmed. In March 1993, Waltman filed an application with the Colorado Oil and Gas Conservation Commission seeking an order recognizing his overriding royalty interests and directing Grynberg to make payments. Grynberg filed an action seeking declaratory relief regarding the overriding royalty interests.

(continued...)

For the reasons set forth above, the Plaintiffs' motion for summary judgment declaring

that the 1994 ORRI was a contractual interest that was discharged by the Debtors' Plan will be

denied.  BWAB's cross-motion for summary judgment will be granted, in part, with respect to its

counterclaim that the 1994 ORRI is a real property interest that was not extinguished, stripped or

avoided by confirmation of the Debtors' Plan.

(B)    The 1999 BWAB ORRI and the 1999 Larson ORRI[19]

The Plaintiffs attack the 1999 ORRIs on two grounds.  First, they argue that the NOI

transferred by Whiting to the Debtors was not a real property interest and, therefore, the 1999

ORRIs arising out of that NOI cannot be real property interests. Second, the Plaintiffs

alternatively assert that, if the 1999 ORRIs are determined to be real property interests, they are

---

[18](...continued)

The Colorado Court of Appeals concluded that "an overriding royalty interest may be characterized as an interest in real property for those purposes which affect the land involved and as a personal property interest for purposes of payments that arise from such interest." *Grynberg,* 946 P.2d at 476-77.  The Court determined that as each payment became due, it was a debt owed by Grynberg to Waltman. *Id.* at 477.  The Court noted that both parties acknowledged that the overriding royalty interest was in dispute at the time of the bankruptcy filing and further determined that "[o]nce the claim to royalty payments based on the overriding royalty interests was disputed, the ownership of that interest was called into question and was, therefore, before the bankruptcy court. [Waltman] was required to take those steps necessary to preserve his claim." *Id.*   The *Grynberg* Court decided that, pursuant to 11 U.S.C. § 1141(b), confirmation of the plan vested all property of the estate in Grynberg free of Waltman's contested royalty interests. *Id.*

The facts of the case before me are markedly different. Neither Whiting nor the Debtors disputed BWAB's ORRIs prior to confirmation of the Plan on August 16, 2012.  Moreover, neither party to the 1994 ORRI is a debtor.  It is uncontested that Whiting paid amounts due under the 1994 ORRI (and the 1999 ORRI) to the Debtors, for distribution to BWAB, from the date of the 1999 Conveyance of the NOI through September 2012, about a month after Plan confirmation.  The fact that the payments passed through the Debtors, as a mere conduit, to BWAB does not alter my conclusion that the 1994 ORRI was a real property interest requiring payments from Whiting to BWAB and was unaffected by the Debtors' bankruptcy filing.

[19]The 1999 BWAB ORRI and the 1999 Larson ORRI may be referred to jointly as the "1999 ORRIs." The 1999 BWAB Assignment and the 1999 Larson Assignment may be referred to jointly as the "1999 Assignments."  Also, BWAB and Larson may be referred to jointly as the "Defendants."

avoidable pursuant to Bankruptcy Code § 544(a)(3) and applicable state law because BWAB and Larson did not record their interests in the 1999 ORRIs.

BWAB and Larson argue in response that the NOI and the 1999 ORRIs are interests in real property.  The Defendants further argue that the Debtors listed their interests in the NOI as "real property" on their filed Schedules and, therefore, the Plaintiffs are judicially estopped from arguing otherwise.  The Defendants also contend that the 1999 ORRIs are not avoidable under Bankruptcy Code § 544(a)(3) because, under applicable state law, the ORRIs were not transfers that could be perfected against a bona fide purchaser.

     (1)    <u>Are the Plaintiffs judicially estopped from arguing that the 1999 ORRIs are not real property interests?</u>

The Debtors listed the NOI as a real property interest in their bankruptcy schedules.  (*See*, *e.g.,* D.I. 140, p. 103 of 141, Schedule A - - Real Property - - listing "Point Arguello GWI: 6.07% NRI:4.21%, Prospect: Point Arguello, Location: Santa Barbara, CA").  Because of this, BWAB and Larson argue that the Plaintiffs are judicially estopped from asserting that NOI is not real property interest.

In *Exide Technologies,* I reviewed the standard for judicial estoppel:

> "[J]udicial estoppel bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency."  *Montrose Medical Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001).  Judicial estoppel is an "extraordinary remed[y] to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice."  *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999) *quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996).   The rationale behind the doctrine of judicial estoppel is to protect the integrity of the judicial process by prohibiting parties from deliberately changing their positions.  *Pickett v. Integrated Health Serv., Inc. (In re Integrated Health Serv., Inc.)*, 304 B.R. 101, 109 (Bankr.D.Del. 2004) citing *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

> Courts typically review a non-exhaustive list of factors to inform the decision whether to apply judicial estoppel in a particular case. *Integrated* Health, 304 B.R. at 109 citing *New Hampshire*, 532 U.S. at 750. The Third Circuit Court of Appeals has relied, generally, on at least three requirements: (1) the party estopped must have taken two positions that are irreconcilably inconsistent, (2) the party changed his or her position in bad faith, i.e., with intent to play fast and loose with the court, and (3) the judicial estoppel sanction is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct. *Montrose*, 243 F.3d at 779-80.

*In re Exide Tech.,* 2013 WL 85193, *7 (Bankr.D.Del. Jan. 8, 2013).

The Plaintiffs argue that judicial estoppel is not applicable here because the Plaintiffs have not changed their position and have not acted in bad faith. I agree. Statements in the Debtors' schedules are not binding on the Plaintiffs. *The Liquidation Committee v. Binsky & Snyder, Inc. (In re J.A. Jones, Inc.),* 361 B.R. 94, 104 (Bankr. W.D.N.C. 2007) (Deciding that statements made by a debtor in a motion are not binding on a post-confirmation committee). Moreover, there is no evidence of bad faith here. It is not unusual for a creditors' committee or an authorized post-confirmation entity, as here, to challenge the validity, priority or extent of a creditor's claim.

(2)    Are the 1999 ORRIs real property interests?

In the 1999 Assignments, Delta conveyed overriding royalty interests "in and to the oil and gas leases and lands" as described in Exhibit A attached thereto. (Roitman Decl., Ex. 8.) Exhibit A, in turn, is entitled "Point Arguello Field, Offshore California" and references the Purchase and Sale Agreement between Whiting and Delta dated June 8, 1999. (*Id.*) On its face, the 1999 Assignments are formal, written conveyances of overriding royalty interests. *See* discussion, *supra.,* citing *Laguna Ranch,* 114 P.2d at 353 ("the term 'overriding royalty' is applied generally in the industry to such fractional interest in the production of oil and gas as are

22

created from the lessee's estate"); *AEC Indus.,* 7 P.3d 1054 ("An overriding interest is an interest

in oil and gas produced at the surface, free of expenses of production. . . . It is an interest that is

carved out of the working interest created by an oil and gas lease, and is limited in duration to the

life of the leasehold interest.").

However, a closer examination of the provisions of the 1999 Assignments raises

questions about the true nature of the conveyances.  In the 1999 Assignments, the Debtors

conveyed a fractional percentage of the interest the Debtors obtained from Whiting in the

Purchase and Sale Agreement. Generally, "an assignee's rights are derivative of whatever rights

the assignor may have." *Creative Ventures, LLC v. Jim Ward & Assoc.,* 195 Cal.App.4th 1430,

1447 (Cal. App. 2011).  *See also Apache Corp. v. W&T Offshore, Inc.,* 626 F.3d 789, 797 (5th

Cir. 2010) (deciding, under Louisiana law, that a working interest assignor can only assign

whatever rights it held in connection with an oil drilling platform).  In other words, the Debtors

could only convey a real property interest to BWAB and Larson if the Debtors' NOI was a real

property interest.

The parties agree that Delta originally intended to acquire Whiting's ownership interest in

the Properties, but could not do so because the other working interest owners would not consent.

Instead, Whiting conveyed the NOI to Delta pursuant to the Conveyance executed in December

1999, which defined the NOI as "the monthly payable positive or negative cash flow resulting to

the Interests [pursuant to an] eight step calculation."[20]  (Roitman Decl., Ex. 7.)

---

[20]The Conveyance defined the Interests as including certain oil, gas and mineral leases, and the
wells, unit agreements, tangible personal property, licenses, rights to payment and other property
specifically described in the Conveyance.

23

As discussed *supra*., the primary goal of contract interpretation is to determine and give effect to the intent of the parties. *Ad Two,* 9 P.3d at 376.   There is an issue of material fact about whether Delta and Whiting intended the NOI to be a real property interest or contractual right to payment.   BWAB and Larson rely upon the Debtors' schedules and the deposition testimony of Delta's former Chief Financial Officer, referring to the NOI as a "working interest," to support their argument that the parties intended to create a real property interest.   (Schedules, D.I. 140 at 9, 112; Nanke Dep. at 38:20 - 29:17.)[21]   *See also* Cal.Pub.Res.Code § 3316.11 (2014) ("'Working interest' means an interest held in lands by virtue of fee title, including lands held in trust, a lease, operating agreement or otherwise, under which the owner of such interest has the right to drill for, develop and produce oil and gas.").   The Plaintiffs counter that there is evidence directly contradicting the Defendants' assertion, including deposition testimony that Delta and its subsequent assigns were specifically instructed *not* to record their interests (Larson Dep. 60:4-6; Roitman Dep. 80:8-17)[22] and Delta's description of the NOI as "the equivalent of a . . . working interest in form of a financial arrangement." (Larson Decl. (D.I. 44-2), Ex. B.)

When considering summary judgment motions, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue of fact for trial.   Due to the open issue of whether the parties intended the NOI to be a real property interest, the Plaintiffs' summary judgment motion and the Defendants' cross-motions for summary judgment seeking a declaration regarding whether the 1999 ORRIs are real property

---

[21]The deposition of Kevin Nanke was attached as Ex. A to BWAB's Memorandum in Support of Cross-Motion for Summary Judgment (D.I. 75).

[22]The depositions are attached as Ex. A and Ex. B to the Plaintiffs' Memorandum of Law in Opposition to BWAB's/Larson's Cross-Motion for Summary Judgment (Adv. D.I. 84).

interests must be denied.

> (3)    Assuming the 1999 ORRIs are real property interests, are they avoidable pursuant to Bankruptcy Code § 544(a)(3)?

The Plaintiffs argue that, even assuming the 1999 ORRIs are real property interests, those interests are avoidable under Bankruptcy Code § 544(a)(3) because BWAB and Larson did not perfect their interests.  The Defendants argue in response that § 544(a)(3) is not applicable here because the NOI was never filed of record, and, therefore: (i) it was impossible to record the 1999 ORRIs within the chain of title on the Properties, and (ii) the ambiguity in the NOI's record title would put a bona fide purchaser of real property on inquiry notice of record title issues under California law.

Bankruptcy Code § 544(a)(3) provides:

> (a)    The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by - -
> . . .
>
> (3)    a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3). The Bankruptcy Appellate Panel of the Ninth Circuit has recognized that:

> One of the most powerful weapons in a bankruptcy trustee's arsenal is the "strong arm" power of Section 544(a)(3) to recover real property, subject to the same limitations that a bona fide purchaser would have when acquiring that property from the debtor outside of bankruptcy.  Trustees for decades have defeated unperfected liens and unrecorded transfers, all to the benefit of unsecured creditors in bankruptcy.

*Taxel v. Chase Manhattan Bank, USA, N.A. (In re Deuel),* 361 B.R. 509, 511 (B.A.P. 9th Cir.

2006).  In this case, the question is whether a bona fide purchaser of the NOI, whose interest was

perfected as of the petition date, would be paramount to the unrecorded 1999 ORRIs?

Although the avoidance powers of Bankruptcy Code § 544(a) arise under federal law,

"the scope of these avoidance powers vis-a-vis third parties is governed entirely by the

substantive law of the state in which the property in question is located as of the bankruptcy

petition's filing."  *Midlantic Nat'l Bank v. Bridge (In re Bridge),* 18 F.3d 195, 200 (3d Cir.

1994).  "The incorporation of state law in this regard establishes that '[w]herever under the

applicable law such a creditor or bona fide purchaser might prevail over prior transfers, liens,

encumbrances or the like, the trustee will also prevail.'"  *Id.,* quoting 4 *Collier on Bankruptcy,*

¶544.01 at 544-3 (15th ed. 1993).

Accordingly, California law applies here.[23]  Because overriding royalty interests are

interests in real property under California law (*see, supra.,* citing *Honolulu Oil Corp. v. Kennedy,*

251 F.2d 424, 429 (9th Cir. 1957)), holders must duly record their interests to provide

constructive notice to a subsequent purchaser or mortgagee.  Cal. Civ. Code §§ 1213, 1214.[24]

---

[23]Under the Outer Continental Shelf Lands Act ("OCSLA"), the laws of the adjacent state are
applied, generally, to oil and gas producing properties located on the outer continental shelf.  *See* 43
U.S.C. § 1333(a)(2)(A).

[24]Cal. Civ. Code § 1213 provides:
Every conveyance of real property . . . acknowledged or proved and certified and recorded
as prescribed by law from the time it is filed with the recorder for record is constructive
notice of the contents thereof to subsequent purchasers and mortgagees; . . .

Cal. Civ. Code § 1214 provides:
Every conveyance of real property . . . is void as against any subsequent purchaser or
mortgagee of the same property, or any part thereof, in good faith and for a valuable
consideration, whose conveyance is first duly recorded, and as against any judgment
affecting the title, unless the conveyance shall have been duly recorded prior to the record
of notice of action.
*See also* Cal. Civ. Code § 1169 (Place of recordation).

BWAB and Larson contend that, under California law, recording their interests in the 1999 ORRIs would not provide constructive notice to subsequent purchasers because *Delta did not record its interest in the NOI*. Recording the 1999 ORRIs would result in "wild deeds" that would not appear in the chain of title for the Properties, since applicable state records show Whiting as the holder of the Properties. Because there is no record of a transfer from Whiting to Delta, the Defendants cannot record the transfers of interest from Delta to BWAB and Larson. *See Far West Sav. & Loan Assn. v. McLaughlin,* 201 Cal.App.3d 67, 73, 246 Cal.Rptr. 872, 875 (Cal.Ct.App. 1988) ("If an instrument cannot be located by searching the "grantor" and "grantee" indices of the public records, the instrument does not constitute constructive notice and later bona fide purchasers or encumbrances are not charged with knowledge of its existence.")

The Defendants further argue that the avoiding power in Bankruptcy Code § 544(a)(3) applies only if "applicable law permits such a transfer to perfected," and since it was impossible for BWAB and Larson to record their interests in the 1999 ORRIs under California law, then §544(a)(3) does not apply. The Court of Appeals for the Third Circuit has determined:

> [T]he language "against whom applicable law permits such a transfer to be perfected" was included in § 544(a)(3) "so as not to require a creditor to perform the impossible in order to perfect his interest." [124 Cong. Rec. 32,400 (1978) (statement of Rep. Don Edwards of California, a sponsor of the proposed Code), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6456.] The case law has uniformly recognized that this legislative history indicates Congress in enacting § 544 (a)(3) "did not intend to transform the trustee into a 'super-priority' creditor," *In re Elin,* 20 B.R. 1012, 1018-19 (D.N.J. 1982) . . . , or to grant the trustee "a substantial additional mantle of power not available to any actual [creditor or] subsequent purchaser [under state law]," *McCannon v. Marston,* 679 F.2d 13, 16-67 (3d Cir. 1982).

*Bridge,* 18 F.3d at 200. Accordingly, when avoiding a transfer under § 544(a)(3), the trustee's power is no greater (and no less) than that available to a bona fide purchaser under applicable state law.

27

I disagree with the Defendants' position that their real property interests could not be recorded. California law allows ORRIs to be perfected by recording and the fact that recording these particular ORRIs would result in "wild deeds" does not alter this. In the *Far West* decision, the California Court of Appeals determined that a second grantee, who purchases for value and records first, prevails over a first grantee whose recording was ineffective because it was outside the chain of title, *i.e.,* a "wild deed."[25] *Far West*, 201 Cal.App.3d at 73-74. Even if the Defendants had recorded the 1999 ORRIs as "wild deeds," the recording would not be effective against a subsequent purchaser for value.[26] BWAB and Larson accepted the 1999 ORRIs

---

[25]The facts in *Far West* included the following:

| | |
|---|---|
| June 1982 | Geiger obtains record title to the subject property and grants a deed of trust to a Savings and Loan, which is recorded that same day; |
| July 8, 1982 | Geiger executes a deed transferring title to GTB Properties, which is **not recorded** until almost a year later; |
| Aug. 3, 1982 | GTB Properties grants a deed to trust to McLaughlin, which is recorded on August 10, 1982 (the "McLaughlin DOT"); |
| July 1, 1983 | Four documents are recorded in the following order: |

         (i)     a "reconveyance" of the McLaughlin DOT (which the Court deemed a "nullity" as signed by a nonparty) (*see* 201 Cal.App.3d at 70 n.1);

        (ii)    a deed from Geiger granting fee title to GTB Properties;

        (iii)   a deed from GTB Properties granting fee title to Stapleton;

        (iv)   a deed of trust from Stapleton to Far West Bank

The *Far West* Court determined that the McLaughlin DOT was filed before GTB Properties obtained record title and, therefore, did not provide constructive notice to the later grantee. *Far West,* 201 Cal.App.3d at 73. The later recordation of the deed from Geiger to GTB Properties did not bring the McLaughin DOT into the chain of title. *Id.* at 74. "To accomplish that, Mclaughlin would have to record the [McLaughlin DOT] again, *after the grant deed to GTB had been recorded, and before Far West gave value.* This, of course, did not happen." *Id.* (emphasis in original).

[26]Moreover, even if the 1999 ORRIs were determined to be equitable interests in the real property, the Ninth Circuit has held that equitable interests in real property are avoidable under Bankruptcy Code § 544(a)(3). *Zeigler v. Hathaway Ranch P'ship (In re Hathaway Ranch P'ship),* 127 B.R. 859, 864 (Bankr. C.D. Cal. 1990).

knowing that neither the NOI nor the 1999 ORRIs would be recorded.  Even assuming that the

parties intended the NOI and the 1999 ORRIs to be real property interests, they also had to know

that failing to record their real property interests would make them susceptible to claims of

intervening encumbrances and purchasers for value under applicable California state law.

BWAB and Larson also argue, however, that the purchaser of an interest from the

Debtors would notice that the Debtors' NOI was unrecorded, which, in turn, would place the

purchaser on "inquiry notice" of other unrecorded interests, such as the 1999 ORRIs.  California

Civil Code § 19 provides that "[e]very person who has actual notice of circumstances sufficient

to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself

in all cases in which, by prosecuting such inquiry, he might have learned such fact."  The

question, here, is whether a prudent purchaser, based on the knowledge available to him on the

Petition Date, would have made an inquiry into the possibility that there were unrecorded

overriding royalty interests in the NOI.  A California bankruptcy court has decided:

> [C]ase law in the Ninth Circuit provides that where the physical condition or
> possession  of the property indicates that there may be an unrecorded interest in the
> property, a prospective purchaser must inquire as to whether any unrecorded interests
> do in fact exist. . . . The reasoning behind this doctrine is that whenever the physical
> condition or nature of possession of the property is unusual or different from that
> which would be expected based on record title, a prudent purchaser would not ignore
> such evidence but would inquire into the reason for the unusual circumstances.

*Swiss Bank Corp. v. Van Ness Assoc., Ltd. (In re Van Ness Assoc., Ltd.),* 173 B.R. 661, 670

(Bankr. N.D. Cal. 1994). "A prudent purchaser is charged with knowledge that a reasonable

inspection of the Property would have revealed." *Id.* at 671.  In *Van Ness*, the Court determined

that the unique size and location of the piece of property in question (*i.e.,* a strip of land across a

larger property, lying directly under a commercial office building) was likely to be subject to an

unrecorded lien in favor of the entity holding a lien on the building and adjacent property.  *Id.*

Similarly, when a person's possession of property is technically inconsistent with record title,

California courts will find that a prospective purchaser has a duty to inquire about the

inconsistency and is charged with constructive notice of all facts that would be revealed by a

reasonably diligent inquiry.  *In re Weisman,* 5 F.3d 417, 421-22 (9th Cir. 1993) (Chapter 7 trustee

had a duty to inquire as to whether divorced debtor retained tenancy-in-common ownership

interest in property in light of former husband's occupation of property with new wife.)

Courts have also determined that inaccuracies in a recorded instrument can trigger a duty

of further inquiry.  *10 Maple Assoc., LLC v. Westamerica Bank (In re 10 Maple Assoc.*), 2012

WL 2576465, *4 (Bankr. N.D.Cal. Jul. 3, 2012) (Different loan amounts appearing in a recorded

deed of trust requires further inquiry; a "good faith purchaser is not entitled to interpret

ambiguities in his own favor nor is he entitled to ignore reasonable warning signs that appear in

the recorded documents.") Previous overriding royalties against the Properties were recorded.

There is nothing in the recorded documents or the unrecorded NOI that would place a

prospective purchaser on inquiry notice about unrecorded additional royalty interests.

Based on the foregoing, I conclude that - - assuming that the 1999 ORRIs were real

property interests - - the Plaintiffs can avoid any priority status of the unrecorded 1999 ORRIs

pursuant to Bankruptcy Code § 544(a)(3).

(4)     Assuming the 1999 ORRIs are not real property interests, are they claims that
        were discharged by the Plan?

The Plaintiffs argue that the 1999 ORRIs are contractual rights to payment that have been

discharged by the terms of the confirmed Plan because BWAB and Larson failed to file claims

before the applicable bar date.  The Defendants argue that, even if the 1999 ORRIs are personal

property interests, Plan confirmation did not strip the Defendants of their interests because they

did not have claims at the time of confirmation.[27]  The Defendants note that all amounts owing

under the 1999 ORRIs were paid pre-petition and through the Plan's Effective Date.  Relying on

*Exide Technologies,* the Defendants argue that there were no claims arising prior to the effective

date because there were no pre-confirmation breaches.  *See Exide Tech.,* 2013 WL 85193 at *6.

        The Defendants' reliance on *Exide* is misplaced.  In *Exide*, the defendant had been

granted (among other things) a pre-petition license to use certain trademarks and tradenames.

The debtor sought to reject that contract, but the Third Circuit Court of Appeals decided that the

agreement was not an executory contract and could not be rejected.  *Id.*  at *2 citing *In re Exide*

*Tech.,* 607 F.3d 957 (3d Cir. 2010).  Thereafter, the debtor filed an adversary proceeding seeking

a declaratory judgment stating that the defendant's rights under the trademark license were

"claims" that were discharged by confirmation of the plan.  However, the trademark license at

issue in *Exide* did not provide for any payments due from the debtor to the defendant. I

determined that the debtor's complaint did not allege that the defendant had a dischargeable

"claim," writing:

        While the Bankruptcy Code's definition of claim is undeniably broad, it is not

---

[27]BWAB also argues that if the 1999 ORRI is not a real property interest, it was an executory contract. "An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Enterprise Energy Corp. v. United States (In re Columbia Gas System, Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995) quoting *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 39 (3d Cir. 1989).  There is nothing in the uncontested facts to support a finding that BWAB or Larsen had any remaining material obligations to the Debtors.

without limit.[28]  The definition of a "claim" includes a "right to payment" that may be contingent or unmatured, but it necessarily requires a pre-confirmation event that triggers a "right to payment," whether based upon a breach of contract, tortious conduct, or a prepetition contract that provides for a right to payment, even if that right to payment is contingent.

*Exide*, 2013 WL 85193 at *5 (footnotes omitted).  Unlike the defendant in *Exide*, the 1999

ORRIs are pre-petition contracts providing for payments from the Debtors to BWAB and Larson.

Although there was no breach prior to the Effective Date, the contractual right to payment is a

claim within the definition in Bankruptcy Code § 101(5).

Accordingly, to the extent that the 1999 ORRIs are contractual rights to payment, they are

"claims" that are subject to the discharge provisions of the Debtors' confirmed Plan.

(C)    The Plaintiffs' Remaining Claims for Avoidance of Post-Petition Payments and Excess Payments

(1)    Post-Petition Payments

The Complaints seek further relief regarding the recovery of the post-petition payments

made by the Debtors to BWAB and Larson pursuant to the 1999 ORRIs (the "Post-Petition

Payments").[29]  The Debtors obtained Court approval to pay post-petition overriding royalty

---

[28]The Bankruptcy Code defines a "claim" to mean:

(A)    right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B)    right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

[29]The Plaintiffs also seek summary judgment against BWAB on their claims for repayment or turnover of post-petition payments made to BWAB based on the 1994 ORRI (the "1994 Post-Petition Payments").  Because I have decided that the 1994 ORRI is not avoidable, I will deny the Plaintiffs'

(continued...)

32

interests and royalties by Orders dated December 19, 2011 and February 13, 2012 (Main Case

D.I.s 66, 296).  The Complaints allege that, pursuant to these orders, BWAB received payments

totaling $412,301.90[30] and Larson received payments totaling $74,243.49 pursuant to the 1999

ORRIs after the bankruptcy filing and prior to Plan confirmation.

The Plaintiffs argue that, because § 544(a)(3) avoids the 1999 ORRIs as of the

commencement of the case, BWAB and Larson were not entitled to receive any Post-Petition

Payments.  The Plaintiffs seek recovery of the Post-Petition Payments under Bankruptcy Code

§§ 542(a) and 549, as well as theories of unjust enrichment and fraudulent transfer.

(a)    Section 542(a)

The Plaintiffs argue that the Defendants should return the Post-Petition Payments

pursuant to Bankruptcy Code § 542(a), which requires:

> [A]n entity, other than a custodian, in possession, custody, or control, during the case,
> of property that the trustee may use, sell, or lease under section 363 of this title, . . .
> shall deliver to the trustee, and account for such property or the value of such
> property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).  Section 363(b) allows a trustee to use, sell or lease "property of the estate,"

which is defined in § 541.  The Plaintiffs argue that the Post-Petition Payments constituted

property of the estate that should have been available to the Debtors because, for the reasons

discussed above, the 1999 ORRIs were avoidable as of the Petition Date.

---

[29](...continued)
request for judgment for repayment or turnover of the 1994 Post-Petition Payments based on claims of
unjust enrichment, fraudulent transfer, or Bankruptcy Code §§ 542(a) or 549.  The foregoing does not
apply to the Plaintiffs' claim against BWAB for repayment of *excess* 1994 Post-Petition Payments due to
an alleged miscalculation of the 1994 ORRI., which is addressed *infra.*

[30]The Plaintiffs allege that BWAB received a total of $507,980.42 in post-petition payments, of
which $95,678.52 were "excess payments."

However, § 541(b)(4)(B) indicates that property of the estate does *not* include certain

overriding royalty interest payments, as follows:

> (b)    Property of the estate does not include - -
>
> . . . .
>
>> (4)    any interest of the debtor in liquid or gaseous hydrocarbons to the extent that  - -
>>
>> . . . .
>>
>>> (B)(i)  the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation property from which such production payment is transferred; and
>>>
>>> (ii)   but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of this title.

11 U.S.C. § 541(b)(4)(B). Bankruptcy Code § 101(42A) defines a "production payment" as "a

term overriding royalty satisfiable in cash or in kind - - (A) contingent on the production of a

liquid or gaseous hydrocarbon from particular real property; and (B) from a specified volume, or

a specified value, from the liquid or gaseous hydrocarbon produced from such property, and

determined without regard to production costs."  Bankruptcy Code § 101(56A) [53D] defines the

term "term overriding royalty" to mean "an interest in liquid or gaseous hydrocarbons in place or

to be produced from particular real property that entitles the owner thereof to a share of

production, or the value thereof, for a term limited by time, quantity, or value realized."

Neither party's brief addresses the issue of whether the 1999 ORRIs fall within the

definition of a "production payment" or "term overriding royalty," which would, in turn, exclude

the 1999 ORRIs from "property of the estate" pursuant to §541(b)(4)(B).  There is little, if any,

case law interpreting these provisions. The parties will be given an opportunity to brief this issue.

(b)    Section 549(a)

The Plaintiffs also seek repayment of the Post-Petition Payments under Bankruptcy Code

§ 549, which allows a trustee to avoid a transfer of property of the estate that (1) occurs after the

commencement of the case; and (2) is not authorized under this title or by the Court.[31]  11 U.S.C.

§ 549(a).   The parties do not dispute that the Debtors were authorized to make the Post-Petition

Payments pursuant to the Orders dated December 19, 2011 and February 13, 2012.  The

Plaintiffs, however, point out that the Orders included a provision stating: "[n]othing in the

Motion or in this Order shall be construed as impairing the Debtors' right to contest the validity,

priority or amount of any Royalties or ORRI that may be due to any of the Royalty Owners or

ORRI Owners."  The Plaintiffs argue that reserving the right to challenge the validity of the

payments allows them to seek repayment of the Post-Petition Payments after a determination that

1999 ORRIs' priority real property interest is avoidable pursuant to Bankruptcy Code §544(a)(3).

While I agree that the reservation of rights language in the Orders allows the Plaintiffs to

challenge the Post-Petition Payments, I disagree that the provision permits the Plaintiffs to

recover those payments *under Bankruptcy Code § 549.*  The right to contest the validity of the

payments under other Bankruptcy Code sections or legal theories does not "un-authorize" those

payments.  The Post-Petition Payments were made pursuant to an Order of this Court and,

therefore, cannot be avoided pursuant to § 549(a).  *Grede v. FCStone, LLC,* 746 F.3d 244, (7th

Cir. 2014) (holding that a liquidation trustee appointed under the debtor's confirmed chapter 11

plan could not avoid a post-petition transfer under § 549 if the transfer was authorized by the

---

[31]If the Debtors' interests that were transferred to the Defendants under the 1999 ORRIs are
excluded from "property of the estate" pursuant to Bankruptcy Code § 541(b)(4)(B), then the Post-
Petition Payments could not be avoided pursuant to § 549.

court); *see also In re Kmart Corp.*, 2006 WL 952042, *7 (Bankr.N.D. Ill. Apr. 11, 2006)

([Section 549(a)(2)(B)] provides protection to all transferees under court orders, whether

erroneously entered or not, that are not subsequently reversed.).

    (c)    <u>Unjust Enrichment</u>

    Alternatively, the Plaintiffs seek recovery of the Post-Petition Payments under the

equitable theory of unjust enrichment, arguing that § 544(a)(3) avoids the priority status of the

1999 ORRI as of the Petition Date, and any royalties received post-petition unfairly benefitted

BWAB and Larson to the detriment of other general unsecured creditors.  "Unjust enrichment is

defined as 'the unjust retention of a benefit to the loss of another, or the retention of money or

property of another against the fundamental principles of justice or equity and good conscience.'"

*Warhanek v. Bidzos*, 2013 WL 5273112, *11 (D.Del. Sept. 18k, 2013) quoting *Tolliver v.*

*Christina Sch. Dist.,* 564 F.Supp.2d 312, 315 (D.Del. 2008).  The *Warhanek* Court further wrote:

> To establish a claim for unjust enrichment, a plaintiff must show: "(1) an enrichment,
> (2) an impoverishment, (3) a relation between the enrichment and impoverishment,
> (4) the absence of justification, and (5) the absence of a remedy provided by law."
> *Nemec v. Shrader,* 991 A.2d 1120, 1130 (Del. 2010).  Unjust enrichment is a theory
> of recovery to remedy the absence of a formal contract. *Bakerman v. Sidney Frank*
> *Importing Co., Inc.,* C.A. No. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10,
> 2006).  Therefore, claims of unjust enrichment may survive a motion to dismiss when
> the validity of the contract is in doubt or uncertain.  *In re Student Fin. Corp.,* C.A.
> No. 03-507-JJF, 2004 WL 609329, at *7 (D.Del. Mar. 23, 2004).

*Warhanek,* 2013 WL 5273112, *7.

    Through this adversary proceeding, the Plaintiffs have successfully challenged the

priority status of the 1999 ORRIs under § 544(a)(3); however, the contract for the overriding

royalty interests remains.  Because the Defendants did not file proofs of claim asserting their

rights under the contracts, the claims are discharged by confirmation of the Plan as of the Plan's

Effective Date.  However, the payments at issue were received post-petition, but pre-confirmation.  During that time there was a contract in place and court-approved payments were made in connection with those contracts. In seeking approval to pay the Post-Petition Payments, the Debtors argued that the payments were part of the ordinary course of its business. (Main Case D.I. 9, ¶14.)  Because the Post-Petition Payments were made in accordance with the terms of a valid contract, the Plaintiffs' claim for unjust enrichment must be denied.

      (d)    <u>Fraudulent Transfer</u>

The Plaintiffs also contend that the Post-Petition Payments were fraudulent transfers. In order to establish a fraudulent transfer claim under Delaware law, which is applicable hereto pursuant to Bankruptcy Code § 544(b), the Plaintiffs must prove (i) that the debtor made a transfer, (ii) for less than reasonably equivalent value, and (iii) that the debtor was, or was rendered, insolvent thereby.  *Brandt v. Trivest II, Inc., (In re Plassein Int'l Corp.),* 2008 WL 1990315, *5 (Bankr.D.Del. May 5, 2008); Del. Code Ann. tit. 6 §§ 1304-1305.

The Plaintiffs must show that the uncontested facts support a finding that the Debtors did not receive reasonably equivalent value for the Post-Petition Payments.[32]  In discussing reasonably equivalent value, the *Plassein* Court wrote:

---

[32]There is no issue that the Post-Petition Payments were transfers by the Debtors,. The Plaintiffs also argue in a footnote that the record in the chapter 11 cases establishes that the Debtors were insolvent during the post-petition period "beyond any doubt."  Plaintiff Mem. (Adv.D.I. 35), n. 32 (arguing that the Reorganized Debtors were valued on a going-concern basis at $100-$110 million as of the assumed projected effective date of September 1, 2012, and the estimated midpoint for the total value available for distribution to creditors was approximately $180 million, which was substantially less than the Debtors' liabilities of $310.7 million as of the Petition Date.  *See* Disclosure Statement at 6, Ex. 5 at 1; First Day Declaration (Main Case D.I. 18) at 9-13.)

> Determining whether a transfer was made for reasonably equivalent value is a two-step inquiry.  First the court must determine if the debtor received any value.  If the court concludes that the debtor received value for the transfer, the court must then determine whether value received is reasonably equivalent to the value transferred.

*Plassein*, 2008 WL 1990315, *5 citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc., (In re R.M.L., Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996).

The Plaintiffs argue that the Defendants could not give reasonably equivalent value - - or any value - - to the Debtors in exchange for the Post-Petition Payments because, pursuant to §544(a)(3), the Plaintiffs successfully challenged the priority status of the 1999 ORRIs. However, §544(a)(3) allows the Plaintiffs to avoid the priority obligation of the Debtors under the 1999 ORRIs, but not the underlying contracts.  The Debtor sought Court approval to make Post-Petition Payments as ordinary course of business payments under the terms of the 1999 ORRI contracts.  Whether the Defendants have given reasonably equivalent value for the Post-Petition Payments is a fact-intensive inquiry that cannot be resolved on the summary judgment record before me.

The Plaintiffs request for summary judgment seeking the recovery of the Post-Petition Payments as fraudulent transfers will be denied.

(2)    Excess Payments

The Plaintiffs also seek recovery of "excess payments" to BWAB based upon an alleged miscalculation of the amounts due under the 1994 ORRI and the 1999 BWAB ORRI (the "Excess Payments").  The parties, however, have not fully developed a record of uncontested facts regarding the calculation of the Excess Payments.  Because there are issues of material fact, the Plaintiffs' request for summary judgment with respect to "excess payments" will be denied.

## **CONCLUSION**

For the reasons set forth above, the cross-motions for summary judgment will be granted, in part, and denied, in part, as follows:

(i)     Avoidance and Recovery of the 1999 ORRIs - The Plaintiffs' request for summary judgment on avoidance of the 1999 ORRIs will be granted because, assuming that the 1999 ORRIs are real property interests, the priority obligations based on those interests are avoidable pursuant to Bankruptcy Code § 544(a)(3);

(ii)    Enforcement of Plan Discharge - The Plaintiffs' request for summary judgment on regarding discharge of the 1994 ORRI and the 1999 ORRIs as of the Plan's Effective Date, and vesting of the NOI in the Reorganized Debtors free and clear of 1994 ORRI and 1999 ORRIs, will be denied, in part, as to the 1994 ORRI, and will be granted, in part, as to the 1999 ORRIs;

(iii)   Unjust Enrichment and Clawback of Excess Payments and Post-Petition Payments The Plaintiffs' request for summary judgment on claims to recover Excess Payments and Post-Petition Payments based on unjust enrichment will be denied;

(iv)    Post-Petition State Law Fraudulent Transfers - The Plaintiffs' request for summary judgment for recovery of Excess Payments and Post-Petition Payments under state fraudulent transfer law will be denied;

(v)     Avoidance and Recovery of Post-petition Transfers under § 549 -  The Plaintiffs' request for summary judgment on recovery of Post-Petition Payments under Bankruptcy Code § 549 will be denied; and

(vi)   <u>Turnover of Post-Petition Payments under § 542(a)</u> - The Plaintiffs' request for

summary judgment for turnover of the Post-Petition Payments under § 542(a) will

be denied, without prejudice, pending further briefing on this issue.

The Plaintiffs did not seek summary judgment on Counts VII and IX in the BWAB

Complaint.  BWAB's and Larson's cross-motions for summary judgment will be granted, in part,

and denied, in part, consistent with the foregoing.

An appropriate Order follows.


BY THE COURT:


KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  April 2, 2015